UNITED STATES DISTRICT COURT
IN THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

JULIAN ALMANZA, ALEJANDRO DAVISON,
ANA ESCOBAR, NICOLAS ARROYO,
MIGUEL OROZCO and AIDA PEREZ, individually,
and on behalf of all others similarly situated,

      Plaintiffs,

vs.

UNITED AIRLINES, INC., a corporation;
DELTA AIRLINES, INC., a corporation;
AMERICAN AIRLINES, INC., a corporation;
AEROVIAS DE MEXICO S.A. DE C.V.,
a corporation; CONCESIONARIA VUELA
COMPAÑÍA DE AVIACIÓN, S.A.P.I. DE C.V.,
a corporation; ABC AEROLÍNEAS, S.A. DE C.V.,
a corporation, and U.S. AIRWAYS, INC.

      Defendants.

_____/

|  |
|---|
| **CLASS ACTION COMPLAINT AND JURY DEMAND** |

LOVETT BENNETT, JR.
ATTORNEY AT LAW, P.C.
Lovett Bennett, Jr.
Georgia Bar No. 051601
Florida Bar No. 370894
*Attorney for Plaintiffs*
21 Courtland Street
P.O. Box 632
Statesboro, Georgia  30459-0632
(912) 764-3122 telephone
lovett@bennettlawfirmonline.com

OLIVER MANER LLP
Patrick T. O'Connor
Georgia Bar No. 548425
Benjamin M. Perkins
Georgia Bar No. 140997
*Attorneys for Plaintiffs*
P.O. Box 10186
Savannah, GA 31412
(912) 236-3311 telephone
(912) 236-8725 facsimile
pto@olivermaner.com
bperkins@olivermaner.com

WILLIAMS KHERKER HART
BOUNDAS, LLP
Steven Kherkher
(Pro Hac Vice motion to be filed)
Sean McCarthy
(Pro Hac Vice motion to be filed)
*Attorneys for Plaintiffs*
8441 Gulf Freeway, Suite 600
Houston, TX 77017
(713) 230-2200 telephone
(713) 643-6226 facsimile
skherkher@williamskherkher.com
smccarthy@williamskherkher.com

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski
Matthew J.M. Prebeg
(Pro Hac Vice motion to be filed)
Sarah Rickard
Matthew J.M. Prebeg
(Pro Hac Vice motion to be filed)
*Attorneys for Plaintiffs*
One Towne Square, Suite 1700
Southfield, MI 48076
Telephone: 248.355.0300
Fax: 248.936.2140
akochanowski@sommerspc.com
srickard@sommerspc.com

LAW OFFICE OF MARK E. LEWIS
Mark E. Lewis
Matthew J.M. Prebeg
(Pro Hac Vice motion to be filed)
*Attorney for Plaintiffs*
3730 Kirby Dr., Suite 1030
Houston, TX 77098
Tel. (713) 936-9285
mlewis@mlewis-law.com

PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(Pro Hac Vice motion to be filed)
Christopher Faucett
(Pro Hac Vice motion to be filed)
Stephen W. Abbott
(Pro Hac Vice motion to be filed)
Brent T. Caldwell
(Pro Hac Vice motion to be filed)
*Attorneys for Plaintiffs*
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
cfaucett@pfalawfirm.com
sabbott@pfalawfirm.com
bcaldwell@pfalawfirm.com

LAW OFFICE OF CAROL S. BUTNER
Carol S. Butner
Matthew J.M. Prebeg
(Pro Hac Vice motion to be filed)
*Attorney for Plaintiffs*
5009 Caroline Street, Suite B
Houston, TX 77004
Tel. (713) 598-7814
Fax (713) 583-0470
carol@butnerlaw.com

## COMPLAINT

Plaintiffs Miguel Orozco, Julian Almanza, Alejandro Davison, Ana Escobar, Nicolas Arroyo, and Aida Perez – individually and on behalf of the class of injured persons they represent – for their Complaint against Defendants Delta Airlines, Inc. ("Delta"); United Airlines, Inc. ("United"); American Airlines, Inc. ("American"); Aerovias De Mexico S.A. De C.V., Inc. ("Aeromexico"); Concesionaria Vuela Compañía de Aviación, S.A.P.I. De C.V. ("Volaris"); ABC Aerolíneas, S.A. De C.V. ("Interjet"); and US Airways, Inc. ("US Airways") (collectively, "Defendants") allege as follows:

## INTRODUCTION

1.       This Racketeer Influenced Corrupt Organizations, 18 U.S.C. §§1961 – 1968, ("RICO") class action arises out of a scheme developed and implemented by the Defendants to knowingly and wrongfully charge Mexican Nationals, children under the age of two, and foreigners with resident status in Mexico, including the Plaintiffs and the class they represent, a "Mexico Tourism Tax"[1] which the Plaintiffs did not owe, for flights between the United States and Mexico.  While representing to the Plaintiffs and class members otherwise, the Defendants are not authorized by the Mexican Government to collect the Mexico Tourism Tax from citizens of Mexico, children under the age of two, and foreigners with resident status in Mexico, among others.  Nonetheless, absent from the face of the tickets, but buried in the details of the costs and fees of each ticket purchased by Plaintiffs and the class they represent, is a line item for a Mexico Tourism Tax (an amount that varies, but that is usually between $20.00 and $25.00) that Defendants know is not applicable to Plaintiffs and the class they represent.

---

[1] Also referred to as a "Mexican Tourism Tax," "UK," "UK Tax," "UK Fee," "DNR," and "DNI Tax," among other names and acronyms)

2.      Defendants have engaged in a multi-year, multi-million dollar scheme to swindle the Plaintiffs and the class they represent (sometimes collectively referred to as the "Exempt Travelers") by collecting a Mexico Tourism Tax from Exempt Travelers when Defendants knew the Exempt Travelers were not subject to the tax, and instead knowingly, in concert with each other and with a co-conspirator Mexican-based organization, retaining the illegally-collected tax which the Exempt Travelers were not required to pay.

3.      The Plaintiffs and each of the putative class members were injured in exactly the same manner – the Defendants made each pay money (fraudulently representing it was a tax which the Mexican government required the Defendants to collect from the class) that they did not owe, in conjunction with air travel to Mexico on flights operated by the Defendants, and retained the unlawfully-collected money in spite of knowledge that the Mexican government did not authorize the Defendants to collect the money from Exempt Travelers.

## BACKGROUND

4.      Defendants are international air transportation companies and members of "Camera Nacional de Aerotransportes" ("CANAERO"). CANAERO is a Mexican legal entity composed of an association of airlines that transport passengers to and from Mexico and the United States, among other countries.   Each of the Defendants is a member of CANAERO. Each of the Defendants regularly participates in meetings with each other and various Mexican authorities under the aegis of CANAERO.

5.      The Mexico Tourism Tax is a mandatory fee charged by the Government of Mexico on certain travelers who land within Mexico on flights originating outside of Mexico. However, under the terms of the taxing legislation, certain groups of individuals are exempt from the tax, most notably Mexican nationals and children under the age of two years old.  Beginning on or

about June 30, 1999 (or about the dates that each Defendant began operating flights to/from Mexico), Defendants, together with other airlines, were signatories to the "CANAERO Contract".[2] CANAERO, on behalf of the airlines within its organization, entered into the CANAERO Contract with the Mexican Government so that, at least in part, procedures could be implemented by which the Defendants and other airlines could collect certain taxes from certain passengers travelling into Mexico from abroad. The CANAERO Contract (also referred to as the "Agreement") specifically identified certain groups of individuals from which the CANAERO airlines could not collect these certain taxes. The group of individuals, the Exempt Travelers, include the Plaintiffs and the class they represent (*i.e.,* citizens of Mexico, children under the age of two, and foreigners with resident status in Mexico).

6.     On information and belief, this complaint marks the first instance in which the CANAERO Contract itself has been publicly disseminated. Indeed, CANAERO and the Defendants have actively concealed the existence and specific terms of the CANAERO Contract from the public, including the Plaintiffs, and from other courts for many years. As such, the Plaintiffs and the class they represent could not have discovered their injuries previously. The existence of the CANAERO Contract is relevant to Defendants' knowledge of their scheme to swindle the putative class members.

7.     The CANAERO Contract provides a "Procedure for the Collection and Payment of the Non-Immigrant Fees to the National Institute of Migration" (the "PROCEDURES").[3] Via the Agreement, Defendants agreed to remit to the Mexican government the Mexico Tourism Tax that the airlines properly collected from non-Exempt Travelers (*i.e.,* passengers actually subject to the

---

[2] Specifically, the contract [translated into English] states it is an agreement among the airlines, CANERO [defined above], and Mexico's Department of the Interior. *See* CANAERO Contract, Exhibit 1, at 1 [Preamble].
[3] *See* PROCEDURES [translated to English], Exhibit 2.

tax) using manifests and a designated form the Defendants would complete for each flight showing the number of passengers per flight to whom the tax applied.[4]  But rather than collecting the tax from just the passengers subject to the tax, the Defendants have illegally collected the tax from Exempt Travelers as well (i.e. the Plaintiffs and the class they represent), while representing to the Exempt Travelers that they are required to pay the tax.

8.      Under the Agreement, the Defendants specifically agreed not to collect the Mexico Tourism Tax from the Exempt Travelers.[5]

9.      Under the Agreement, the Defendants agreed to have mechanisms in place to distinguish the cases in which the Mexico Tourism Tax does not apply; *e.g.,* in the instance of Mexican Nationals and other Exempt Travelers who acquired airfare tickets for travel into Mexico.[6]  This requirement exists to ensure assessment of the Mexico Tourism Tax solely against those travelers to Mexico whose travel is taxable.[7]  In appropriate cases, for example when the Mexico Tourism Tax is inappropriately assessed by a CANAERO affiliated company (such as

---

[4] *See* CANAERO Contract *at* pgs. 5-6 (section (D)).
[5] The PROCEDURES provide: "The fee for non-immigrants 'DNI,' shall not be charged in any of the following cases:

    (A) Mexican citizens.
    (B) Non-Mexican passengers, while in connection or transit, traveling abroad with a stay of less than 24 hours at the connection or transit site inside the national territory.
    (C) Deported and/or rejected travelers.
    (D) Minors up to two years of age (infants).
    (E) Service crew.
    (E) [sic]Foreigners with resident status in Mexico.
    (F) Aeronautic Technical Personnel in Service, Protected by Migratory Form FM3."

*Id.* at 1.
[6] *See* CANAERO Contract, Exhibit 1, at page 5 (section (C)).
[7] *Id.*

each of the Defendants) against an Exempt Traveler (such as the Plaintiffs and the class they represent), the airline agreed to ensure that a refund is provided.[8]

10.     Since 1999 (or about the dates that each Defendant began operating flights to/from Mexico), rather than collect only the tax that should have been charged by not requiring, the Defendants on information and belief, have obtained, retained, and reinvested those improperly collected taxes into their respective operations.   Throughout the period of the CANAERO Contract, despite collecting, registering, knowing, and/or having constructive knowledge of their passengers' passport numbers and nationalities (information collected online or by sales agents when the passengers would buy their tickets to Mexico and, significantly, information that instantly identifies passengers who are exempt from the tax) the Defendants systematically and improperly: (1) charged Exempt Travelers the Mexico Tourism Tax, (ii) concealed from Exempt Travelers that they were not subject to the Mexico Tourism Tax, (iii) failed to offset ticket prices charged for such Exempt Travelers, and (iv) failed to refund the tax.   These actions and omissions harmed the Plaintiff class in exactly the same manner.   Each putative class member paid money to the Defendants (under the aegis of a legitimate tax) they did not owe, because the Defendants represented to each member of the class that they owed the tax, and the Defendants did not refund the tax as they were required to do after illegally collecting the tax.

11.     In recent years, various Exempt Traveler plaintiffs brought lawsuits against members of CANAERO, including two of the Defendants here, related to the improper collection of the Mexico Tourism Tax.   The theories of liability in those cases were based upon state law contract arising from the contractual relationship between the plaintiff air travelers and the airline defendants vis-à-vis their air fare tickets and the airline defendants' contracts of carriage.

---

[8] *Id.*

Representative examples of such suits include, *Sanchez v. Aerovias de Mexico, S.A. De C.V.*, 590 F.3d 1027 (9th Cir. 2010) and *McMullen v. Delta Airlines, Inc.*, 361 Fed.Appx. 757 (9th Cir. 2010). In each case, the courts determined that the dispute was subject to the Airline Deregulation Act of 1978 (here, the "ADA"), and held that the plaintiffs could not make the requisite showing that their causes of action were exempted from the ADA due, in part, to the fact that the airlines had undertaken no self-imposed obligation *not to collect* the Mexican tax from all passengers to Mexico, regardless of whether they are exempt from the tax.

12.     To Plaintiffs' knowledge, the defendants in those cases, all members of CANAERO and signatories to the Agreement, while acknowledging the existence of a Mexico Tourism Tax, never disclosed in any of these prior lawsuits the existence of the CANAERO Contract or that the airlines had willingly undertaken the obligation, through the express terms of the CANAERO Contract, to refrain from collecting the tax from Exempt Travelers (*i.e.*, the putative class members). Instead, the defendants in those actions remained silent.

13.     For example, in *Sanchez*, the plaintiff, who held dual Mexican-United States citizenship and thus was exempt from the Mexico Tourism Tax, sued Aeromexico (also a Defendant here) in California state court for breach of contract, among other claims (but not federal claims, as are asserted here), when Aeromexico added the tax to the price of her airfare ticket from the United States to Mexico.[9]   Aeromexico moved to dismiss the suit under the Airline Deregulation Act of 1978 (here, the "ADA"), 49 U.S.C. § 41713, *et seq.*, claiming the ADA preempted the plaintiff's claims:

> [B]ecause they relate to the airline's "price[s], route[s], or service[s]," 49 U.S.C. § 41713(b)(1), and are not excepted because Aeromexico had no contractual obligation to advise passengers about the tax or their right to a refund.[10]

---

[9] *Sanchez*, 590 F.3d at 1028.
[10] *See id.*

The Ninth Circuit upheld the District Court's grant of summary judgment on these grounds.[11]

14.    The ADA generally preempts state law causes of action by barring any state-enacted "law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier...." 49 U.S.C. § 41713(b)(1) unless the airline breaches its own *self-imposed undertakings*.

15.    Aeromexico, however, never disclosed to the federal district or appellate courts (or, apparently, to the plaintiff in that case) that Aeromexico and its competitors were in fact signatories to a *private contract* (a "self-imposed undertaking") through CANAERO in which the airlines had agreed to implement measures to ensure that Exempt Travelers (like Sanchez in that case) were not charged (or alternatively were refunded) the Mexico Tourism Tax.[12]

16.    Aeromexico's Vice President Comptroller, Cesar Laguna, filed a declaration in *Sanchez* in which he represented to the court, while discussing the Mexico Tourism Tax, that CANAERO had on behalf of the Defendants:

> [A]greed with the government of Mexico on procedures whereby Aeromexico and the other airlines it represents would collect the UK Fee [i.e., the Mexico Tourism Tax] from passengers traveling on routes from abroad into Mexico, then remit the UK Fees to the government of Mexico.[13]

This declaration creates the impression that Aeromexico was simply complying with governmental obligations imposed by Mexico. But as noted, the declaration failed to disclose the actual obligations Aeromexico voluntarily assumed under the CANAERO Contract. The Aeromexico

---

[11] *See id.* at 1028 and 1031.
[12] *See generally* defendants' pleadings in the District Court (C.D. Cal. Cause No. 2:07-cv-07280-R-RC) and at the Ninth Circuit (Case No. 08-55588).
[13] *See* the Declaration of Cesar Laguna in Support of Motion to Dismiss or, in the Alternative, Motion for Summary Judgment of Aerovias de Mexico, S.A. De C.V., filed in the underlying District Court Case [C.D. Cal. Cause No. 2:07-cv-07280-R-RC], [Dkt. No. 35] at 2 (Page ID# 147).

comptroller failed to disclose or identify in his declaration the actual written CANAERO Contract. Nor did he disclose that Aeromexico and its competitors (including the airline Defendants in this case) were direct parties to, and obligees under, a written contract they willingly had subjected themselves to (*i.e.,* the CANAERO Contract).[14] Nor did he advise the court that Aeromexico and the other airlines were required by the CANAERO Contract to not collect the Mexico Tourism Tax from the Exempt Travelers. He failed to disclose the fact that Aeromexico and the other Defendants are required to reimburse Exempt Travelers when the tax is improperly collected. Even today, none of the Defendants here disclose on their websites or in other advertising the existence of the CANAERO Contract, or the fact that certain specific passengers (*i.e.,* the Plaintiffs and the class they represent) are specifically exempt from the Mexico Tourism Tax, and should be reimbursed if the tax is improperly collected from them.

17.     Based on these material omissions, the Ninth Circuit found no evidence that Aeromexico had any contractual obligation "*not to collect* [the Mexico Tourism Tax] from those who are exempt, *or to refund it to exempt passengers from whom it was nevertheless collected.*"

18.     Equally important, Mr. Laguna's declaration admits that there is an agreement or understanding among the Defendants that each would charge the Mexico Tourism Tax to all passengers, including the Exempt Travelers. He states:

> 8. . . . I am informed and believe that . . . United Airlines, American Airlines, and other airlines which fly routes into Mexico all provide this service to their passengers.
>
> 9. With respect to the collection of the UK Fee, it is not feasible for Aeromexico to implement procedures that are different from those of its competitors. . . Any change in procedures that would inhibit the flow of Aeromexico's passengers routed to Mexico through the destination airports or cause its passengers to experience longer delays than

---

[14] *See generally id.* [Dkt. No. 35].

> passengers of other airlines would put Aeromexico at a competitive disadvantage with the other airlines operating on routes into Mexico.[15]

In other words, according to Aeromexico, it would not be feasible for Aeromexico to comply with the terms of the CANAERO Contract and implement measures by which the Exempt Travelers are not taxed, while Aeromexico's competitors (i.e. the other Defendants here) do not also implement those measures. Thus, rather than comply with the terms of the CANAERO Contract, all of the Defendants have agreed to self-impose the collection of the Mexican Tourism Tax from Exempt Travelers.

19.     In a subsequent suit, the plaintiff in *McMullen v. Delta Airlines, Inc.*, sued Delta on a breach of contract theory (among other causes) relying on two provisions of Delta's International Contract of Carriage. Delta similarly failed to disclose the existence of the CANAERO Contract in *McMullen*, and the Ninth Circuit dismissed that case, too, for lack of evidence of "any contractual language that obligates Delta *not to collect* the Mexican tax from all passengers to Mexico, regardless of whether they are exempt from the tax."[16]

20.     None of the other Defendants have ever disclosed the terms of the CANAERO Contract publicly, or otherwise expressly notified Exempt Travelers of their right not to have the Mexico Tourism Tax collected from them, or to be refunded the amount of the Mexico Tourism Tax if collected in error. To the contrary, Defendants represent to Exempt Travelers that Defendants are required to collect the Mexico Tourism Tax from each passenger, including citizens of Mexico.

21.     Nowhere on their websites, or on passenger tickets or invoices, do the Defendants disclose the existence of the CANAERO Contract, or otherwise affirmatively notify Mexican

---

[15] *See* the Declaration of Cesar Laguna at 3.
[16] *McMullen, supra*, 361 Fed.Appx. at 758 (9th Cir. 2010) (emphasis added).

Nationals and other Exempt Travelers that they are exempt from the Mexico Tourism Tax and that no such tax is owed.  Rather, Defendants have in the past, and continue to represent expressly and impliedly to all passengers, including the Exempt Travelers, that Defendants are required to collect from the class members travelling to Mexico the Mexico Tourism Tax.  Defendants have made these false representations knowingly in interstate commerce in the United States through mail and wire.

## THE PARTIES

### PLAINTIFFS

22.     The following named Plaintiffs bring this action individually and on behalf of the class of injured persons they represent as defined in this Complaint ("Plaintiffs").

23.     Plaintiff Miguel Orozco is a Mexican citizen lawfully residing in Atlanta, Georgia, U.S.A.  Mr. Orozco has flown to Mexico numerous times on one or more Defendant airlines, including Delta, and was improperly assessed the Mexico Tourism Tax.

- On March 30, 2012, Mr. Orozco flew from Atlanta, Georgia to Cancun, Mexico on Delta Flight 691.  Through a ticket issued with ticket# 00623681482152, Delta assessed Mr. Orozco a Mexico Tourism Tax in the amount of $21.80.  On information and belief, Delta filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Orozco as a Mexican national, and kept the amount of the illegally-collected tax.

- On March July 29, 2011, Mr. Orozco flew from Atlanta, Georgia to Guadalajara, Mexico on Delta Flight 537.  Through a ticket issued with ticket# 00623547806232, Delta fraudulently represented to Mr. Almanza that Delta was required to assess Mr. Orozco a Mexico Tourism Tax in the amount of $22.19.  On information and belief, Delta filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Orozco as a Mexican national, and kept the amount of the illegally-collected tax.

24.     Plaintiff Julian Almanza is a Mexican citizen lawfully residing in Chicago, Illinois, U.S.A.  Mr. Almanza has flown to Mexico numerous times on one or more Defendant airlines, including Delta, American, Aeromexico, Volaris and U.S. Airways.

- On April 18, 2011, Mr. Almanza flew from San Juan, Puerto Rico, through Atlanta, Georgia, to Mexico City, Mexico on Delta Flights 418/365.  Through a ticket issued with ticket# 00621874983730, Delta fraudulently represented to Mr. Almanza that Delta was required to assess Mr. Almanza a Mexico Tourism Tax in the amount of $21.79.  On information and belief, Delta filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Almanza as a Mexican national, and kept the amount of the illegally-collected tax.

- On December 20, 2013, Mr. Almanza flew from Chicago, Illinois to Mexico City, Mexico on American Airlines Flight 658.  Through a ticket issued with ticket# 0012374181011, American fraudulently represented to Mr. Almanza that American was required to assess Mr. Almanza a Mexico Tourism Tax in the amount of $22.52.  On information and belief, American Airlines filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Almanza as a Mexican national, and kept the amount of the illegally-collected tax.

- On October 22, 2014, Mr. Almanza flew from Chicago, Illinois to Mexico City, Mexico on Aeromexico Flight 689.   Through a ticket issued with ticket# 1392186720167, Aeromexico fraudulently represented to Mr. Almanza that Aeromexico was required to assess Mr. Almanza a Mexico Tourism Tax in the amount of $23.16.  On information and belief, Aeromexico filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Almanza as a Mexican national, and kept the amount of the illegally-collected tax.

- On July 6, 2014, Mr. Almanza flew from Chicago, Illinois to Mexico City, Mexico on Volaris Flight 935.  Through a ticket issued with reservation# PHHYOL, Volaris fraudulently represented to Mr. Almanza that Volaris was required to assess Mr. Almanza a Mexico Tourism Tax in the amount of $45.08.  On information and belief, Volaris filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Almanza as a Mexican national, and kept the amount of the illegally-collected tax.

- On January 13, 2015, Mr. Almanza flew from Chicago, Illinois to Mexico City, Mexico on U.S. Airways Flight 1597.  Through a ticket issued with confirmation# AWB4T2, U.S. Airways fraudulently represented to Mr. Almanza that U.S. Airways was required to assess Mr. Almanza a Mexico Tourism Tax in the amount of $22.97.  On information and belief, U.S. Airways filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Almanza as a Mexican national, and kept the amount of the illegally-collected tax.

25.     Plaintiff Alejandro Davison is a Mexican citizen lawfully residing in Chicago, Illinois, U.S.A.  Mr. Davison has flown to Mexico numerous times on one or more Defendant airlines, including Delta and United, and was improperly assessed the Mexico Tourism Tax.

- On December 14, 2013, Mr. Davison flew from Chicago to Atlanta, Georgia and from Atlanta, Georgia to Mexico City, Mexico on Delta Flights 2030 and 363. Through a ticket issued with ticket# 00623464108735, Delta fraudulently represented to Mr. Davison that Delta was required to assess Mr. Davison a Mexico Tourism Tax in the amount of $27.02.  On information and belief, Delta filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Davison as a Mexican national, and kept the amount of the illegally-collected tax.

- On December 24, 2013, Mr. Davison flew from Atlanta, Georgia to Guadalajara, Mexico on United Flight 343.  Through a ticket issued with confirmation# JPSK8Q, United fraudulently represented to Mr. Davison that United was required to assess Mr. Davison a Mexico Tourism Tax in the amount of 322.23 Mexican Pesos (i.e. approximately $22.05 U.S. Dollars).  On information and belief, United filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Davison as a Mexican national, and kept the amount of the illegally-collected tax.

26.     Plaintiff Ana Escobar is a Mexican citizen lawfully residing in Chicago, Illinois, U.S.A.  Ms. Escobar has flown to Mexico numerous times on one or more Defendant airlines, including Aeromexico, and was improperly assessed the Mexico Tourism Tax.

- On June 28, 2014, Ms. Escobar flew from Chicago, Illinois to Mexico City, Mexico on Aeromexico Flight 689.  Through a ticket issued with ticket# 1392184167363, Aeromexico fraudulently represented to Ms. Escobar that Aeromexico was required to assess Ms. Escobar a Mexico Tourism Tax in the amount of $21.80.  On information and belief, Aeromexico filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Ms. Escobar as a Mexican national, and kept the amount of the illegally-collected tax.

27.     Plaintiff Aide Pineda is a Mexican citizen lawfully residing in Chicago, Illinois, U.S.A.  Ms. Pineda has flown to Mexico numerous times on one or more Defendant airlines, including Aeromexico, and was improperly assessed the Mexico Tourism Tax.

- On May 9, 2014, Ms. Pineda flew from Chicago, Illinois to Mexico City, Mexico on Aeromexico Flight 689.  Through a ticket issued with ticket# 1397394069199,

Aeromexico fraudulently represented to Ms. Pineda that Aeromexico was required to assess Ms. Pineda a Mexico Tourism Tax in the amount of $23.16. On information and belief, Aeromexico filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Ms. Pineda as a Mexican national, and kept the amount of the illegally-collected tax.

28.     Plaintiff Nicolas Arroyo is a Mexican citizen lawfully residing in Houston, Texas, U.S.A. Mr. Arroyo has flown to Mexico numerous times on one or more Defendant airlines, including Interjet and United.

- On July 12, 2013, Mr. Arroyo flew from San Antonio, Texas to Monterrey, Mexico on Interjet Flight 961. Through a ticket issued with reservation# Z7ZHGP, Interjet charged Mr. Arroyo a Mexico Tourism Tax. On information and belief, Interjet filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Arroyo as a Mexican national, and kept the amount of the illegally-collected tax.

- On January 18, 2015, Mr. Arroyo flew from Houston, Texas to Monterrey, Mexico on United Flight 4652. Through a ticket issued with confirmation# LE4D4Q, United represented to Mr. Arroyo that United was required to assess Mr. Arroyo a Mexico Tourism Tax. On information and belief, United filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Arroyo as a Mexican national, and kept the amount of the illegally-collected tax

### DEFENDANTS

29.     Defendant Delta Airlines, Inc. ("Delta") is a Delaware corporation headquartered in Atlanta, Georgia, that has, at all material times, done business in this District and that also, at all material times, has offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican nationals) in this district. Delta Airlines, Inc. may be served through its registered agent in this District: Corporation Service Company; 40 Technology Parkway South, Suite 300; Norcross, Georgia 30092.

30.     Defendant United Airlines, Inc. ("United") is a Delaware corporation headquartered in Chicago, Illinois, that has, at all material times, done business in this District and that also, at all material times, has offered and sold airfare for flights from the United States to

Mexico to passengers (including but not limited to Mexican nationals) in this district. United Airlines, Inc. may be served through its registered agent in this District: C.T. Corporation System; 1201 Peachtree Street NE; Atlanta, Georgia 30361.

31. Defendant American Airlines, Inc. ("American") is a Delaware corporation headquartered in Dallas, Texas, and doing business in this District at all material times, that also, at all material times, done business in this District and that also, at all material times, has offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican nationals) in this district. American Airlines, Inc. may be served through its registered agent in this District: C.T. Corporation System; 1201 Peachtree Street NE; Atlanta, Georgia 30361.

32. Defendant Aerovias De Mexico S.A. De C.V., Inc. ("Aeromexico") is a Mexican corporation registered to do business in this state that has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican nationals) in this district and has minimum contacts with the United States. Aeromexico may be served through its registered agent: Gabriel Parra; Two Alhambra Plaza, Suite 120; Miami, Florida 33134.

33. Defendant Concesionaria Vuela Compañía de Aviación, S.A.P.I. De C.V. ("Volaris") is a Mexican corporation doing business in the United States that has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican nationals) in this district and has minimum contacts with the United States. Volaris may be served through its registered agent: Mr. Manuel L. Rivero; 1313 Ponce de Leon Blvd., Suite 201; Coral Gables, Florida 33134.

34.     Defendant ABC Aerolineas, S.A. de C.V. ("Interjet") is a Mexican corporation doing business in the United States that has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican nationals) in this district and has minimum contacts with the United States.  Interjet may be served through its registered agent in the United States, Mr. Manuel L. Rivero; 1313 Ponce de Leon Blvd., Suite 201; Coral Gables, Florida 33134.

35.     Defendant US Airways, Inc. ("US Airways") is a Delaware corporation headquartered in Tempe, Arizona, that is registered to do business in Georgia, that has, at all material times, done business in this District and that also, at all material times, has offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican nationals) in this district.  US Airways may be served through its registered agent in this District: C.T. Corporation System; 1201 Peachtree Street NE; Atlanta, Georgia 30361.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331.  This court has jurisdiction over Plaintiffs because Plaintiffs submit to the jurisdiction of the court; it also has general and/or specific jurisdiction over Defendants because Defendants continuously and systematically engaged, and continue to engage, in business in Georgia, including this District.  In accord with 18 U.S.C. § 1965(a), (b), and (d)[17] all of the Defendants are subject to this Court's jurisdiction because at all times material to this

---

[17] RICO's section 1965(d) provides that process may be served "in any judicial district of the United States" when required by the "ends of justice," and also allows process service "in any judicial district in which such person resides, is found, has an agent, or transacts affairs."  U.S. courts, including the Eleventh Circuit, accordingly have long held that such "nationwide service of process" provisions (as in RICO and the ERISA statute) also confer personal jurisdiction over a defendant in any judicial district, so long as the defendant has minimum contacts with the United States.  *See Republic of Panama v. BCCI Holdings (Luxembourg) S. A.,* 119 F.3d 935, 942 (11th Cir.1997).

complaint, they continuously and systematically conducted business or "transact[ed] affairs" in this District, and/or has minimum contacts with the United States.

37.     Defendant Delta Airlines maintains its global, corporate headquarters in Atlanta, Georgia, and all Defendants have consistently sold and offered to sell air-travel to Mexico from this District.  Venue as to Defendants is proper in this court pursuant to 28 U.S.C. §1391(b)(2) and/or (b)(3) because all Defendants are subject to personal jurisdiction in this District. Venue is also proper in this court under the RICO Act's venue provision (18 U.S.C. § 1965) because a substantial part of the events giving rise to this suit occurred in this District.

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this suit as a class action pursuant to the FED. R. CIV. P. 23(b)(2 and 3).

39.     Plaintiffs bring this action individually and for a class tentatively defined as:

> All Mexican nationals, guardians of children under the age of two at the time of their travel, and foreigners with resident status in Mexico, who purchased airfare for flights from the United States to Mexico between June 30, 1999 and the present, from one or more of the Defendants, and whose purchase prices included a Mexico Tourism Tax and whose tax payment was not refunded.

40.     Plaintiffs' claims are typical of the claims of the class in that, during the relevant period, Defendants sold them tickets for U.S.-to-Mexico air travel and included the Mexico Tourism Tax in the purchase price despite the fact that purchasers were Exempt Travelers, legally excused from payment of the tax.  The determination of damages incurred by each Plaintiff and each class member are also identical – i.e., the amount of money wrongfully collected by each Defendant from each Plaintiff and class member.

41.     Plaintiffs will fairly and adequately represent the interests of the class because their claims are typical of those of the class and their interests are fully aligned with those of the class.

Plaintiffs have retained attorneys that are experienced and skilled in complex class action litigation, including in class action RICO litigation.

42.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

43.     The Defendants have acted on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. FED. R. CIV. P. 23(b)(2).  If the Plaintiffs prove that the Defendants systematically violated the RICO Act as alleged in this complaint or otherwise, the Court should enjoin the Defendants from continuing such behavior in the future.

44.     This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy and for protecting the rights of each Plaintiff and Class member. FED. R. CIV. P. 23(b)(3).

45.     The questions of law and/or fact common to the class, include but are not limited to the following:

      a.    Whether the Defendants agreed to be bound by the terms of the CANAERO Contract;

      b.    Whether the Defendants engaged in acts of mail and/or wire fraud when they schemed to collect and keep monies from Plaintiffs that was never owed;

      c.    Whether the Defendants engaged in acts of mail and/or wire fraud when they collected the Mexico Tourism Tax from the class members;

d. Whether the Defendants caused injury to the business or property of class members by improperly charging them with the Mexico Tourism Tax from which Defendants knew or should have known the class members were exempt.

46. These and other questions of law and/or fact that are common to the class predominate over any questions affecting only individual class members. No element necessary to establish RICO liability requires individualized proof.

47. Plaintiffs' claims are typical of the claims of the class.

48. A class action under FED. R. CIV. P. 23(b)(3) is superior because:

a. Individual litigation of claims by Plaintiffs and class members is impracticable and would prove unduly burdensome to the resources of the parties and to the Court. In reality, individual litigation is not the right way to redress claims for the $20-$25 wrongfully collected by the Defendants as a Mexico Tourism Tax;

b. No other known pending litigation exists over these issues;

c. It is manifestly desirable to concentrate the litigation of the class' claims in Georgia and this district;

d. This case as a class action will present no management difficulties for the Court.

## THE COMMON ELEMENTS OF THE RICO ACT, 18 U.S.C. §§ 1961-68

49. RICO prohibits the following conduct:

It shall be unlawful for [1] any person [2] employed by or associated with [3] any enterprise [4] engaged in, or the activities of which affect, interstate or foreign commerce, [5] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs [6] through a pattern of racketeering activity or collection of unlawful debt. 18. U.S.C. § 1961-68 (numbering added to text of statute)

The facts as alleged herein establish that each of the requirements of RICO liability are met.

## ALL DEFENDANTS ARE RICO "PERSONS"

50.     Each Defendant named herein is a "person" for purposes of the RICO Act.  A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  A RICO person can be either an individual or a corporate entity. As corporations, all Defendants are RICO persons.

## THE RICO ENTERPRISE

51.     RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[18] All of the Defendants, through their affiliation with CANAERO, agreed to the terms of the CANAERO Contract.  All Defendants have agreed among themselves, either expressly or tacitly, to scheme to collect monies from Plaintiffs under the aegis of the Mexico Tourism Tax that was never actually owed. All Defendants together with non-party CANAERO thus have acted as an "association-in-fact" for a common purpose, have and maintained relationships between and among each other (and nonparties), and the association-in-fact has a longevity sufficient to permit those associates to pursue the enterprise's purpose – to improperly profit from knowingly and wrongfully collecting the Mexico Tourism Tax from Exempt Travelers.

52.     Each Defendant has an existence that can be defined apart from the commission of the predicate acts constituting the pattern of racketeering activity.  That is, each Defendant has a separate, legitimate existence as an operating business or individual.

53.     A defendant can be both a RICO "person" and part of another RICO "enterprise." Corporations are included in the Act's definition of a "person." 18 U.S.C. § 1961(3). Defendants, all members of CANAERO at all times since 1999 (or thereafter about the dates that each Defendant began operating flights to/from Mexico and/or agreed to the terms of the CANAERO

--------

[18] 18 U.S.C. § 1961(4).

Contract), all agreed to be subject to the terms of the CANAERO Contract, and all having systematically committed the RICO violations alleged here with respect to the class, are thus also RICO "persons" separate from the RICO "enterprise" at issue here.

54.     There is also an identifiable framework within each "enterprise" here capable of consensual decision making that is separate from and would still exist even apart from the predicate acts alleged here.

55.     The agreement among the Defendants to wrongfully collect the Mexico Tourism Tax is itself an association in fact.  The agreement exists to improperly and illegally collect taxes from unsuspecting travelers exempt from the Mexico Tourism Tax who purchase airfare tickets from the Defendants for flights from the U.S. into Mexico, and then reap the profits from those ill-gotten gains.

## ALL DEFENDANTS ARE "ASSOCIATED WITH"
## THE RICO "ENTERPRISE"

56.     Under Section 1962(c), a defendant must be "employed by or associated with" the RICO enterprise.  All Defendants are at least "associated with" the enterprise, as set forth in detail previously, through their individual and collective actions, their mutual affiliation with CANAERO, their mutual involvement in agreeing to comply with the terms of the CANAERO Contract, and/or in otherwise committing the systematic and consistent misrepresentations and predicate act RICO violations alleged here.

## ALL RICO "PERSONS" ARE DISTINCT
## FROM THE RICO "ENTERPRISE"

57.     RICO requires the involvement of a RICO "enterprise." 18 U.S.C. § 1964 (a-d). An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §

1961(5). The enterprise itself is not the liable entity; rather the liable entity are the RICO "persons" who conduct the affairs of the enterprise through a pattern of racketeering activity.

58.     The corporations described in this complaint are distinct from each other. The corporate defendants are distinct from their collective RICO enterprise because they are functionally separate, perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity. Each of the corporations has distinct market share, advertising, and thus different activities in the scheme.

## THE DEFENDANTS ENGAGED IN ACTIVITIES THAT AFFECT INTERSTATE AND FOREIGN COMMERCE

59.     Each of the Defendants engaged in, and/or each's activities affect, interstate or foreign commerce by committing the RICO violations alleged here with respect to Exempt Travelers flying from the United States to Mexico.

## THE DEFENDANTS PARTICIPATED IN THE CONDUCT OF THE ENTERPRISE'S AFFAIRS

60.     Each of the Defendants conducted, or participated directly or indirectly, in the conduct of the RICO enterprise's affairs with respect to the CANAERO Contract and their actions with respect to the class.

## THE DEFENDANTS ENGAGED IN A "PATTERN OF RACKETEERING ACTIVITY" OVER AN EXTENDED PERIOD OF TIME WITH A THREAT OF REPETITION INTO THE FUTURE

61.     RICO requires a "pattern of racketeering activity." A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense (an act "indictable under any of" certain provisions of" 18. U.S.C. § 1961 (1) (D)). See 18 U.S.C. § 1961(5). A "pattern of racketeering activity" can be a past conduct that by its nature projects into the future with a threat of repetition. It can also be conduct over a closed

period through a series of related predicates extending over a substantial period.  Both of these apply here.

62.     The Defendants' pattern of racketeering activity is well established and has continued from 1999 (or thereafter about the dates that each Defendant began operating flights to/from Mexico and/or agreed to the terms of the CANAERO Contract) through the present and has no signs of stopping in the future.  Still today, each Defendant continues to:

- unlawfully and improperly collect and keep the Mexico Tourism Tax from persons that Defendant knows are not subject to such tax;

- unlawfully collect the tax from Exempt Travelers;

- conceal from Exempt Travelers flying on their airlines that they are exempted from the Mexico Tourism Tax;

- fails to advise Exempt Travelers that they should be reimbursed the Mexico Tourism Tax when improperly collected; and

- fails to provide measures by which Exempt Travelers may be reimbursed the Mexico Tourism Tax when improperly collected.

**DEFENDANTS HAVE USED AND CAUSED TO BE USED FRAUDULENT MAIL AND WIRE COMMUNICATIONS IN INTERSTATE COMMERCE, 18 U.S.C. § 1341 AND 18 U.S.C. § 1343 AND EACH SUCH COMMUNICATION WAS A SEPARATE PREDICATE ACT**

63.     Mail and wire fraud are enumerated predicate acts that can constitute RICO "racketeering activity" under Section 1961(1)(D).

64.     Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it. 18 U.S.C. § 1341. Since 1999 (or about the dates that each Defendant began operating flights to/from Mexico), the Defendants have transmitted, caused to be transmitted or invited others to transmit to class members advertising, tickets, itinerary

confirmations, receipts, invoices, and other material relevant to airfare tickets for travel from the United States to Mexico, by mail or private or commercial carriers (such as UPS). These transmissions are each in furtherance of the scheme to defraud in that they operated to:

- misrepresent the Mexico Tourism Tax as applicable to class members;

- improperly collect the Mexico Tourism Tax from class members;

- failed to identify the class members' exemption from the tax; and

- failed to advise class members of their right to a refund of the tax.

Defendants have done so for the purpose of executing their scheme or artifice to defraud in furtherance of the RICO enterprise.

65.     Without limitation, each invoice or statement sent by U.S. Mail to a class member which includes the Mexico Tourism Tax is a mailing and an act of mail fraud, in violation of 18 U.S.C. § 1341. Examples of such invoices, each of which is a predicate act, are described in Pars. 25-29 of this Complaint. Other such invoices, each of which represents a separate act of mail and /or wire fraud, were sent each time an Exempt Traveler booked a ticket through one of the Defendants for travel to Mexico. It is estimated that flights from the United States to Mexico are typically booked by Exempt Travelers one-third to one-half of the airplane's capacity, meaning that a predicate act occurred multiple times a week over many years.

66.     Wire fraud occurs when an individual devises a plot to defraud and subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343. Since 1999 or the date thereafter that each Defendant began charging members of the class the Mexico Tourism Tax, the Defendants have used the Internet to disseminate, publish, and/or direct to the public in general and class members in particular the same types of material and information, again for the purpose of executing their scheme or artifice to defraud in violation of RICO. The Defendants have transmitted, caused to be

transmitted and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing their scheme or artifice to defraud in furtherance of these RICO enterprises.   Without limitation, for example, each transmission or display of webpages, emails, text messages, receipts, itineraries, flight confirmations and the like making the misrepresentations and/or omissions alleged in this complaint, and/or any transmission of signals, pictures or information by such means is a separate act of wire fraud, in violation of 18 U.S.C. §1343

67.    Each Defendant acted with requisite intent to establish, perpetuate and/or carry out the scheme to defraud. Each Defendant acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information mailed or wired in furtherance of the enterprise or otherwise so as to constitute requisite *scienter* to commit mail and wire fraud. That *scienter* can be inferred from, among other things, at least the following:

- Each Defendant, as a member of CANAERO or by agreeing to the terms of the CANAERO Contract, and/or also as willing, direct signatories to the CANAERO Contract at issue here (or subsequently adopted the terms and conditions of the CANAERO contract), knew the class members were legally exempt from the Mexico Tourism Tax and that Defendants were contractually obligated to not collect the tax from class members (and provide methods of reimbursement in the event of erroneously collecting the tax) and yet systematically collected from class members the tax while concealing the class' exemption from the tax or refunding class members the amount of the tax the Defendants improperly added to class members' airfare.

- Each Defendant knew, or should have implemented measures to know, through itineraries, passport numbers and/or other nationality documentation that each required the class members to give as part of the international ticket buying or boarding process, that class members were Exempt Travelers.

- The January 4, 2008, Declaration of Aeromexico Vice President/Comptroller, Cesar Laguna, submitted in the *Sanchez* case and

discussed earlier in this Complaint[19], reveals the Defendants cooperated and colluded, through their common membership in CANAERO and/or with each other, directly and indirectly, to collect the Mexico Tourism Tax indiscriminately from Exempt Travelers, while knowing actually or constructively that all Defendants (collectively comprising the RICO "enterprise") were engaged in the same improper practice. The declaration indicates there was a tacit, if not explicit, agreement or understanding among the Defendants not to disrupt this practice. After describing the collection of the Mexico Tourism Tax as a "service" to both the Mexican government and to passengers (allegedly speeding their movement through airports to their destinations in Mexico), the Aeromexico Vice President/Comptroller's declaration states, in part, that:

> Aeromexico's competitors who fly between Mexico and other countries, including the United States, also provide this service [i.e., collection of the Mexico Tourism Tax]. I am informed and believe that…United Airlines, American Airlines, and other airlines which fly routes into Mexico all provide this service to their passengers.

> With respect to the collection of the UK Fee [i.e., the Mexico Tourism Tax], it is not feasible for Aeromexico to implement procedures that are different from those of its competitors, and that could inhibit the flow of its passengers through the airports. Any change in procedures that would inhibit the flow of Aeromexico's passengers routed to Mexico through the destination airports or cause its passengers to experience longer delays than passengers of other airlines would put Aeromexico at a competitive disadvantage with the other airlines operating on routes into Mexico.[20]

- The Defendants were parties to, or were aware of lawsuits alleging that they were misrepresenting to passengers their obligation to pay a Mexico Tourism Tax, and were unlawfully collecting that tax. None of these lawsuits was resolved in favor of any of the Defendants on the merits, such that any Defendant could reasonably believe the tax they were collecting from class members was lawful.

**THE DEFENDANTS' SYSTEMATIC UNLAWFUL COLLECTION OF THE MEXICO TOURISM TAX FROM CLASS MEMBERS AND CONCEALMENT FROM CLASS**

---

[19] *Sanchez v. Aerovias de Mexico, S.A. De C.V.*, C.D. Cal. Case No. 2:07-cv-07280-R-RC.
[20] *See id.*, C.D. Cal. Case No. 2:07-cv-07280-R-RC, Dkt. No. 35 [Laguna Decl.] at 3 [Page ID# 148], ¶¶ 8-9.

**MEMBERS THEIR EXEMPTION FROM THE TAX AND RIGHT EITHER NOT TO HAVE THE TAX COLLECTED FROM THEM OR TO HAVE THE TAX REFUNDED TO THEM IS A *PER SE* SCHEME TO DEFRAUD UNDER THE MAIL AND WIRE FRAUD STATUTES**

68.     The Defendants have used a false and fraudulent scheme, or a scheme to defraud within the meaning of federal law, to harm Plaintiffs and the class.  In all material respects, the Defendants have conducted their affairs unlawfully, intentionally, willfully and with intent to defraud, that is, knowingly and with such specific intent to deceive as is in violation of the mail and wire fraud statutes. They have done so in order to cause financial gain for themselves and/or for others, all to the detriment of the named Plaintiffs and the members of the class.

69.     First, each Defendant has promoted and furthered the scheme that, by its very nature, is a *per se* scheme and artifice to defraud to obtain money by false pretenses.  As detailed in this complaint, all Defendants have knowingly and systematically represented, via their websites, booking information, invoices, emails, and/or advertising, that the tax was mandatory for class members, while knowing that to be false.  Each of the enumerated acts of wire and mail fraud in furtherance of the scheme is an act of racketeering.  These systematic and persistent acts and knowing omissions in furtherance of the scheme are enough to state a RICO claim based upon a pattern of racketeering.

70.     Second, as part of the scheme, the Defendants made many numerous false statements in furtherance of the scheme, all to obtain profit. The mail and or wire were used over a period of many years and will continue to be used until the scheme is stopped.

71.     Third, as part of the illegal scheme, the Defendants omitted material facts for the purpose of and with the intention of the fraudulent scheme by obtaining money from the victims of that scheme.

**DEFENDANTS' CONDUCT HAS PROXIMATELY**

**CAUSED THE PLAINTIFFS' RICO INJURY**

72.     Defendants are liable because Plaintiffs were injured in their business or property by reason of Defendants' violation of 18 U.S.C. § 1962. *See* 18 U.S.C. §1964(c). A plaintiff need not show that he or she relied on any allegedly fraudulent misrepresentations to state a claim under RICO.  Establishing a proximate cause of a RICO "scheme to defraud" requires only showing use of the mail or wire in furtherance of a scheme to defraud and an injury proximately caused by that scheme. Proximate cause exists where there is some direct "relation between the injury asserted and the injurious conduct alleged."[21] Considerations of foreseeability, directness, and logic are parts of RICO-related proximate cause.

73.     The Plaintiffs and the class each suffered the same injury—loss of money—that was directly foreseeable, indeed intended, by Defendants and directly related to the scheme.  Each putative class member remitted to Defendants a tax they did not owe. Here, the Defendants, since 1999 (or about the dates that each Defendant began operating flights to/from Mexico), have operated the same scheme, with the same general participants, to improperly collect Mexico Tourism Tax payments from unsuspecting Exempt Travelers.

**PLAINTIFFS AND THE CLASS HAVE SUFFERED A RICO INJURY
TO BUSINESS OR PROPERTY**

74.     A "violation" of RICO is committed if "individuals and entities," use the mails or interstate wire facilities in the execution of "any scheme to defraud." 18 U.S.C. §§ 1341, 1343, Sections 1961(1) (B), 1962.  Sections 1964 (a), (c) and (d) authorize persons "injured" in their "business or property," "by reason of" RICO's "violation" to sue for appropriate redress, including equitable relief, treble damages and attorneys' fees.

---

[21] *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462, 126 S.Ct. 1991, 1999 (2006).

75.     The Plaintiffs and the class have suffered injuries to business as defined by RICO as the direct result of Defendants' acts and omissions.  Defendants knowingly and improperly required each of the Plaintiffs to pay money – on flights each class member took to Mexico – that the class members were in fact legally exempt from paying.

76.     The precise amount lost by the class has not yet been determined but is believed to be in the many millions of dollars in the aggregate from 1999 through the present.  The means of determining the loss is the same classwide.  Upon information and belief, each Defendant has tracked, maintained, and accounted for amounts of the Mexico Tourism Tax improperly collected for each year from 1999 (or about the dates that each Defendant began operating flights to/from Mexico) through present (and likely for each and every flight, through the use of manifests and/or special forms the CANAERO Contract required Defendants to remit to the Mexican government showing the number of non-Exempt Travelers per flight to Mexico). Thus, the precise loss of every class member is easily capable of being ascertained in this litigation in the same manner, and the total business injury computed for the class.

77.     Moreover, each Defendant (1) wrongfully concealed the existence of the CANAERO Contract from the public, (2) which prevented the Plaintiffs and the class they represent from discovering their claims, and (3) precluded the present claims.

## COUNTS

### COUNT ONE
### VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(c)

78.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

79.   Each of the defendants has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs and the class by their actions.

## COUNT TWO
## VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(a)

80.   Section 1962(a) makes it unlawful, "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate commerce."

81.   Defendants have received income derived from the pattern of racketeering activity described here and have used such income in the "acquisition of an interest in," and/or in the "establishment or operation of" the enterprise at issue here by using portions of those ill-gotten gains to fund CANAERO, and/or to increase and/or sustain Defendants' individual and collective market access and profits in the United States-to-Mexico air travel market.

82.   The Defendants thus have violated the RICO Act's Section 1962(a) and, jointly and severally, have caused Plaintiffs and the class a business injury.

## COUNT THREE
## VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(d)

83.   Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

84.   The Defendants have participated in a conspiracy to engage in violations of 18 U.S.C. §§ 1961(5), 1962(c), as set forth in Count One.  As the declaration filed in the California federal court litigation by Aeromexico's Vice President/Comptroller reveals, each Defendant knew all Defendants were improperly charging class members with the Mexico Tourism Tax but

31

explicitly and/or implicitly conspired and colluded to not "rock the boat" by rectifying that situation or disclosing to class members the CANAERO Contract and the fact of their exemption from the tax and right not to have that tax collected from them, or for refunds. This was out of each Defendant's fear of being put to a competitive disadvantage by the rest of the group continuing the improper practice and/or out of a desire to make additional revenue and/or save themselves and each other money by simply keeping quiet and letting the scheme continue.

85.     As stated above, each of the Defendants has participated in the scheme and their participation is necessarily a combination of more than two individuals.

86.     As stated above, the Defendants' creation, support or maintenance of the fraudulent scheme is illegal.

87.     The Defendants, through CANAERO (an industry group comprising the Defendants) and/or otherwise, demonstrably reached a meeting of the minds on the object or course of action, specifically to create, support and maintain the scheme of collectively charging all passengers to Mexico indiscriminately with the Mexico Tourism Tax without spending the time or money to put systems in place to notify class members of their exemption and to either not collect the tax from them or to refund them for the amount of the tax when improperly collected. This scheme, by which Defendants colluded to charge all passengers, including Exempt Travelers comprising the Plaintiffs and the class, the Mexico Tourism Tax manifestly was to Defendants' financial benefit as evidenced by each Defendant's voluntary and knowing participation in the scheme over the course of years (and by the other evidence discussed here, including the Declaration of Aeromexico's VP Comptroller, Cesar Laguna), and by the Defendants' failure to refund those monies improperly collected.

88.     Each Defendant and others have committed one or more overt acts to achieve or further the unlawful objects and purposes of the scheme detailed herein.

89.     The Defendants used false and fraudulent pretenses to deceive persons of ordinary prudence and due care, and made material nondisclosures and concealments of fact and information that were important to understand their scheme.   The Defendants conducted their affairs unlawfully, intentionally, willfully and with the intent to defraud, for their own financial gain and benefit and for the financial gain and benefit of others, all to the detriment of the named Plaintiffs and the class.

90.     Each Defendant has violated Section 1962(c) and is liable, jointly and severally, for the business injury Defendants caused to the Plaintiffs and the class.

### PRAYER FOR RELIEF

The named Plaintiffs and the class they represent request the following relief:

a.     Certification of the class;

b.     A judgment against the Defendants;

c.     Damages in the amount of the injury to business incurred by the named Plaintiffs and the class as a result of Defendants' conduct and for injury to their business and property, all as a result of Defendants' violations of 18 U.S.C. § 1962(a), (c) and (d) and that such sum be trebled in accordance with 18 U.S.C. § 1964(c);

d.     Temporary and permanent injunctive relief enjoining the Defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, or continuing the scheme by which they are improperly charging class members with the Mexico Tourism Tax and are concealing from the class members' exemption from the tax and right either not to have the tax collected or to have the amount of the tax refunded;

e.     Disgorgement of all proceeds of the scheme detailed in this complaint by each Defendant;

f.     The costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

g.    For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

The named Plaintiffs – on their own behalf, and on behalf of the class they represent – demand a jury trial.

Filed this 10th day of March, 2015.

Respectfully submitted,

/s/*Patrick T. O'Connor*
OLIVER MANER LLP
Patrick T. O'Connor
Georgia Bar No. 548425
Benjamin M. Perkins
Georgia Bar No. 140997
*Attorneys for Plaintiffs*
P.O. Box 10186
Savannah, GA 31412
(912) 236-3311 telephone
(912) 236-8725 facsimile
pto@olivermaner.com
bperkins@olivermaner.com

LOVETT BENNETT, JR.
ATTORNEY AT LAW, P.C.
Lovett Bennett, Jr.
*Attorney for Plaintiffs*
21 Courtland Street
P.O. Box 632
Statesboro, Georgia  30459-0632
(912) 764-3122
Georgia Bar No. 051601
Florida Bar No. 370894

PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(Pro Hac Vice motion to be filed)
Chris Faucett
(Pro Hac Vice motion to be filed)
Stephen Abbott
(Pro Hac Vice motion to be filed)
Brent T. Caldwell
(Pro Hac Vice motion to be filed)
*Attorneys for Plaintiffs*
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 742-9260
mprebeg@pfalawfirm.com
cfaucett@pfalawfirm.com
sabbott@pfalawfirm.com
bcaldwell@pfalawfirm.com


WILLIAMS KHERKER HART
BOUNDAS, LLP
Steven Kherkher
(Pro Hac Vice motion to be filed)
Sean McCarthy
(Pro Hac Vice motion to be filed)
*Attorneys for Plaintiffs*
8441 Gulf Freeway, Suite 600
Houston, TX 77017
Tel. (713) 230-2200
Fax (713) 643-6226
skherkher@williamskherkher.com
aeasterby@williamskherkher.com
smccarthy@williamskherkher.com


SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski
(Pro Hac Vice motion to be filed)
Sarah Rickard
(Pro Hac Vice motion to be filed)
*Attorney for Plaintiffs*
One Towne Square, Suite 1700
Southfield, MI 48076
Telephone: 248.746.4048
Fax: 248.936.2153

LAW OFFICE OF MARK E. LEWIS
Mark E. Lewis
(Pro Hac Vice motion to be filed)
*Attorney for Plaintiffs*
2700 Post Oak Blvd., Ste. 1120
Houston, TX 77056
Tel. (713) 936-9285
mlewis@mlewis-law.com


LAW OFFICE OF CAROL S. BUTNER
Carol S. Butner
(Pro Hac Vice motion to be filed)
*Attorney for Plaintiffs*
5009 Caroline Street, Suite B
Houston, TX 77004
Tel. (713) 598-7814
Fax (713) 583-0470
carol@butnerlaw.com

# Exhibit 1

COOPERATION AND COORDINATION AGREEMENT ENTERED INTO BY, AS ONE PARTY, THE SECRETARIAT OF THE INTERIOR, THROUGH THE UNDERSECRETARIAT FOR POPULATION AND IMMIGRATION SERVICES, REPRESENTED BY THE UNDERSECRETARY, MR. JOSE ANGEL PESCADOR OSUNA, AND BY THE SENIOR OFFICIAL, MR. GERARDO CAJIGA ESTRADA, ASSISTED BY THE COMMISSIONER OF THE NATIONAL IMMIGRATION INSTITUTE, HEREINAFTER REFERRED TO AS THE "I.N.M.," DR. ALEJANDRO CARRILLO CASTRO, HEREINAFTER REFERRED TO AS "INTERIOR," AND THE NATIONAL AIR TRANSPORTATION ASSOCIATION, REPRESENTED BY ITS PRESIDENT, JUAN I. STETA, P.E., ASSISTED BY THE SECRETARY, MR. JAVIER CHRISTLIEB MORALES, AND BY ITS EXECUTIVE DIRECTOR, MR. GABRIEL ORTEGA ALCOCER, HEREINAFTER REFERRED TO AS THE "CANAERO," AND THE AIR TRANSPORTATION COMPANIES AFFILIATED WITH "CANAERO," WHICH ADHERE TO THIS AGREEMENT, THROUGH THEIR REPRESENTATIVES, A LIST OF WHICH IS ATTACHED HERETO AS EXHIBIT NUMBER 1, HEREINAFTER REFERRED TO AS THE "AIR TRANSPORTATION COMPANIES," FOR THE PURPOSE OF ESTABLISHING THE BASES FOR COOPERATION BETWEEN THE PARTIES, IN ORDER TO COMPLY WITH THE ADMINISTRATIVE RULES ISSUED BY THE SECRETARIAT OF THE TREASURY AND PUBLIC CREDIT, TO ESTABLISH THE SYSTEMS, PROCEDURES AND INSTRUCTIONS REGARDING THE COLLECTION OF THE IMMIGRATION SERVICE FEE FROM NON-IMMIGRANTS, AS TOURISTS (FMT), TRANSMIGRANTS (FM6) AND VISITING BUSINESSMEN (FMN), AND VISITING CONSULTANTS (FMVC), HEREINAFTER REFERRED TO AS "DNI," WHICH IS REFERRED TO IN ARTICLE 8 OF THE FEDERAL FEE LAW, SECTIONS I, III AND VIII.

## RECITALS.

I.  THE GENERAL POPULATION LAW PROVIDES THAT THE SECRETARIAT OF THE INTERIOR IS RESPONSIBLE FOR IMMIGRATION MATTERS, ORGANIZING AND COORDINATING THE VARIOUS IMMIGRATION SERVICES, OVERSEEING THE ENTRY AND DEPARTURE OF NATIONALS AND ALIENS, REVIEWING THEIR DOCUMENTATION, APPLYING THE LAW AND THE REGULATIONS THEREUNDER, AS WELL AS ANY RESPONSIBILITIES ASSIGNED TO IT BY OTHER LAWS AND REGULATIONS.

II. THE SECRETARIAT OF THE INTERIOR, THROUGH THE NATIONAL IMMIGRATION INSTITUTE, HAS PROPOSED THE FOLLOWING STRATEGIC OBJECTIVES IN IMMIGRATION POLICY IN THIS ADMINISTRATION:

A) TO PERMANENTLY CONTRIBUTE TO DETERMINING AND UPDATING AN IMMIGRATION POLICY THAT IS BASED ON NATIONAL OBJECTIVES AND THAT ENCOURAGES MIGRATORY FLOWS THAT BENEFIT THE COUNTRY.

1

B) TO EXERCISE IMMIGRATION OVERSIGHT POWERS IN MEXICO, WITHIN THE FRAMEWORK OF RESPECT FOR LAW AND HUMAN RIGHTS OF MIGRANTS.

C) TO IMPROVE THE QUALITY OF SERVICES, THROUGH THE SIMPLIFICATION OF PROCEDURES, THE DEVELOPMENT OF PERSONNEL, TECHNOLOGICAL MODERNIZATION, THE STRENGTHENING OF ADMINISTRATIVE EFFICIENCY, INTERINSTITUTIONAL COOPERATION AND THE PROMOTION OF A CULTURE OF SERVICE AND HONESTY.

III. IN THIS CONTEXT, AMONG OTHER PROGRAMS, A PROGRAM WAS APPROVED BY THE FEDERAL EXECUTIVE BRANCH FOR NEW SOURCES OF FINANCING FOR THE INSTITUTE ITSELF, FOR THE PURPOSE OF OPTIMIZING ITS RESOURCES AND APPLYING THEM TO IMPROVING THE ACHIEVEMENT OF THE AFOREMENTIONED STRATEGIC OBJECTIVES. ONE OF THE RESULTING ACTIONS IS THE ESTABLISHMENT OF THE COLLECTION OF IMMIGRATION SERVICE FEES FROM NON-IMMIGRANTS, AS TOURISTS, TRANSMIGRANTS, BUSINESSPEOPLE AND VISITING CONSULTANTS, HEREINAFTER REFERRED TO AS THE "DNI," CONTEMPLATED IN ARTICLE 8, SECTIONS I, III AND VIII OF THE FEDERAL FEE LAW, WHOSE AMENDMENTS AND ADDITIONS WERE PUBLISHED IN THE FEDERAL OFFICIAL GAZETTE ON DECEMBER 31, 1998. IN ADDITION, ON MARCH 3 OF THIS YEAR, THE OMNIBUS TAX BILL FOR 1999 WAS PUBLISHED, SECTION 9 OF WHICH, PERTAINING TO FEES, SPECIFICALLY, RULES 9.2., 9.3. AND 9.4, AND IN THE FIFTH DECISION, WHICH MODIFIED RULES 9.2, 9.4., 9.5. AND 9.21 OF THE OMNIBUS TAX BILL, CONTAINED THE PROVISIONS RELATED TO ARTICLE 8, SECTIONS I, III AND VIII OF THE FEDERAL FEE LAW, FOR THE PURPOSES OF THE COLLECTION OF THE DNI.

IV. THE FEDERAL TAX CODE PROVIDES THAT ALL FEDERAL REVENUES, EVEN IF THEY ARE EARMARKED FOR SPECIAL PURPOSES, SHALL BE COLLECTED THROUGH THE SECRETARIAT OF THE TREASURY AND PUBLIC CREDIT OR BY THE OFFICES THAT THE LATTER AUTHORIZES (ART. 4 PARAGRAPH 2). IN ADDITION, ARTICLE 3, FIFTH PARAGRAPH, OF THE FEDERAL FEE LAW PROVIDES THAT THE PUBLIC OFFICIALS RESPONSIBLE FOR THE PROVISION OF THE SERVICES SHALL BE RESPONSIBLE FOR THE COLLECTION AND PAYMENT OF THE FEES PROVIDED FOR IN SUCH LAW.

V. IN THE EXERCISE OF THE AUTHORITY VESTED IN IT BY THE FEDERAL TREASURY SERVICE LAW AND THE INTERNAL RULES OF THE SECRETARIAT OF THE TREASURY AND PUBLIC CREDIT, THE LATTER HAS ISSUED THE ADMINISTRATIVE RULES THAT ESTABLISH THE PROCEDURES, SYSTEMS AND INSTRUCTIONS REGARDING THE COLLECTION OF THE FEE FROM NON-IMMIGRANTS REFERRED TO IN THIS AGREEMENT, SO THAT "CANAERO" AND "THE AIR TRANSPORTATION COMPANIES" SHALL COOPERATE WITH THE INM IN THE COLLECTION OF THE "DNI".

2

**VI.** "THE AIR TRANSPORTATION COMPANIES" HAVE THE PLAN, SYSTEMS, MECHANISMS AND ADMINISTRATIVE STRUCTURE CONSIDERED CAPABLE OF BEING USED FOR THE COLLECTION OF THE "DNI".

**VII.** THE 1995-2000 NATIONAL DEVELOPMENT PLAN PROVIDES THAT, WITH REGARD TO THE MODERNIZATION OF PUBLIC ADMINISTRATION, IT IS NECESSARY TO RAPIDLY AND EFFECTIVELY ADVANCE TOWARD THE PROVISION OF INTEGRATED SERVICES TO THE PUBLIC THAT AVOID PAPERWORK, SAVE TIME AND EXPENSES AND PREVENT ARBITRARINESS, AND THAT A RENEWAL IS REQUIRED THAT WILL REUSE ITS WORK PLANS, REORDER ITS INCENTIVES, SIMPLIFY ITS PROCEDURES AND MODIFY ITS MANAGEMENT METHODS.

**VIII.**   THE PLANNING LAW PROVIDES THAT THE AGENCIES AND ENTITIES OF THE FEDERAL EXECUTIVE BRANCH AND INTERESTED PRIVATE PARTIES MAY ENTER INTO AGREEMENTS FOR ACHIEVING THE GOALS AND OBJECTIVES SET IN THE NATIONAL DEVELOPMENT PLAN.

**IX.** BY RULE 9.21 OF THE FIFTH MODIFICATION OF THE OMNIBUS TAX BILL PUBLISHED IN THE FEDERAL OFFICIAL GAZETTE ON JUNE 30, 1999, THE SECRETARIAT OF THE TREASURY AND PUBLIC CREDIT AUTHORIZED THE PAYMENT OF FEES PROVIDED FOR IN ARTICLE 8, SECTIONS I, II AND III OF THE FEDERAL FEE LAW BY MEXICAN OR INTERNATIONAL AIRLINES WITH WHICH THE "I.N.M." HAS ENTERED INTO AGREEMENTS COVERING SUCH, IN ACCORDANCE WITH THE TERMS ESTABLISHED BY THE SUCH SECRETARIAT.

### REPRESENTATIONS.

**1.** OF "INTERIOR".

**1.1** IT IS AN AGENCY OF THE FEDERAL GOVERNMENT IN ACCORDANCE WITH ARTICLES 26 AND 27 OF THE FEDERAL PUBLIC ADMINISTRATION LAW.

**1.2** THE UNDERSECRETARY OF POPULATION AND IMMIGRATION SERVICES HAS THE AUTHORITY TO ENTER INTO THIS AGREEMENT IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE 6, SECTION IX, OF THE INTERNAL RULES OF SUCH SECRETARIAT.

**1.3** THE SENIOR OFFICIAL HAS THE AUTHORITY TO SIGN THIS AGREEMENT IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE 7, SECTION X, OF THE INTERNAL RULES OF SUCH SECRETARIAT.

3

**1.4** UNDER ARTICLE 41 OF THE INTERNAL RULES OF THE SECRETARIAT OF THE INTERIOR, PUBLISHED IN THE FEDERAL OFFICIAL GAZETTE ON AUGUST 31, 1998, THE NATIONAL IMMIGRATION INSTITUTE IS THE DECONCENTRATED TECHNICAL AGENCY OF THE SECRETARIAT OF THE INTERIOR WHOSE PURPOSE IS TO PLAN, EXECUTE, MONITOR, SUPERVISE AND EVALUATE IMMIGRATION SERVICES IN THE MEXICAN REPUBLIC, FOR THE PURPOSE OF GUARANTEEING EFFECTIVENESS IN DEALING WITH THE PROBLEMS LINKED TO THE IMMIGRATION PHENOMENON, AND THAT ARTICLE 48, SECTIONS I AND XIV, OF SUCH RULES LAW GIVES THE COMMISSIONER OF THE NATIONAL IMMIGRATION INSTITUTE THE FUNCTION OF SERVING AS SECRETARY OF THE TECHNICAL COUNCIL OF THE INM AS WELL AS PROPOSING THE EXECUTION OF AGREEMENTS AND OTHER LEGAL ACTS RELATED TO THE PROVISION OF IMMIGRATION SERVICE.

**1.5** IT HAS REQUESTED THE COOPERATION OF "CANAERO" AND THE "AIR TRANSPORTATION COMPANIES" IN COLLECTING THE "DNI" ACCORDING TO THE ABOVE-DESCRIBED PLAN.

**1.6** IT DESIGNATES AS ITS DOMICILE FOR THE PURPOSES OF THIS AGREEMENT HOMERO 1832, *COL.* LOS MORALES, *DELEGACION* MIGUEL HIDALGO, POSTAL CODE 11510, MEXICO CITY, FEDERAL DISTRICT.

**2.** THE "CANAERO" REPRESENTS:

**2.1.** THAT IT PROVES ITS LEGAL FORMATION BY PUBLIC DOCUMENT NO. 51949, DATED THE FIFTH OF NOVEMBER OF 1966, EXECUTED BEFORE GRACIANO CONTRERAS, ESQ., NOTARY PUBLIC NO. 54, DULY RECORDED IN THE PUBLIC COMMERCIAL REGISTRY OF MEXICO CITY, FEDERAL DISTRICT.

**2.2.** THAT THE PRESIDENT, THE SECRETARY AND THE EXECUTIVE DIRECTOR HAVE THE AUTHORITY TO EXECUTE THIS AGREEMENT, STATING UNDER OATH THAT IT HAS NOT BEEN REVOKED OR LIMITED.

**2.3.** THAT ITS CORPORATE PURPOSE IS, AMONG OTHER THINGS, REPRESENTING THE GENERAL INTERESTS OF THE COMPANIES ENGAGED IN AIR TRANSPORTATION, WITH OFFICES ESTABLISHED IN THE MEXICAN REPUBLIC, AS WELL AS THEIR ASSOCIATES, BEFORE ANY AUTHORITY.

**2.4.** THAT IT DESIGNATES AS ITS LEGAL DOMICILE FOR THE PURPOSES OF THIS AGREEMENT AVENIDA PASEO DE LA REFORMA NO. 509, *COLONIA* CUAUHTEMOC, *DELEGACION* CUAUHTEMOC, POSTAL CODE 06500, MEXICO CITY, FEDERAL DISTRICT

**3.** "THE AIR TRANSPORTATION COMPANIES" REPRESENT:

4

**3.1** THAT THEY ARE COMPANIES LEGALLY ORGANIZED UNDER THE APPLICABLE LAW, AS RECORDED IN THE MEXICAN AERONAUTICS REGISTRY, AND THAT THEIR REPRESENTATIVES STATE UNDER OATH THAT THEY HAVE THE AUTHORITY TO EXECUTE THIS AGREEMENT.

NOW, THEREFORE, BASED ON ARTICLES ARTICULOS 26, 27, 45 AND 50 OF THE FEDERAL PUBLIC ADMINISTRATION LAW; ARTICLES 1, 4, 37, 38 AND 39 OF THE PLANNING LAW; ARTICLES 1, 2, 14, 15, 21 AND 22 OF THE FEDERAL STATE-OWNED COMPANIES LAW; ARTICLES 1 AND 7 OF THE GENERAL POPULATION LAW; ARTICLE 6 OF THE FEDERAL TREASURY SERVICE LAW; ARTICLES 1, 2, 3 AND 8 OF THE FEDERAL FEE LAW; AND ARTICLES 1, 2, 6, 41, 42 AND 43 OF THE INTERNAL RULES OF THE SECRETARIAT OF THE INTERIOR, THE PARTIES AGREE TO BE BOUND BY THE FOLLOWING:

## CLAUSES

**ONE.-** PURPOSE.

THE PURPOSE OF THIS AGREEMENT IS TO ESTABLISH THE PROPER COORDINATION BETWEEN THE PARTIES FOR THE PURPOSE OF COMPLYING WITH THE PROCEDURE ESTABLISHED HEREIN WITH REGARD TO THE COLLECTION OF THE IMMIGRATION SERVICE FEE FOR NON-IMMIGRANTS ESTABLISHED IN ARTICLE 8, SECTIONS I, III AND VIII OF THE FEDERAL FEE LAW AND IN ACCORDANCE WITH THE OMNIBUS TAX BILL FOR 1999, WHICH IS AN INTEGRAL PART OF THIS DOCUMENT AND WHICH ARE PRESENTED AS EXHIBIT 3, TAKING ADVANTAGE OF THE PLAN, SYSTEMS AND ADMINISTRATIVE MECHANICS AND INFRASTRUCTURE THAT "THE AIR TRANSPORTATION COMPANIES" HAVE.

**TWO.-** THE PARTIES' OBLIGATIONS.

THE PARTIES SHALL COORDINATE AND COOPERATE IN THEIR ACTIONS IN ACCORDANCE WITH THE PROCEDURE FOR THE COLLECTION, GATHERING AND CONTROL OF THE "DNI" AUTHORIZED BY THE SECRETARIAT OF THE TREASURY AND PUBLIC CREDIT, WHICH, HAVING BEEN AGREED TO BY THE PARTIES, SHALL BE AN INTEGRAL PART OF THIS AGREEMENT AS EXHIBIT NUMBER 2.

THE PARTIES AGREE TO ESTABLISH A MECHANISM THAT WILL ALLOW THE REVIEW OF THE PAYMENT OF THE DNI IF THE VARIATION BETWEEN THE FIGURE ESTIMATED BY INM AND THAT THAT PAID BY "THE AIR TRANSPORTATION COMPANIES" IS GREATER THAN 5%.

**THREE.-** "THE AIR TRANSPORTATION COMPANIES'" OBLIGATIONS:

5

A) TO RECEIVE THE NOTICE FROM THE "I.N.M." REGARDING VARIATIONS OF THE AMOUNT OF THE DNI, AS WELL AS ANY OTHER INFORMATION THAT IS NECESSARY FOR ACHIEVING THE PURPOSES OF THIS AGREEMENT.

B) TO COLLECT, FROM PAYERS OF THE "DNI", THE APPROPRIATE FEE UNDER THE FEDERAL FEE LAW, AS COLLABORATORS WITH THE "I.N.M.".

C) TO DETERMINE THE CASES IN WHICH THE DNI IS NOT APPLICABLE, AMONG WHICH ARE MEXICAN NATIONALS WHO PURCHASE AIR TRANSPORTATION TICKETS OUTSIDE OF THE COUNTRY, AND, IF APPLICABLE, MAKE THE APPROPRIATE REIMBURSEMENTS.

D) TO DECLARE AND PAY TO THE TREASURER OF THE FEDERATION, USING FORM 5-A, THE TOTAL AMOUNT COLLECTED FOR THE "DNI" FROM PASSENGERS SUBJECT TO THIS FEE, ACCORDING TO THE PERIODS AND PAYMENT DATES INDICATED IN THE FOLLOWING TABLE:

| PERIOD | PAYMENT DATE |
|---|---|
| FROM JULY 1 TO SEPTEMBER 30 | OCTOBER 31* |
| FROM OCTOBER 1 TO DECEMBER 31 | JANUARY 31* |
| FROM JANUARY 1 TO MARCH 31 | APRIL 30* |
| FROM APRIL 1 TO JUNE 30 | JULY 31* |

* OR THE IMMEDIATELY FOLLOWING BUSINESS DAY, IF A NON-BUSINESS DAY

PAYMENT SHALL BE MADE USING FORM 5-A, INDICATING FEE CODE (427)

E) IF THE TOTAL AMOUNT COLLECTED REFERRED TO IN THE RECEIVING SECTION IS NOT DELIVERED WITHIN THE ESTABLISHED PERIOD OF TIME, ANY AIR TRANSPORTATION COMPANIES, AND ANY THAT ADHERE TO THIS AGREEMENT, THAT HAVE FAILED TO COMPLY SHALL PAY THE SURCHARGES PAYABLE BY THE INM, WHICH SHALL PASS THEM THROUGH TO THE AIR TRANSPORTATION COMPANIES AND ANY THAT HAVE ADHERED TO THIS AGREEMENT, AS THE RESULT OF THE FAILURE OR DELAY IN THE PAYMENT OF THE APPROPRIATE DNI.

F) TO VERIFY OR CONFIRM THE QUARTERLY DECLARATIONS THAT THE AIR TRANSPORTATION COMPANIES WILL SUBMIT TO THE "INM" FOR THE COLLECTION OF THE DNI, THE LATTER MAY HAVE ACCESS TO THE COMPANIES' DEPARTURE MANIFESTS OR THE ACCOUNTING RECORDS FOR THE "DNI", IN THOSE THAT BREAK OUT THE PAYERS OF THIS FEE, AS APPLICABLE.

THE INM MAY REVIEW THE DECLARATIONS FILED BY THE AIR TRANSPORTATION COMPANIES IN CONNECTION WITH THE COLLECTION OF THE DNI WITHIN A PERIOD OF NO MORE THAN 1 YEAR AFTER THE DATE OF THE SUBMISSION THEREOF.

6

AFTER MAKING THE PAYMENT ACCORDING TO THE SCHEDULE DESCRIBED IN SECTION D) ABOVE, THE AIR TRANSPORTATION COMPANIES SHALL, WITHIN 3 BUSINESS DAYS OF DOING SO, FAX THE "INM" A COPY OF THE DECLARATION MADE ON FORM 5-A, AND WITHIN THE FOLLOWING 10 BUSINESS DAYS, A PHOTOSTATIC COPY OF SUCH PROOF OF PAYMENT ATTACHED TO A WRITTEN DOCUMENT ISSUED BY "THE AIR TRANSPORTATION COMPANIES" INDICATING THE PERIOD FOR WHICH PAYMENT IS MADE.

**FOUR.-** "INTERIOR'S" OBLIGATIONS:

IN ACCORDANCE WITH CLAUSE 2, INTERIOR, ACTING THROUGH THE "I.N.M.", SHALL BE OBLIGATED TO:

**A)** TIMELY NOTIFY THE "CANAERO", ON A QUARTERLY BASIS, WITHIN A PERIOD OF 10 BUSINESS DAYS PRIOR TO THE LAST DAY OF THE MONTH, OF THE AMOUNT OF THE "DNI", AS WELL AS ANY OTHER PERTINENT INFORMATION, IN ORDER FOR IT, IN TURN, TO INFORM "THE AIR TRANSPORTATION COMPANIES" THEREOF.

**B)** SUPERVISE AND CHECK "THE AIR TRANSPORTATION COMPANIES" WITH RESPECT TO THE OBLIGATIONS THAT THEY ASSUME HEREUNDER.

**FIVE.-** THE "CANAERO'S" OBLIGATIONS.

TO COMPLY WITH THE COMMITMENTS ASSUMED UNDER THIS AGREEMENT, CANAERO AGREES TO:

**A)** RECEIVE FROM "INTERIOR", THROUGH THE "I.N.M.", THE NOTICE OF THE VARIATIONS OF THE AMOUNT OF "DNI", UNDER CLAUSE FOUR, SECTION A).

**B)** NOTIFY "THE AIR TRANSPORTATION COMPANIES", AND THOSE THAT ADHERE TO THIS AGREEMENT, OF THE AMOUNT OF THE DNI, IN ORDER FOR THEM TO APPLY IT TO THE FOREIGN PASSENGERS: ANY TOURISTS, TRANSMIGRANTS, VISITING BUSINESSMEN AND CONSULTANTS OBLIGATED TO PAY THIS FEE WHO PURCHASE AN INTERNATIONAL AIR TICKET INSIDE OR OUTSIDE OF MEXICO, WHOSE ENTRY INTO THE COUNTRY IS ON OR AFTER THE FIRST DAY OF JULY 1999, IN ACCORDANCE WITH THE RULES ISSUED BY THE SECRETARIAT OF THE TREASURY AND PUBLIC CREDIT (EXHIBIT 3)

**C)** PROMOTE THE ADHERENCE OF THE AIR TRANSPORTATION COMPANIES TO THIS AGREEMENT.

**SIX.-** NOTICES.

"THE AIR TRANSPORTATION COMPANIES" DESIGNATE, AS THEIR DOMICILES FOR THE PURPOSES OF THIS AGREEMENT, THOSE INDICATED IN EXHIBIT 1.

ANY PARTY THAT CHANGES ITS DOMICILE IN THE FUTURE MUST NOTIFY THE COUNTERPARTIES THEREOF IN WRITING WITHIN A PERIOD OF NO MORE THAN 10 DAYS; IF THE AFOREMENTIONED NOTICE IS NOT GIVEN, NOTICES SHALL BE EFFECTIVE AT THE LAST DOMICILE RECORDED. IN ORDER TO FACILITATE RELIABLE AND EFFECTIVE COMMUNICATIONS, THE PARTIES SHALL FORMALLY DESIGNATE, IN WRITING, A PERSON WHO WILL BE RESPONSIBLE FOR SERVING AS THE LIAISON FOR COMPLIANCE WITH THIS AGREEMENT. THE NAME, DOMICILE, TELEPHONE AND FAX NUMBER OF SUCH PERSON SHALL BE PROVIDED WITHIN A PERIOD OF 5 DAYS AFTER THE EXECUTION HEREOF.

**SEVEN.-** FORM OF COLLECTION.

THE COLLECTION OF THE "DNI" BY THE AIR TRANSPORTATION COMPANIES AND ANY THAT ADHERE TO THIS AGREEMENT SHALL BE MADE IN MEXICAN PESOS OR THE EQUIVALENT THEREOF IN A FOREIGN CURRENCY. HOWEVER, IT SHALL ALWAYS BE PAID TO THE TREASURY IN MEXICAN PESOS, AS AGREED IN THIS INSTRUMENT AND THE EXHIBITS THERETO.

THE COLLECTION OF THE "DNI" SHALL BE INCLUDED IN THE AIRLINE TICKET.

IN THE EVENT THAT THE "DNI" IS NOT COLLECTED IN THE AIRLINE TICKET ITSELF, IT SHALL BE PAID BY THE FEE PAYER TO "THE AIR TRANSPORTATION COMPANIES" AT THE TIME THAT HIS DEPARTURE FROM THE COUNTRY IS DOCUMENTED.

**EIGHT.-** OBJECTIONS.

IN THE EVENT THAT THE AIR TRANSPORTATION COMPANIES HAVE PAID IN EXCESS OF THE AMOUNTS COLLECTED FOR THE DNI, THEY SHALL NOTIFY THE I.N.M. THEREOF, WHICH SHALL MAKE A RULING ON SUCH WITHIN A PERIOD OF 15 CALENDAR DAYS FROM THE DATE OF THE NOTICE. IN THE EVENT THAT THE I.N.M. DOES NOT RESOLVE THE OBJECTION WITHIN THE ESTABLISHED PERIOD OF TIME, IT SHALL BE DEEMED VALID.

IF IT IS NOT ACCEPTED AND THERE IS AN OBJECTION BY "THE AIR TRANSPORTATION COMPANIES" WITH RESPECT TO THE AMOUNT OF "DNI" PAID, THE COMPANIES THEMSELVES MAY SUBMIT THEIR OBJECTION IN WRITING TO THE "I.N.M." WITHIN A MAXIMUM PERIOD OF 30 CALENDAR DAYS AFTER THEY RECEIVE THE "OFFICIAL LETTER OF NOTICE". THE FOREGOING SHALL NOT SUSPEND THE OBLIGATION TO DELIVER THE TOTAL AMOUNT OF THE "DNI" INDICATED IN SUCH OFFICIAL LETTER, WITHIN THE PERIOD OF TIME PROVIDED.

IN THE CASE OF VALID OBJECTIONS, THE AIR TRANSPORTATION COMPANIES MAY SET THEM OFF IN THE PAYMENT IMMEDIATELY FOLLOWING THE RULING, IN WHICH EVENT THEY SHALL NOTIFY THE "I.N.M."; THE AFOREMENTIONED AIR TRANSPORTATION COMPANIES SHALL RESERVE THEIR RIGHT WITH RESPECT TO THE RECOVERY OF THE CHARGES INVOLVED, WHICH SHALL BE ACCOMPANIED BY A COPY OF THE APPLICABLE "RULING ON OBJECTION" DOCUMENT. IF NO SUCH COPY EXISTS, THEY SHALL SUBMIT A COPY OF THE OBJECTION DOCUMENT WITH SUCH, STAMPED RECEIVED BY THE I.N.M., PROVIDED THAT 15 CALENDAR DAYS HAVE ELAPSED SINCE THE RESPONSE WAS RECEIVED FROM THE "I.N.M.".

THE INTENT OF THE PARTIES IS TO REDUCE OBJECTIONS RELATED TO THE PROCEDURES TO A MINIMUM, FOR WHICH THE "CANAERO AND INTERIOR" SHALL HAVE PERIODIC MEETINGS AIMED AT THE REVIEW OF SUCH, THE FIRST OF WHICH SHALL BE NINETY DAYS AFTER THE DATE THAT THIS AGREEMENT IS SIGNED.

**NINE.-** ADJUSTMENT OF THE CALCULATION.

THE I.N.M., AS THE RESULT OF THE EXERCISE OF THE POWER OF VERIFICATION REFERRED TO IN CLAUSE THREE, SECTION G), AND IF THE "I.N.M." HAS AN OBJECTION, IT SHALL GIVE NOTICE OF THE CALCULATION THEREOF, WHICH SHALL BE DEEMED VALID AFTER THIRTY DAYS AFTER SUCH NOTICE IS GIVEN, IF THERE IS NO OBJECTION BY THE "AIR TRANSPORTATION COMPANIES", WHICH SHALL PAY SUCH WITHIN THIRTY BUSINESS DAYS AFTER THE DATE OF THE RECEIPT OF THE OFFICIAL LETTER OF NOTICE.

**TEN .-** ADHERENCE TO THIS AGREEMENT.

"THE AIR TRANSPORTATION COMPANIES" MAY ADHERE TO THIS AGREEMENT, THROUGH THEIR RESPECTIVE LEGAL REPRESENTATIVES, BY SIGNING EXHIBIT 1 ATTACHED HERETO, OR BY SENDING THE "I.N.M." AN OFFICIAL COMMUNICATION FROM THE COMPANY TO SUCH EFFECT, WITH A COPY FOR THE "CANAERO", IN ORDER FOR THE OBLIGATIONS AGREED TO HEREIN TO BE DEEMED ASSUMED AS THEIR RESPONSIBILITY.

**ELEVEN.-** PROCEDURE.

FOR THE PURPOSE OF PRECISELY DEFINING THE OPERATIONAL ASPECTS OF THE COMMITMENTS ASSUMED HEREIN, "INTERIOR" AND THE "CANAERO" SHALL PREPARE A PROCEDURE TO BE FOLLOWED. THIS SHALL BE AN INTEGRAL PART OF THIS AGREEMENT AS EXHIBIT NO. 4.

9

SUCH PROCEDURE MAY BE MODIFIED FROM TIME TO TIME, DEPENDING THE NEED TO FACILITATE THE COLLECTION AND PAYMENT OF THE DNI, BY AGREEMENT OF THE PARTIES.

**TWELVE.-** TERM.

THIS AGREEMENT SHALL HAVE A TERM OF SIX MONTHS FROM THE DATE THAT IT IS SIGNED AND AS LONG AS THE DNI ON WHICH IT IS BASED CONTINUES TO EXIST. IN THE EVENT THAT EITHER PARTY WOULD LIKE TO TERMINATE IT IN WRITING, IT MUST NOTIFY THE OTHERS IN WRITING WITHIN A PERIOD OF 90 CALENDAR DAYS PRIOR TO THE TERMINATION DATE.

THE PARTIES STATE THEIR AGREEMENT THAT, IN THE EVENT OF ANY DISPUTE IN THE INTERPRETATION OF, IMPLEMENTATION OF, OR COMPLIANCE WITH, THIS AGREEMENT, THEY SHALL SUBMIT TO THE JURISDICTION OF THE COURTS OF MEXICO CITY, FEDERAL DISTRICT, AND WAIVE ANY JURISDICTION THAT THEY MIGHT BE ENTITLED TO ASSERT BASED ON THEIR CURRENT OR FUTURE DOMICILES.

THE PARTIES, BEING FAMILIAR WITH THE CONTENT AND LEGAL SCOPE OF THIS AGREEMENT AND THE EXHIBITS THERETO, WHICH ARE AN INTEGRAL PART THEREOF, SIGN IT IN WITNESS THEREOF IN SEXTUPLICATE, IN MEXICO CITY, FED. DIST., ON THE 30TH DAY OF THE MONTH OF JUNE OF NINETEEN NINETY-NINE.

FOR "INTERIOR"

[SIGNATURE]

**MR. JOSÉ ÁNGEL PESCADOR OSUNA UNDERSECRETARY FOR POPULATION AND IMMIGRATION SERVICES**

FOR "INTERIOR"

[SIGNATURE]

**MR. GERARDO CAJIGA ESTRADA SENIOR OFFICIAL**

FOR THE "I.N.M."



**DR. ALEJANDRO CARRILLO CASTRO COMMISSIONER OF THE NATIONAL MIGRATION INSTITUTE**



10

Last page of the Agreement to establish the systems, procedures and instructions regarding the collection of fees for immigration services for Non-immigrants, in their status as Tourists (FMT), Transmigrants (FM6), and Visiting Consultants (FMVC), hereinafter referred to as the "DNI," referred to in Article 8, Sections I, III and VIII of the Federal Fee Law.

## FOR THE "CANAERO"

[SIGNATURE]                                    [SIGNATURE]

**JUAN I. STETA, P.E.**                        **MR. JAVIER CRISTLIEB**
**PRESIDENT**                                   **SECRETARY**

[SIGNATURE]

**MR. GABRIEL ORTEGA ALCOCER**
**EXECUTIVE DIRECTOR**

## FOR "THE AIR TRANSPORTATION COMPANIES"

11

CONVENIO DE COLABORACIÓN Y CONCERTACIÓN QUE CELEBRAN POR UNA PARTE LA SECRETARÍA DE GOBERNACIÓN, POR CONDUCTO DE LA SUBSECRETARÍA DE POBLACIÓN Y DE SERVICIOS MIGRATORIOS, REPRESENTADA POR SU TITULAR EL C. LIC. JOSÉ ANGEL PESCADOR OSUNA Y POR EL OFICIAL MAYOR, C. LIC. GERARDO CAJIGA ESTRADA ASISTIDOS POR EL COMISIONADO DEL INSTITUTO NACIONAL DE MIGRACIÓN, A QUIEN EN LO SUCESIVO SE LE DENOMINARÁ "I.N.M.", DR. ALEJANDRO CARRILLO CASTRO, A QUIEN EN LO SUCESIVO SE LE DENOMINARÁ "GOBERNACIÓN", Y LA CÁMARA NACIONAL DE AEROTRANSPORTES REPRESENTADA POR SU PRESIDENTE, EL C. ING. STETA, ASISTIDO POR EL SECRETARIO C. LIC. JAVIER CHRISTLIEB MORALES, Y POR SU DIRECTOR GENERAL, LIC. GABRIEL ORTEGA ALCOCER, A QUIEN EN LO SUCESIVO SE LE DENOMINARÁ LA "CANAERO", Y LAS EMPRESAS DE TRANSPORTE AÉREO AFILIADAS A LA "CANAERO" Y LAS QUE SE ADHIERAN AL PRESENTE CONVENIO, A TRAVÉS DE SUS REPRESENTANTES, CUYA RELACIÓN SE ACOMPAÑA, COMO ANEXO NÚMERO 1, A LAS QUE EN ADELANTE SE LES DENOMINARÁ "LAS EMPRESAS DE TRANSPORTE AÉREO", CON EL PROPÓSITO DE ESTABLECER LAS BASES DE COLABORACIÓN ENTRE LAS PARTES, A FIN DE DAR CUMPLIMIENTO A LAS REGLAS ADMINISTRATIVAS DICTADAS POR LA SECRETARÍA DE HACIENDA Y CRÉDITO PÚBLICO PARA ESTABLECER LOS SISTEMAS, PROCEDIMIENTOS E INSTRUCCIONES EN MATERIA DE RECAUDACIÓN DEL COBRO DE LOS DERECHOS POR SERVICIOS MIGRATORIOS A NO INMIGRANTES, EN SUS CARACTERÍSTICAS DE TURISTAS (FMT), TRANSMIGRANTES (FM6) Y VISITANTES HOMBRES DE NEGOCIOS (FMN), Y VISITANTES CONSEJEROS (FMVC), EN ADELANTE NOMINADO "DNI", A QUE SE REFIERE EL ARTÍCULO 8° DE LA LEY FEDERAL DE DERECHOS, FRACCIONES I, III Y VIII.

## ANTECEDENTES.

I. QUE LA LEY GENERAL DE POBLACIÓN SEÑALA QUE CORRESPONDE A LA SECRETARÍA DE GOBERNACIÓN EN MATERIA MIGRATORIA, ORGANIZAR Y COORDINAR LOS DISTINTOS SERVICIOS MIGRATORIOS; VIGILAR LA ENTRADA Y SALIDA DE LOS NACIONALES Y EXTRANJEROS; REVISAR LA DOCUMENTACIÓN DE LOS MISMOS; APLICAR LA LEY Y SU REGLAMENTO; ASÍ COMO LAS DEMÁS FACULTADES QUE LE CONFIEREN OTRAS DISPOSICIONES LEGALES.

II. QUE LA SECRETARÍA DE GOBERNACIÓN, POR CONDUCTO DEL INSTITUTO NACIONAL DE MIGRACIÓN, EN POLÍTICA DE MATERIA MIGRATORIA, SE HA PLANTEADO EN LA PRESENTE ADMINISTRACIÓN, COMO OBJETIVOS ESTRATÉGICOS:

A) CONTRIBUIR, DE MANERA PERMANENTE, EN LA DEFINICIÓN Y ACTUALIZACIÓN DE UNA POLÍTICA MIGRATORIA QUE RESPONDA A LOS OBJETIVOS NACIONALES Y ALIENTE LOS FLUJOS MIGRATORIOS QUE BENEFICIEN AL PAÍS.

1

B) EJERCER LAS FACULTADES DE VIGILANCIA MIGRATORIA EN EL TERRITORIO NACIONAL, EN UN MARCO DE RESPETO A LA LEY Y A LOS DERECHOS HUMANOS DE LOS MIGRANTES.

C) MEJORAR LA CALIDAD DE LOS SERVICIOS, A TRAVÉS DE LA SIMPLIFICACIÓN DE TRÁMITES, EL DESARROLLO DEL PERSONAL, LA MODERNIZACIÓN TECNOLÓGICA, EL FORTALECIMIENTO DE LA EFICIENCIA ADMINISTRATIVA, LA COLABORACIÓN INTERINSTITUCIONAL Y EL FOMENTO DE UNA CULTURA DE SERVICIO Y HONESTIDAD.

III. EN ESTE CONTEXTO, SE APROBÓ POR EL EJECUTIVO FEDERAL, ENTRE OTROS PROGRAMAS, EL DE NUEVAS FUENTES DE FINANCIAMIENTO DEL PROPIO INSTITUTO, A FIN DE OPTIMIZAR SUS RECURSOS Y APLICARLOS PARA EL MEJOR CUMPLIMIENTO DE LOS OBJETIVOS ESTRATÉGICOS YA MENCIONADOS.   UNA DE LAS ACCIONES CONSECUENTES, ES EL ESTABLECIMIENTO DEL COBRO DE LOS DERECHOS POR SERVICIOS MIGRATORIOS A NO INMIGRANTES, EN SUS CARACTERÍSTICAS DE TURISTAS, TRANSMIGRANTES Y PERSONAS DE NEGOCIOS,   Y VISITANTES CONSEJEROS, EN ADELANTE NOMINADO "DNI", PREVISTO EN EL ARTÍCULO 8 FRACCIONES I, III Y VIII DE LA LEY FEDERAL DE DERECHOS, CUYAS REFORMAS Y ADICIONES FUERON PUBLICADAS EN EL DIARIO OFICIAL DE LA FEDERACIÓN EL 31 DE DICIEMBRE DE 1998.  ASIMISMO, CON FECHA  3 DE MARZO DEL PRESENTE AÑO FUE PUBLICADA EN EL DIARIO OFICIAL DE LA FEDERACIÓN LA MISCELÁNEA FISCAL PARA 1999, QUE EN SU NUMERAL 9, RELATIVO A DERECHOS, CONCRETAMENTE EN LAS REGLAS 9.2., 9.3. Y 9.4, Y EN LA QUINTA RESOLUCIÓN QUE MODIFICA A LA MISCELÁNEA FISCAL PARA 1999 EN SUS REGLAS 9.2, 9.4., 9.5. Y 9.21, CONTIENEN DIVERSAS DISPOSICIONES RELACIONADAS CON EL ARTÍCULO 8 FRACCIONES I, III Y VIII DE LA LEY FEDERAL DE DERECHOS, PARA EFECTOS DEL COBRO DEL "DNI".

IV. QUE EL CÓDIGO FISCAL DE LA FEDERACIÓN ESTABLECE QUE LA RECAUDACIÓN DE TODOS LOS INGRESOS DE LA FEDERACIÓN, AÚN CUANDO ESTÉN DESTINADOS A FINES ESPECÍFICOS, SE HARÁ POR CONDUCTO DE LA SECRETARÍA DE HACIENDA Y CRÉDITO PÚBLICO O POR LAS OFICINAS QUE ÉSTA AUTORICE (ART. 4 PÁRRAFO 2°). ASIMISMO, EL ARTÍCULO 3º, PÁRRAFO QUINTO, DE LA LEY FEDERAL DE DERECHOS, SEÑALA QUE LOS SERVIDORES PÚBLICOS ENCARGADOS DE LA PRESTACIÓN DE LOS SERVICIOS SERÁN RESPONSABLES DEL COBRO Y ENTERO DE LOS DERECHOS PREVISTOS EN DICHA LEY.

V. QUE EN USO DE LAS FACULTADES QUE LE CONFIERE LA LEY DEL SERVICIO DE LA TESORERÍA DE LA FEDERACIÓN, Y EL REGLAMENTO INTERIOR DE LA SECRETARÍA DE HACIENDA Y CRÉDITO PÚBLICO, ÉSTA HA DICTADO LAS REGLAS ADMINISTRATIVAS QUE ESTABLECEN LOS PROCEDIMIENTOS, SISTEMAS, INSTRUCCIONES EN MATERIA DE RECAUDACIÓN DEL DERECHO POR NO INMIGRANTE, A QUE SE REFIERE ESTE CONVENIO, A FIN DE QUE  "CANAERO" Y "LAS EMPRESAS DE TRANSPORTE AÉREO", COLABOREN CON EL "INM", EN EL COBRO DEL "DNI".

2

VI. QUE "LAS EMPRESAS DE TRANSPORTE AÉREO" CUENTAN CON EL ESQUEMA, SISTEMAS, MECANISMOS E INFRAESTRUCTURA ADMINISTRATIVA, MISMA QUE SE CONSIDERA SUJETA A SER APROVECHABLE PARA EL COBRO DEL "DNI".

VII. QUE EL PLAN NACIONAL DE DESARROLLO 1995-2000, ESTABLECE QUE, EN MATERIA DE MODERNIZACIÓN DE LA ADMINISTRACIÓN PÚBLICA ES NECESARIO AVANZAR CON RAPIDEZ Y EFICACIA HACIA LA PRESTACIÓN DE SERVICIOS INTEGRADOS AL PÚBLICO QUE EVITEN TRÁMITES, AHORREN TIEMPO Y GASTOS, E INHIBAN LA DISCRECIONALIDAD; QUE SE REQUIERE UNA RENOVACIÓN QUE REUTILICE SUS ESQUEMAS DE TRABAJO, REORDENE SUS INCENTIVOS, SIMPLIFIQUE SUS PROCEDIMIENTOS Y MODIFIQUE SUS MÉTODOS DE GESTIÓN.

VIII. QUE LA LEY DE PLANEACIÓN ESTABLECE QUE LAS DEPENDENCIAS Y ENTIDADES DEL EJECUTIVO FEDERAL Y LOS PARTICULARES INTERESADOS, PODRÁN CELEBRAR CONVENIOS PARA EL LOGRO DE LAS METAS Y OBJETIVOS PLASMADOS EN EL PLAN NACIONAL DE DESARROLLO.

IX. QUE MEDIANTE LA REGLA 9.21, DE LA QUINTA MODIFICACIÓN DE LA RESOLUCIÓN MISCELANEA FISCAL PUBLICADA EN EL DIARIO OFICIAL DE LA FEDERACIÓN EL DÍA 30 DE JUNIO DE 1999, LA SECRETARÍA DE HACIENDA Y CRÉDITO PÚBLICO, AUTORIZÓ QUE EL ENTERO DE LOS DERECHOS PREVISTOS EN EL ARTÍCULO 8, FRACCIONES I, III Y VIII, DE LA LEY FEDERAL DE DERECHOS, SE EFECTUARÁ POR LAS LÍNEAS AÉREAS NACIONALES O INTERNACIONALES CON LAS QUE EL "I.N.M." CELEBRE LOS CONVENIOS CORRESPONDIENTES, DE CONFORMIDAD CON LO QUE ESTABLECE LA PROPIA SECRETARÍA.

## DECLARACIONES.

1. DE "GOBERNACIÓN".

1.1 QUE ES UNA DEPENDENCIA DEL GOBIERNO FEDERAL DE CONFORMIDAD CON LOS ARTÍCULOS 26 Y 27 DE LA LEY ORGÁNICA DE LA ADMINISTRACIÓN PÚBLICA FEDERAL.

1.2 QUE EL SUBSECRETARIO DE POBLACIÓN Y DE SERVICIOS MIGRATORIOS TIENE FACULTADES PARA SUSCRIBIR EL PRESENTE CONVENIO DE ACUERDO CON LO QUE SEÑALA EL ARTÍCULO 6º, FRACCIÓN IX, DEL REGLAMENTO INTERIOR DE LA PROPIA SECRETARÍA.

1.3 QUE EL OFICIAL MAYOR TIENE FACULTADES PARA SUSCRIBIR EL PRESENTE CONVENIO DE ACUERDO CON LO QUE SEÑALA EL ARTÍCULO 7º, FRACCIÓN X, DEL REGLAMENTO INTERIOR DE LA PROPIA SECRETARÍA.

3

**1.4** QUE CONFORME AL ARTÍCULO 41, DEL REGLAMENTO INTERIOR DE LA SECRETARÍA DE GOBERNACIÓN, PUBLICADO EN EL DIARIO OFICIAL DE LA FEDERACIÓN, EL DIA 31 DE AGOSTO DE 1998, EL INSTITUTO NACIONAL DE MIGRACIÓN ES UN ÓRGANO TÉCNICO DESCONCENTRADO DE LA SECRETARÍA DE GOBERNACIÓN, QUE TIENE POR OBJETO PLANEAR, EJECUTAR, CONTROLAR, SUPERVISAR Y EVALUAR LOS SERVICIOS MIGRATORIOS EN LA REPÚBLICA MEXICANA, A FIN DE GARANTIZAR LA EFICACIA EN LA ATENCIÓN DE LOS PROBLEMAS VINCULADOS CON EL FENÓMENO MIGRATORIO; Y QUE EN EL ARTÍCULO 48 FRACCIONES I Y XIV, DEL MISMO ORDENAMIENTO JURÍDICO, SE OTORGA AL C. COMISIONADO DEL INSTITUTO NACIONAL DE MIGRACIÓN, LA DE FUNGIR COMO SECRETARIO DEL CONSEJO TÉCNICO DEL INM, ASÍ COMO PROPONER LA CELEBRACIÓN DE CONVENIOS Y DEMÁS ACTOS JURÍDICOS RELACIONADOS CON LA PRESTACIÓN DEL SERVICIO MIGRATORIO.

**1.5** QUE HA SOLICITADO LA COLABORACIÓN DE "CANAERO" Y "LAS EMPRESAS DE TRANSPORTE AÉREO" PARA LLEVAR A CABO EL COBRO DEL "DNI", BAJO EL ESQUEMA YA DESCRITO.

**1.6** QUE SEÑALA COMO DOMICILIO PARA LOS EFECTOS DEL PRESENTE CONVENIO, EL UBICADO EN HOMERO 1832, COL. LOS MORALES, DELEGACIÓN MIGUEL HIDALGO, C.P. 11510, MÉXICO, DISTRITO FEDERAL.

**2. LA "CANAERO" DECLARA:**

**2.1.** QUE ACREDITA SU LEGAL CONSTITUCIÓN MEDIANTE ESCRITURA PÚBLICA N° 51949, DE FECHA CINCO DE NOVIEMBRE DE 1966, PASADA ANTE LA FE DEL SEÑOR LICENCIADO GRACIANO CONTRERAS, NOTARIO PÚBLICO NO. 54, DEBIDAMENTE INSCRITA EN EL REGISTRO PÚBLICO DE COMERCIO DE LA CIUDAD DE MÉXICO, DISTRITO FEDERAL.

**2.2.** QUE EL PRESIDENTE, EL SECRETARIO, Y EL DIRECTOR GENERAL CUENTAN CON FACULTADES PARA CELEBRAR ESTE CONVENIO, MANIFESTANDO BAJO PROTESTA DE DECIR VERDAD QUE NO LES HAN SIDO REVOCADAS NI LIMITADAS.

**2.3.** QUE SU OBJETO SOCIAL, ENTRE OTROS, ES EL DE REPRESENTAR LOS INTERESES GENERALES DE LOS INDUSTRIALES QUE SE DEDICAN AL TRANSPORTE AÉREO, CON OFICINAS ESTABLECIDAS EN LA REPÚBLICA MEXICANA, ASÍ COMO A SUS ASOCIADOS ANTE CUALQUIER AUTORIDAD.

**2.4.** QUE SEÑALA COMO DOMICILIO LEGAL, PARA LOS EFECTOS DEL PRESENTE CONVENIO, LA AVENIDA PASEO DE LA REFORMA NO. 509, COLONIA CUAUHTÉMOC, DELEGACIÓN CUAUHTÉMOC, CÓDIGO POSTAL 06500, MÉXICO, DISTRITO FEDERAL.

**3. "LAS EMPRESAS DE TRANSPORTE AÉREO" DECLARAN:**

4

**3.1** QUE SON EMPRESAS LEGALMENTE CONSTITUIDAS, CONFORME A LAS LEYES DE LA MATERIA, SEGÚN CONSTA EN EL REGISTRO AERONÁUTICO MEXICANO Y QUE, BAJO PROTESTA DE DECIR VERDAD, SUS REPRESENTANTES MANIFIESTAN TENER FACULTADES PARA LA CELEBRACIÓN DE ESTE CONVENIO.

POR LO AQUÍ EXPUESTO, Y CON FUNDAMENTO EN LOS ARTÍCULOS 26, 27, 45 Y 50 DE LA LEY ORGÁNICA DE LA ADMINISTRACIÓN PÚBLICA FEDERAL; 1º, 4º, 37, 38 Y 39 DE LA LEY DE PLANEACIÓN; 1º, 2º, 14, 15 21 Y 22 DE LA LEY FEDERAL DE ENTIDADES PARAESTATALES; 1º Y 7º DE LA LEY GENERAL DE POBLACIÓN; 6º DE LA LEY DE SERVICIO DE LA TESORERÍA DE LA FEDERACIÓN, 1º, 2º, 3º Y 8º DE LA LEY FEDERAL DE DERECHOS; 1º, 2º. 6º, 41, 42, 43 DEL REGLAMENTO INTERIOR DE LA SECRETARÍA DE GOBERNACIÓN, LAS PARTES SE SUJETAN A LAS SIGUIENTES:

## CLAÚSULAS

**PRIMERA.-** DEL OBJETO.

EL PRESENTE CONVENIO TIENE POR OBJETO ESTABLECER LA DEBIDA COORDINACIÓN ENTRE LAS PARTES, A FIN DE CUMPLIR CON EL PROCEDIMIENTO ESTABLECIDO EN ÉSTE INSTRUMENTO EN MATERIA DE RECAUDACIÓN DEL DERECHO DE SERVICIOS MIGRATORIOS PARA NO INMIGRANTES, ESTABLECIDO EN EL ARTÍCULO 8, FRACCIONES I, III, VIII, DE LA LEY FEDERAL DE DERECHOS Y  DE ACUERDO A LA RESOLUCIÓN MISCELÁNEA FISCAL PARA 1999, QUE FORMA PARTE INTEGRANTE DE ESTE INSTRUMENTO Y QUE SE PRESENTAN COMO ANEXO 3. APROVECHANDO EL ESQUEMA, SISTEMAS, MECÁNICA E INFRAESTRUCTURA ADMINISTRATIVA,  CON QUE CUENTAN "LAS EMPRESAS DE TRANSPORTE ÁEREO".

**SEGUNDA.-** DE LAS OBLIGACIONES DE LAS PARTES.

LAS PARTES COORDINARÁN Y CONCERTARÁN SUS ACCIONES CONFORME AL PROCEDIMIENTO PARA LA RECAUDACIÓN, CONCENTRACIÓN Y CONTROL DEL "DNI", AUTORIZADO POR LA SECRETARÍA DE HACIENDA Y CRÉDITO PÚBLICO, MISMO QUE ACORDADO POR LAS PARTES FORMA PARTE INTEGRANTE DE ESTE CONVENIO, COMO ANEXO NÚMERO 2.

LAS PARTES ESTÁN DE ACUERDO EN ESTABLECER UN MECANISMO QUE PERMITA LA REVISIÓN DEL ENTERO DEL "DNI", CUANDO LA VARIACIÓN ENTRE LA CIFRA ESTIMADA POR EL INM Y LA ENTERADA POR "LAS EMPRESAS DE TRANSPORTE AÉREO" SEA MAYOR AL 5%

**TERCERA.-** OBLIGACIONES DE "LAS EMPRESAS DE TRANSPORTE AÉREO":

5

**A).** RECIBIR LA NOTIFICACIÓN DEL "I.N.M." RESPECTO DE LAS VARIACIONES DEL MONTO DEL "DNI", ASÍ COMO LA DEMÁS INFORMACIÓN QUE SEA NECESARIA PARA EL CUMPLIMIENTO DE LOS OBJETIVOS DE ESTE CONVENIO.

**B)** COBRAR A LOS CAUSANTES DEL "DNI", LA CUOTA APLICABLE CONFORME A LA LEY FEDERAL DE DERECHOS, COMO COLABORADORES DEL " I.N.M.".

**C)** DISCRIMINAR LOS CASOS EN LOS QUE EL "DNI" NO ES APLICABLE, ENTRE ELLOS LOS NACIONALES MEXICANOS QUE ADQUIERAN BOLETOS DE TRANSPORTE AÉREO EN EL EXTRANJERO Y, EN SU CASO, EFECTUAR LOS REEMBOLSOS CORRESPONDIENTES.

**D)** DECLARAR Y ENTERAR A LA TESORERÍA DE LA FEDERACIÓN, MEDIANTE EL FORMULARIO 5-A,  EL MONTO TOTAL COBRADO POR CONCEPTO DEL "D.N.I." DE LOS PASAJEROS SUJETOS A ESTE DERECHO, CONFORME A LOS PERIODOS Y FECHAS DE ENTERO QUE SE SEÑALAN EN LA SIGUIENTE TABLA:

| PERIODO | FECHA DE ENTERO |
|---|---|
| DEL 01 DE JULIO AL 30 DE SEPTIEMBRE | 31 DE OCTUBRE* |
| DEL 01 DE OCTUBRE AL 31 DE DICIEMBRE | 31 DE ENERO* |
| DEL 01 DE ENERO AL 31 DE MARZO | 30 DE ABRIL* |
| DEL 01 DE ABRIL AL 30 DE JUNIO | 31 DE JULIO* |

* Ó AL SIGUIENTE DÍA HÁBIL INMEDIATO POSTERIOR, SI ESTE FUERA INHABIL.

LOS PAGOS SE HARÁN UTILIZANDO LA FORMA 5-A, SEÑALANDO LA CLAVE DEL DERECHO (427)

**E)** EN CASO DE NO ENTREGAR EL MONTO TOTAL DE LO COBRADO A QUE SE REFIERE EL INCISO ANTERIOR, EN EL TÉRMINO ESTABLECIDO, "LAS EMPRESAS DE TRANSPORTE AÉREO" Y LAS QUE SE ADHIERAN AL PRESENTE CONVENIO QUE HAYAN INCUMPLIDO, CUBRIRÁN LOS RECARGOS QUE RESULTEN A CARGO DEL "INM", QUIEN TRASLADARÁ LOS MISMOS A "LAS EMPRESAS DE TRANSPORTE AÉREO"  Y DE AQUELLAS QUE SE ADHIERAN AL PRESENTE CONVENIO, COMO EFECTO DE LA OMISIÓN O DEL   RETRASO EN EL PAGO DEL "DNI" CORRESPONDIENTE.

**F)** PARA VERIFICAR O CONSTATAR LAS DECLARACIONES TRIMESTRALES QUE PRESENTARÁN "LAS EMPRESAS DE TRANSPORTE AÉREO" AL "INM", POR LA RECOLECCIÓN DEL "DNI", ÉSTE PODRÁ TENER ACCESO A LOS MANIFIESTOS DE SALIDA O A LOS REGISTROS CONTABLES DEL "DNI" DE LAS EMPRESAS, EN LOS QUE SE DISTINGA A LOS CAUSANTES DE ÉSTE DERECHO, SEGÚN SEA EL CASO.

EL "INM" PODRÁ VERIFICAR LAS DECLARACIONES PRESENTADAS POR LAS "EMPRESAS DE TRANSPORTE AÉREO" POR MOTIVO DE LA RECOLECCIÓN DEL "DNI" DENTRO DE UN PERIODO QUE NO EXCEDERÁ DE 1 AÑO DE LA FECHA DE SU PRESENTACIÓN.

6

HABIENDO EFECTUADO EL PAGO DE ACUERDO CON LO QUE SE SEÑALA EN EL CALENDARIO DESCRITO EN EL INCISO D). ANTERIOR, "LAS EMPRESAS DE TRANSPORTE AÉREO" DENTRO DE LOS 3 DÍAS HÁBILES SIGUIENTES A QUE SE HIZO ÉSTE, DEBERÁN ENVIAR POR FAX AL "INM" COPIA DE LA DECLARACIÓN EFECTUADA EN LA FORMA 5-A Y DENTRO DE LOS 10 DÍAS HÁBILES SIGUIENTES, COPIA FOTOSTÁTICA DE DICHO COMPROBANTE DE PAGO ANEXA A UN ESCRITO EMITIDO POR "LAS EMPRESAS DE TRANSPORTE AÉREO", EN EL QUE SE INDIQUE EL PERIODO QUE SE PAGA.

**CUARTA.-** OBLIGACIONES DE "GOBERNACIÓN".

DE CONFORMIDAD CON LA CLÁUSULA SEGUNDA, "GOBERNACIÓN" SE OBLIGA, POR CONDUCTO DEL "I.N.M.", A:

**A)** NOTIFICAR OPORTUNAMENTE A LA "CANAERO" EN FORMA TRIMESTRAL Y EN UN TÉRMINO DE DIEZ DÍAS NATURALES ANTERIORES AL ÚLTIMO DÍA DEL MES, EL MONTO DEL "DNI", ASÍ COMO CUALQUIER OTRA INFORMACIÓN PERTINENTE, PARA QUE ÉSTA, A SU VEZ, LO HAGA DEL CONOCIMIENTO DE "LAS EMPRESAS DE TRANSPORTE AÉREO".

**B)** SUPERVISAR Y VERIFICAR A "LAS EMPRESAS DE TRANSPORTE AÉREO" RESPECTO A LAS OBLIGACIONES QUE CONTRAE EN EL PRESENTE INSTRUMENTO.

**QUINTA.-** OBLIGACIONES DE "CANAERO".

PARA EL CUMPLIMIENTO DE LOS COMPROMISOS CONTRAIDOS EN ÉSTE CONVENIO LA "CANAERO", SE OBLIGA A:

**A)** RECIBIR DE "GOBERNACIÓN", POR MEDIO DEL "I.N.M.", LA NOTIFICACIÓN DE LAS VARIACIONES DEL MONTO DEL "DNI", CONFORME A LA CLÁUSULA CUARTA INCISO A).

**B)** NOTIFICAR A "LAS EMPRESAS DE TRANSPORTE AÉREO" Y A LAS QUE SE ADHIERAN A ÉSTE CONVENIO, EL MONTO DEL "DNI", PARA QUE LO APLIQUEN A LOS PASAJEROS EXTRANJEROS: TURISTAS, TRANSMIGRANTES, HOMBRES DE NEGOCIOS Y VISITANTES CONSEJEROS, CAUSANTES DE ESTE DERECHO Y QUE ADQUIERAN BOLETO AÉREO INTERNACIONAL, DENTRO O FUERA DEL TERRITORIO NACIONAL, CUYO INGRESO AL PAÍS SEA A PARTIR DEL DÍA PRIMERO DE JULIO DE 1999, CONFORME A LAS REGLAS EMITIDAS POR LA SECRETARÍA DE HACIENDA Y CRÉDITO PÚBLICO (ANEXO 3).

**C)** PROMOVER LA ADHESIÓN DE "LAS EMPRESAS DE TRANSPORTE AÉREO", AL PRESENTE CONVENIO.

**SEXTA.-** DE LAS NOTIFICACIONES.

7

"LAS EMPRESAS DE TRANSPORTE AÉREO", SEÑALAN COMO SUS DOMICILIOS PARA EFECTOS DE ÉSTE CONVENIO, LOS QUE SE MENCIONAN EN EL ANEXO 1.

CUALQUIERA DE LAS PARTES QUE CAMBIARA SU DOMICILIO EN EL FUTURO, DEBERÁ DAR AVISO POR ESCRITO A SUS CONTRAPARTES DE TAL CIRCUNSTANCIA, EN UN PLAZO NO MAYOR DE 10 DÍAS; DE NO EFECTUAR EL AVISO SEÑALADO, LAS NOTIFICACIONES SURTIRÁN SUS EFECTOS EN EL ÚLTIMO DOMICILIO QUE SE TENGA REGISTRADO, PARA FACILITAR UNA COMUNICACIÓN CONFIABLE Y EFECTIVA, LAS PARTES SE COMPROMETAN A DESIGNAR FORMALMENTE Y POR ESCRITO A UN RESPONSABLE QUE SERVIRÁ DE ENLACE PARA EL CUMPLIMIENTO DEL PRESENTE CONVENIO, EL NOMBRE, DOMICILIO, TELÉFONO Y FAX DE DICHA PERSONA DEBERÁ DARSE A CONOCER EN UN PLAZO DE CINCO DÍAS A PARTIR DE LA FIRMA DEL PRESENTE INSTRUMENTO.

SÉPTIMA.- FORMA DE COBRO.

EL COBRO DEL "DNI" QUE EFECTÚEN "LAS EMPRESAS DE TRANSPORTE AÉREO", Y AQUELLAS QUE SE ADHIERAN AL PRESENTE CONVENIO, SE REALIZARÁ EN PESOS MEXICANOS O EN SU EQUIVALENTE EN MONEDA EXTRANJERA, SIN EMBARGO SU ENTERO SE EFECTUARÁ SIEMPRE EN MONEDA NACIONAL, DE CONFORMIDAD A LO PACTADO EN EL PRESENTE INSTRUMENTO Y SUS ANEXOS.

EL COBRO DEL "DNI", QUEDARÁ INCLUÍDO EN EL BOLETO DE AVIÓN.

EN CASO DE QUE EL "DNI" NO SEA COBRADO EN EL PROPIO BOLETO DE AVIÓN, EL MISMO SE PAGARÁ POR EL CAUSANTE A  "LAS EMPRESAS DE TRANSPORTE AÉREO" AL MOMENTO DE DOCUMENTAR SU SALIDA DEL PAÍS.

OCTAVA.- DE LAS INCONFORMIDADES.

EN CASO DE QUE "LAS EMPRESAS DE TRANSPORTE AÉREO" HAYAN PAGADO EXCEDENTES DE LOS MONTOS COBRADOS POR EL "DNI", LE NOTIFICARÁN AL "I.N.M." ÉSTA CIRCUNSTANCIA, QUIEN DETERMINARÁ LO CONDUCENTE EN UN TÉRMINO DE 15 DÍAS NATURALES A PARTIR DE LA FECHA DE NOTIFICACIÓN. EN CASO DE QUE EL "I.N.M." NO RESUELVA LA INCONFORMIDAD EN EL PLAZO ESTABLECIDO, ÉSTA SE CONSIDERARÁ PROCEDENTE.

DE NO SER ACEPTADA Y EXISTA INCONFORMIDAD POR PARTE DE "LAS EMPRESAS DE TRANSPORTE AÉREO" RESPECTO AL MONTO PAGADO POR EL "DNI", LAS PROPIAS EMPRESAS PODRÁN REMITIR DENTRO DE UN PLAZO MÁXIMO DE 30 DÍAS NATURALES AL "I.N.M.", CONTADOS A PARTIR DEL DÍA QUE RECIBAN EL "OFICIO DE NOTIFICACIÓN", SU INCONFORMIDAD POR ESCRITO. LO ANTERIOR NO SUSPENDERÁ LA OBLIGACIÓN DE ENTREGAR EL MONTO TOTAL DEL "DNI" SEÑALADO EN DICHO OFICIO, EN EL PLAZO PREVISTO.

EN CASO DE INCONFORMIDADES PROCEDENTES, "LAS EMPRESAS DE TRANSPORTE AÉREO", PODRÁN COMPENSARLAS EN EL PAGO INMEDIATO SIGUIENTE A LA RESOLUCIÓN, DEBIENDO NOTIFICARLO AL "I.N.M."; QUEDANDO A SALVO EL DERECHO DE LAS CITADAS EMPRESAS DE TRANSPORTE AEREO RESPECTO DE LA RECUPERACIÓN DE LOS CARGOS CORRESPONDIENTES, ACOMPAÑANDO COPIA DEL DOCUMENTO: "RESOLUCIÓN DE INCONFORMIDAD" CORRESPONDIENTE. EN CASO DE NO EXISTIR DICHA COPIA, ACOMPAÑARÁ COPIA DEL ESCRITO DE INCONFORMIDAD, SELLADO DE RECIBIDO POR EL "I.N.M.", SIEMPRE Y CUANDO HAYAN TRANSCURRIDO LOS 15 DÍAS NATURALES SIN HABER OBTENIDO RESPUESTA DEL "I.N.M.".

LA INTENCIÓN DE LAS PARTES ES REDUCIR A SU MÍNIMA EXPRESIÓN LAS INCONFORMIDADES RELACIONADAS CON LOS PROCEDIMIENTOS, PARA LO CUAL, "CANAERO" Y "GOBERNACIÓN", TENDRÁN REUNIONES PERIÓDICAS TENDIENTES A SU REVISIÓN, SIENDO LA PRIMERA EN NOVENTA DÍAS CONTADOS A PARTIR DE LA FECHA DE FIRMA DEL PRESENTE CONVENIO.

**NOVENA.-** DEL AJUSTE DE LA LIQUIDACIÓN.

EL "I.N.M.", COMO RESULTADO DEL EJERCICIO DE SU FACULTAD DE VERIFICACIÓN CITADA EN LA CLÁUSULA TERCERA, FRACCIÓN G),   Y CUANDO EXISTA INCONFORMIDAD POR PARTE DEL "I.N.M.", NOTIFICARÁ LA LIQUIDACIÓN CORRESPONDIENTE, LA QUE RESULTARÁ PROCEDENTE DESPUÉS DE TREINTA DÍAS DE SU PRESENTACIÓN, SI NO EXISTE INCONFORMIDAD POR PARTE DE LAS "EMPRESAS DE TRANSPORTE AÉREO", DEBIENDO ÉSTAS LIQUIDARLA DENTRO DE LOS TREINTA DÍAS HÁBILES SIGUIENTES A LA FECHA DE RECEPCIÓN DEL OFICIO DE NOTIFICACIÓN.

**DÉCIMA .-** DE LA ADHESIÓN AL PRESENTE CONVENIO.

"LAS EMPRESAS DE TRANSPORTE AÉREO" PODRÁN ADHERIRSE AL PRESENTE CONVENIO, POR CONDUCTO DE SUS RESPECTIVOS REPRESENTANTES LEGALES, A TRAVÉS DE LA FIRMA DEL ANEXO 1, QUE SE ACOMPAÑA AL PRESENTE DOCUMENTO O BIEN MEDIANTE EL ENVÍO AL "I.N.M." DE UNA COMUNICACIÓN OFICIAL DE LA EMPRESA EN TAL SENTIDO, CON COPIA PARA LA "CANAERO", PARA QUE SE ENTIENDAN ASUMIDAS A SU CARGO LAS OBLIGACIONES AQUÍ PACTADAS.

**DÉCIMA PRIMERA.-** DEL PROCEDIMIENTO.

PARA EFECTOS DE PRECISAR LOS ASPECTOS OPERATIVOS DE LOS COMPROMISOS CONTRAIDOS EN EL PRESENTE INSTRUMENTO, "GOBERNACIÓN", Y "CANAERO" ELABORARON EL PROCEDIMIENTO A SEGUIR. ESTE FORMARÁ PARTE INTEGRANTE DEL PRESENTE CONVENIO COMO ANEXO No. 4.

DICHO PROCEDIMIENTO PODRÁ SER MODIFICADO DE TIEMPO EN TIEMPO, DE ACUERDO CON LAS NECESIDADES DE FACILITAR EL COBRO Y PAGO DEL "DNI", POR ACUERDO ENTRE LAS PARTES.

**DÉCIMA SEGUNDA.-** DE LA VIGENCIA.

EL PRESENTE CONVENIO TENDRÁ UNA VIGENCIA DE SEIS MESES A PARTIR DE LA FECHA DE SU FIRMA O MIENTRAS SUBSISTA EL "DNI" QUE LO ORIGINA. EN EL CASO DE QUE ALGUNA DE LAS PARTES QUISIERA DARLO POR TERMINADO, TENDRÁ QUE DAR AVISO POR ESCRITO A LAS DEMÁS, EN UN TÉRMINO DE NOVENTA DÍAS NATURALES ANTERIORES A LA FECHA DE TERMINACIÓN.

LAS PARTES MANIFIESTAN SU CONFORMIDAD PARA QUE EN CASO DE CONTROVERSIA SOBRE LA INTERPRETACIÓN, INSTRUMENTACIÓN O CUMPLIMIENTO DEL PRESENTE CONVENIO, LAS MISMAS SE SOMETERÁN A LA JURISDICCIÓN Y COMPETENCIA DE LOS TRIBUNALES DE LA CIUDAD DE MÉXICO, DISTRITO FEDERAL, RENUNCIANDO AL FUERO QUE POR RAZÓN DE SU DOMICILIO PRESENTE O FUTURO PUDIERA CORRESPONDERLES.

ENTERADAS DEL CONTENIDO Y ALCANCE LEGAL DE ÉSTE CONVENIO Y SUS ANEXOS, QUE FORMAN PARTE INTEGRAL DEL MISMO, LAS PARTES LO FIRMAN DE CONFORMIDAD POR SEXTUPLICADO EN LA CIUDAD DE MÉXICO, D.F. A LOS 30 DÍAS DEL MES DE JUNIO DE MIL NOVECIENTOS NOVENTA Y NUEVE.

POR "GOBERNACIÓN"

POR "GOBERNACIÓN"

LIC. JOSÉ ÁNGEL PESCADOR OSUNA
SUBSECRETARIO DE POBLACIÓN Y
DE SERVICIOS MIGRATORIOS

LIC. GERARDO CAJIGA ESTRADA
OFICIAL MAYOR

POR EL "INM"

DR. ALEJANDRO CARRILLO CASTRO
COMISIONADO DEL INSTITUTO NACIONAL DE MIGRACIÓN

10

Última página del Convenio para establecer los sistemas, procedimientos e instrucciones en materia de recaudación del cobro de los derechos por servicios migratorios a No Inmigrantes, en sus características de Turistas (FMT), Transmigrantes (FM6), y Visitantes Consejeros (FMVC), en adelante nominado "DNI", a que se refiere el artículo 8° de la Ley Federal de Derechos, fracciones I, III y VIII.

## POR LA "CANAERO"

ING. JUAN I. STETA
PRESIDENTE

LIC. JAVIER CHRISTLIEB
SECRETARIO

LIC. GABRIEL ORTEGA ALCOCER
DIRECTOR GENERAL

## POR "LAS EMPRESAS DE TRANSPORTE AÉREO"

11

**Exhibit 2**

## PROCEDURE FOR THE COLLECTION AND PAYMENT TO THE NATIONAL IMMIGRATION INSTITUTE OF THE NON-IMMIGRANT FEE

ON DECEMBER 31, 1998, THE SECRETARIAT OF THE TREASURY AND PUBLIC CREDIT PUBLISHED, IN THE FEDERAL OFFICIAL GAZETTE, THE LAW AMENDING THE FEDERAL FEE LAW.

THE FEDERAL FEE LAW IN EFFECT FOR 1999, PROVIDES, IN TITLE 1 THEREOF "FEES FOR THE PROVISION OF SERVICES," CHAPTER 1 "THE SECRETARY OF THE INTERIOR," SECTION ONE "IMMIGRATION SERVICES," ARTICLE 8: "THE FOLLOWING IMMIGRATION FEES SHALL BE PAID FOR THE ISSUANCE OF AN AUTHORIZATION GRANTING IMMIGRATION STATUS OF "NON-IMMIGRANT" TO ALIENS, AND FOR ANY EXTENSIONS THEREOF, IN THE VARIOUS IMMIGRATION CATEGORIES:

I.- TOURIST (FMT) ...................................................................................$150.00
II.- VISITING BUSINESSMEN (FMN) OR VISITING CONSULTANTS (FMVC)...............$150.00
III.- TRANSMIGRANT (FM6)........................................................................$150.00

THE NON-IMMIGRANT FEE "DNI" SHALL NOT BE COLLECTED IN THE FOLLOWING CASES:

A) MEXICAN CITIZENS.
B) NON-MEXICAN PASSENGERS, IN CONNECTION OR IN TRANSIT, HEADED OUTSIDE OF MEXICO, WITH THE STAY OF LESS THAN 24 HOURS AT THE POINT OF CONNECTION OR TRANSIT WITHIN MEXICO.
C) DEPORTED AND/OR REJECTED PASSENGERS.
D) CHILDREN LESS THAN 2 YEARS OLD (INFANTS).
E) CREWS IN SERVICE.
E) ALIENS RESIDING IN MEXICO.
F) AERONAUTICAL TECHNICAL PERSONNEL IN SERVICE, HOLDERS OF IMMIGRATION FORM FM3.

IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE 1 OF THE AFOREMENTIONED FEDERAL FEE LAW, SUCH AMOUNTS SHALL BE ADJUSTED FOR INFLATION IN THE MONTHS OF APRIL, JULY, OCTOBER AND JANUARY, WITH THE ADJUSTMENT FACTOR CORRESPONDING TO THE PERIOD SINCE THE FOURTH MONTH IMMEDIATELY PRIOR THERETO TO THE LAST MONTH PRIOR TO THE MONTH FOR WHICH THE ADJUSTMENT IS MADE, OR WHATEVER MAY BE PROVIDED BY THE FEDERAL FEE LAW ITSELF.

THE SECRETARIAT OF THE INTERIOR, THROUGH THE NATIONAL IMMIGRATION INSTITUTE "I.N.M", SHALL NOTIFY THE "CANAERO" OF THE MODIFIED AMOUNTS APPLICABLE IN EACH PERIOD SUBSEQUENT TO JULY 1, THAT IS, FROM OCTOBER ON.

IN ORDER FOR "THE AIR TRANSPORTATION COMPANIES" AFFILIATED WITH THE "CANAERO" TO BE ABLE TO COLLECT AND PAY THIS FEE, FOR SUCH PURPOSE, THE FOLLOWING PROCEDURE SHALL BE FOLLOWED:

1.- THE AIRLINES, TRAVEL AGENCIES OR ANY PERSON THAT IS AUTHORIZED TO ISSUE AN INTERNATIONAL TICKET WITH A DESTINATION FROM OR TO MEXICO SHALL COLLECT THE DNI AT THE TIME OF ISSUING IT, IN ACCORDANCE WITH THE REGULATIONS AND AMOUNT IN EFFECT.

2.- THE CHARGE SHALL APPEAR ON THE TICKET, USING THE CODE "UK," AND SHALL BE RECORDED IN THE MANNER THAT EACH OF THE AIRLINES HAS ESTABLISHED FOR SUCH PURPOSE, IN ACCORDANCE WITH EXHIBIT 1 TO THE COLLABORATION AND COOPERATION AGREEMENT OF WHICH THIS EXHIBIT IS AN INTEGRAL PART.

3.- AT THE TIME THAT THE PASSENGER PRESENTS HIMSELF TO BE DOCUMENTED FOR DEPARTURE FROM MEXICO, "THE AIR TRANSPORTATION COMPANY" SHALL CHECK ON THE TICKET WHETHER THE DNI HAS BEEN COLLECTED AND SHALL PROCEED AS FOLLOWS:

A) IF THE "DNI" HAS BEEN COLLECTED, THE PASSENGER WILL BE DOCUMENTED WITHOUT ANY ADDITIONAL PROCEDURES.
B) IF THE "DNI" HAS NOT BEEN COLLECTED, AND IT IS APPLICABLE ACCORDING TO THE FIRST PARAGRAPHS OF THIS PROCEDURE, IT SHALL BE COLLECTED, AND THE RECEIPT ISSUED, WHICH SHALL BE DELIVERED TO THE PASSENGER.

4.- IF THE "DNI" IS MISTAKENLY COLLECTED FROM AN EXEMPT PASTURE, UPON ISSUING THAT TICKET, AND THIS IS ASSERTED BY THE PASSENGER, HE MAY BE REIMBURSED THROUGH THE SALES CONDUIT OR CHANNEL, PROVIDED THAT THE FOLLOWING IS COMPLIED WITH:

A) THE PASSENGER PROVES, BY THE PRESENTATION OF THE TICKET, THAT HE WAS CHARGED THE DNI, AND IT IS NOTED ON SUCH, WITH THE APPLICABLE CODE AND AMOUNT.
B) THE PASSENGER PROVES THAT HE IS EXEMPT FROM PAYMENT BY A SUITABLE OFFICIAL DOCUMENT ISSUED BY MEXICAN AUTHORITIES.

5.- THE I.N.M. MAY, BY PRESENTING THE APPROPRIATE OFFICIAL LETTER, CHECK THE TICKETS OF ONE OR MORE FLIGHTS, PROVIDED THAT THIS IS DONE WITHIN A PERIOD OF NO MORE THAN ONE HOUR AFTER THE DEPARTURE OF THE FLIGHT.

2

6.    THE "AIR TRANSPORTATION COMPANIES" SHALL BE RESPONSIBLE FOR COLLECTION ONLY WHERE THE "DNI" IS ENTERED ON THE TICKETS OR HAS BEEN COLLECTED AT THE COUNTER AT THE TIME OF DOCUMENTATION, WHICH MAY BE DECLARED ON THE APPLICABLE DEPARTURE MANIFEST OR IN THE ACCOUNTING OF THE AIR TRANSPORTATION COMPANY INVOLVED.

7.    THE "I.N.M." AGREES THAT, DURING THE TERM OF THE COOPERATION AND COORDINATION AGREEMENT FOR THE COLLECTION OF THE "DNI", THE AIR TRANSPORTATION COMPANIES SHALL MAKE THEIR BEST EFFORTS TO COLLECT SUCH FEE, FOR WHICH THEY SHALL USE, TO THE EXTENT POSSIBLE FOR THEM, ALL TECHNICAL AND HUMAN RESOURCES THAT THEY HAVE.

8.    WHILE THE "DNI" COOPERATION AGREEMENT IS IN EFFECT, OR UNTIL ANOTHER COLLECTION MECHANISM IS ESTABLISHED, THE "I.N.M." ACCEPTS THAT "THE AIR TRANSPORTATION COMPANIES" WILL REPORT AND PAY ONLY THE AMOUNT COLLECTED ON THE TICKETS OR AT THE DOCUMENTATION COUNTER, OR BASED ON THEIR OWN ACCOUNTING, OR AS INDICATED IN THE DEPARTURE MANIFESTS THAT THEY HAVE TO SUBMIT TO THE AERONAUTICAL AUTHORITY.

9.    THE PARTIES AGREE TO THE FOLLOWING PAYMENT SCHEDULE:

| DECLARATION PERIODS | DATE OF PAYMENT |
|---|---|
| FROM JULY 1 TO SEPTEMBER 30 | OCTOBER 31* |
| FROM OCTOBER 1 TO DECEMBER 31 | JANUARY 31* |
| FROM JANUARY 1 TO MARCH 31 | APRIL 30* |
| FROM APRIL 1 TO JUNE 30 | JULY 31* |

* OR THE IMMEDIATELY FOLLOWING BUSINESS DAY, IF A NON-BUSINESS DAY

PAYMENT SHALL BE MADE USING FORM 5-A, (SHCP-5) INDICATING FEE CODE (  )

10.   AFTER THE PAYMENT IS MADE, ACCORDING TO THE SCHEDULE SET OUT IN POINT 9 ABOVE, "THE AIR TRANSPORTATION COMPANIES" SHALL, WITHIN 3 BUSINESS DAYS AFTER SUCH IS DONE, FAX THE "I.N.M." A COPY OF THE DECLARATION MADE ON FORM 5-A, AND WITHIN THE FOLLOWING 10 BUSINESS DAYS, A PHOTOSTATIC COPY OF SUCH PROOF OF PAYMENT ATTACHED TO A RECEIPT ISSUED BY "THE AIR TRANSPORTATION COMPANIES", INDICATING THE PERIOD FOR WHICH PAYMENT IS MADE.

11.   THE SOURCE DOCUMENTS THAT WILL BE USED FOR THE RESOLUTION OF DISPUTES SHALL BE: THE DEPARTURE MANIFEST, IF SUCH SYSTEM IS USED. IF THE ACCOUNTING SYSTEM IS USED, THE RESPECTIVE SUPPORTING DOCUMENTS WILL BE RELIED ON.

3

Last page of the procedure for the collection and payment of the non-immigrant fee to the National Immigration Institute.

FOR "INTERIOR"

[SIGNATURE]

MR. JOSÉ ÁNGEL PESCADOR OSUNA
UNDERSECRETARY FOR POPULATION AND
IMMIGRATION SERVICES

FOR "INTERIOR"

[SIGNATURE]

MR. GERARDO CAJIGA ESTRADA
SENIOR OFFICIAL

FOR THE "I.N.M."

[SIGNATURE]

DR. ALEJANDRO CARRILLO CASTRO
COMMISSIONER OF THE NATIONAL MIGRATION INSTITUTE

FOR THE "CANAERO"

[SIGNATURE]

JUAN I. STETA, P.E.
PRESIDENT

[SIGNATURE]

MR. JAVIER CRISTLIEB
SECRETARY

[SIGNATURE]

MR. GABRIEL ORTEGA ALCOCER
EXECUTIVE DIRECTOR

FOR THE "AIR TRANSPORTATION COMPANIES"

4

**PROCEDIMIENTO PARA EL  COBRO Y PAGO AL INSTITUTO NACIONAL DE MIGRACIÓN DEL DERECHO DE NO INMIGRANTE.**

EL PASADO DÍA 31 DE DICIEMBRE DE 1998, LA SECRETARÍA DE HACIENDA Y CRÉDITO PÚBLICO, A TRAVÉS DEL DIARIO OFICIAL DE LA FEDERACIÓN, PUBLICÓ LA LEY QUE MODIFICA LA LEY FEDERAL DE DERECHOS.

LA LEY FEDERAL DE DERECHOS VIGENTE PARA 1999, EN SU TITULO I "DE LOS DERECHOS POR LA PRESTACIÓN DE LOS SERVICIOS", CAPÍTULO I, DE LA SECRETARÍA DE GOBERNACIÓN, SECCIÓN PRIMERA "SERVICIOS MIGRATORIOS", ARTÍCULO 8º, SEÑALA: "POR LA EXPEDICIÓN DE AUTORIZACIÓN EN LA QUE SE OTORGA CALIDAD MIGRATORIA DE "NO INMIGRANTE" A EXTRANJEROS Y POR LAS PRORROGAS CORRESPONDIENTES, EN LAS DIVERSAS CARACTERÍSTICAS MIGRATORIAS, SE PAGARÁ EL DERECHO POR SERVICIOS MIGRATORIOS CONFORME A LAS SIGUIENTES CUOTAS:

I.-                                                                                                    TURISTA
(FMT)...........................................................................................$150.00
II.-VISITANTES  HOMBRES  DE  NEGOCIOS  (FMN)  O  VISITANTE  CONSEJERO
(FMVC)..........................................................................................$150.
00
VIII.-TRANSMIGRANTE
(FM6)...........................................................................$150.00"


EL DERECHO PARA NO INMIGRANTES "DNI", NO DEBERA DE SER COBRADO CUANDO SE TRATE DE LOS SIGUIENTES CASOS:

A) CIUDADANOS MEXICANOS.
B) PASAJEROS NO MEXICANOS, EN CONEXIÓN O TRÁNSITO, HACIA EL EXTRANJERO, CON ESTANCIA MENOR A 24 HORAS EN EL PUNTO DE CONEXIÓN O TRÁNSITO DENTRO DEL TERRITORIO NACIONAL.
C) PASAJEROS DEPORTADOS Y/O RECHAZADOS.
D) MENORES DE HASTA 2 AÑOS. (INFANTES).
E) LAS TRIPULACIONES EN SERVICIO.
E) EXTRANJEROS CON CALIDAD DE RESIDENTES EN MÉXICO.
F)PERSONAL  TÉCNICO  AERONÁUTICO  EN  SERVICIO,  AMPARADO  CON  FORMA MIGRATORIA FM3.

DICHAS CUOTAS, DE ACUERDO A LO QUE SEÑALA EL ARTÍCULO 1º, DE LA MENCIONADA LEY  FEDERAL DE DERECHOS, SE ACTUALIZARÁN EN LOS MESES DE ABRIL,  JULIO,  OCTUBRE  Y  ENERO,  CON  EL  FACTOR  DE  ACTUALIZACIÓN CORRESPONDIENTE AL PERIODO COMPRENDIDO DESDE EL CUARTO MES INMEDIATO ANTERIOR HASTA EL ÚLTIMO MES ANTERIOR A AQUEL POR EL CUAL SE EFECTÚA LA ACTUALIZACIÓN O LO QUE ESTABLEZCA LA PROPIA LEY FEDERAL DE DERECHOS.

LA SECRETARÍA DE GOBERNACIÓN, A TRAVÉS DEL INSTITUTO NACIONAL DE MIGRACIÓN "I.N.M.", NOTIFICARÁ A LA "CANAERO" LAS CUOTAS MODIFICADAS APLICABLES EN CADA PERIODO SUBSECUENTE AL 1º DE JULIO, ES DECIR, DE OCTUBRE EN ADELANTE.

CON OBJETO DE QUE LAS "EMPRESAS DE TRANSPORTE AÉREO", AFILIADAS A LA "CANAERO", ESTÉN EN POSIBILIDAD DE COBRAR Y ENTERAR ESTE DERECHO, CON TAL MOTIVO, SE DEBERÁ SEGUIR EL SIGUIENTE PROCEDIMIENTO:

1.- LAS LINEAS AEREAS, AGENCIAS DE VIAJES O CUALQUIER PERSONA QUE ESTÉ AUTORIZADA PARA EMITIR UN BOLETO INTERNACIONAL, CON DESTINO DE Ó A MÉXICO, DEBERA COBRAR, AL MOMENTO DE EXPEDIRLO, EL "DNI", CONFORME A LA REGLAMENTACIÓN Y MONTO VIGENTE.

2.- EL CARGO DEBERA APARECER EN EL BOLETO UTILIZANDO  EL CODIGO "UK", Y DEBERA REPORTARSE DE LA MANERA QUE CADA UNA DE LAS LINEAS AEREAS TENGA ESTABLECIDO PARA EL CASO, DE ACUERDO CON EL ANEXO 1 DEL CONVENIO DE COLABORACIÓN Y CONCERTACIÓN, DEL CUAL ÉSTE ANEXO FORMA PARTE INTEGRANTE..

3.- AL MOMENTO DE PRESENTARSE EL PASAJERO A DOCUMENTARSE PARA SU SALIDA  DEL TERRITORIO NACIONAL, "LA EMPRESA DE TRANSPORTE AEREO", VERIFICARA EN EL BOLETO QUE EL "DNI" SE HAYA COBRADO, PROCEDIENDO COMO A CONTINUACION SE SEÑALA:

A) SI EL "DNI" FUE COBRADO, SE PROCEDERA A DOCUMENTAR AL PASAJERO, SIN EFECTUAR TRAMITE ADICIONAL.
B) SI EL "DNI" NO FUE COBRADO, Y ESTE APLICA CONFORME A LO SEÑALADO EN LOS PRIMEROS PÁRRAFOS DE ESTE PROCEDIMIENTO, SE PROCEDERA AL COBRO DEL MISMO, EMITIÉNDOSE DOCUMENTO COMPROBATORIO, MISMO QUE SERÁ ENTREGADO AL PASAJERO.

4.- SI EL "DNI" FUE COBRADO, POR ERROR A UN PASAJERO EXENTO, AL EXPEDIR EL BOLETO, Y ESTE ES RECLAMADO POR EL PASAJERO, SE PODRA REEMBOLSAR POR EL CONDUCTO O CANAL DE VENTA, SIEMPRE Y CUANDO SE CUMPLA CON LO SIGUIENTE:

A) QUÉ EL PASAJERO COMPRUEBE, MEDIANTE LA PRESENTACIÓN DEL BOLETO, QUE LE FUE COBRADO EL  "DNI", Y QUE ESTÉ ASENTADO EN EL MISMO, CON LA CLAVE Y MONTO CORRESPONDIENTE.
B) QUÉ EL PASAJERO COMPRUEBE ESTAR EXENTO DEL PAGO, MEDIANTE DOCUMENTO OFICIAL IDÓNEO, EMITIDO POR LAS AUTORIDADES MEXICANAS.

5.- EL "I.N.M." MEDIANTE PRESENTACION DEL OFICIO CORRESPONDIENTE, PODRÁ REALIZAR LA VERIFICACION DE LOS BOLETOS DE UNO O VARIOS VUELOS, SIEMPRE Y CUANDO, ESTA VERIFICACION SE REALICE EN UN PLAZO NO MAYOR A UNA HORA POSTERIOR A LA SALIDA DEL VUELO.

2

6.- "LAS EMPRESAS DE TRANSPORTE AÉREO", SERÁN ÚNICAMENTE RESPONSABLES DE LOS COBROS QUE DEL "DNI," SE ASIENTEN EN LOS BOLETOS O QUE HAYAN SIDO COBRADOS EN EL MOSTRADOR AL MOMENTO DE LA DOCUMENTACIÓN, LOS CUALES PODRÁN SER DECLARADOS EN EL MANIFIESTO DE SALIDA CORRESPONDIENTE O EN LA CONTABILIDAD DE "LA EMPRESA DE TRANSPORTE AÉREO" RESPECTIVA.

7.- EL "I.N.M." ESTA DE ACUERDO EN QUE, DURANTE LA VIGENCIA DEL CONVENIO DE COLABORACIÓN Y CONCERTACIÓN PARA EL COBRO DEL "DNI", "LAS EMPRESAS DE TRANSPORTE AEREO", REALIZARAN SU MEJOR ESFUERZO PARA EL COBRO DE ESTE DERECHO, PARA LO CUAL UTILIZARAN, HASTA DONDE LES SEA POSIBLE SUS RECURSOS TECNICOS Y HUMANOS CON QUE CUENTAN.

8.- EN TANTO EL CONVENIO DE COLABORACIÓN DEL "DNI", ESTÉ VIGENTE, O SE ESTABLEZCA OTRO MECANISMO DE COBRO, EL "I.N.M.", ACEPTA QUE "LAS EMPRESAS DE TRANSPORTE AÉREO" REPORTEN Y ENTEREN ÚNICAMENTE EL MONTO DE LO COBRADO EN LOS BOLETOS O EN EL MOSTRADOR DE DOCUMENTACIÓN O EN BASE A SU PROPIA CONTABILIDAD O A LO SEÑALADO EN LOS MANIFIESTOS DE SALIDA QUE TIENEN QUE PRESENTAR A LA AUTORIDAD AERONÁUTICA.

9.- LAS PARTES ACEPTAN EL SIGUIENTE CALENDARIO DE PAGOS:

| PERIODOS DE DECLARACIÓN | FECHA DE PAGO |
|---|---|
| DEL 01 DE JULIO AL 30 DE SEPTIEMBRE | 31 DE OCTUBRE * |
| DEL 01 DE OCTUBRE AL 31 DE DICIEMBRE | 31 DE ENERO * |
| DEL 01 DE ENERO AL 31 DE MARZO | 30 DE ABRIL * |
| DEL 01 DE ABRIL AL 30 DE JUNIO | 31 DE JULIO * |

* Ó AL SIGUIENTE DÍA HÁBIL INMEDIATO POSTERIOR, SI ESTE FUERA INHABIL.

LOS PAGOS SE HARÁN UTILIZANDO LA FORMA 5-A, (SHCP-5), SEÑALANDO LA CLAVE DEL DERECHO (   ).

10.- HABIENDO EFECTUADO EL PAGO, DE ACUERDO CON LO QUE SE SEÑALA EN EL CALENDARIO DESCRITO EN EL PUNTO 9 ANTERIOR, "LAS EMPRESAS DE TRANSPORTE AÉREO" DENTRO DE LOS 3 DÍAS HÁBILES SIGUIENTES A QUE SE HIZO ÉSTE, DEBERÁN ENVIAR POR FAX AL "INM" COPIA DE LA DECLARACIÓN EFECTUADA EN LA FORMA 5-A, Y DENTRO DE LOS 10 DÍAS HÁBILES SIGUIENTES, COPIA FOTOSTÁTICA DE DICHO COMPROBANTE DE PAGO ANEXA A UN RECIBO EMITIDO POR "LAS EMPRESAS DE TRANSPORTE AÉREO", EN EL QUE SE INDIQUE EL PERÍODO QUE SE PAGA.

11.- LOS DOCUMENTOS FUENTE QUE SE UTILIZARÁN PARA LA RESOLUCIÓN DE LAS INCONFORMIDADES SERÁN: EL MANIFIESTO DE SALIDA, CUANDO SE UTILICE DICHO ESQUEMA. SI SE UTILIZA EL SISTEMA CONTABLE, SE ACUDIRÁ A LOS DOCUMENTOS SOPORTE RESPECTIVOS.

3

Última página del procedimiento para
el cobro y pago al Instituto Nacional
de Migración del Derecho de No
Inmigrante.

POR "GOBERNACIÓN

LIC. JOSÉ ANGEL PESCADOR OSUNA
SUBSECRETARIO DE POBLACIÓN Y
DE SERVICIOS MIGRATORIOS

POR "GOBERNACIÓN"

LIC. GERARDO CAJIGA ESTRADA
OFICIAL MAYOR

POR EL "INM

DR. ALEJANDRO CARRILLO CASTRO
COMISIONADO DEL INSTITUTO NACIONAL DE MIGRACIÓN

POR LA "CANAERO"

ING. JUAN I. STETA
PRESIDENTE

LIC. JAVIER CHRISTLIEB
SECRETARIO

LIC. GABRIEL ORTEGA ALCOCER
DIRECTOR GENERAL

POR "LAS EMPRESAS DE TRANSPORTE AÉREO"

4