# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

JULIAN ALMANZA, ALEJANDRO          *
DAVISON, ANA ESCOBAR, NICOLAS      *
ARROYO, MIGUEL OROZCO, and         *
AIDA PEREZ, individually, and      *
on behalf of all others            *          CV 215-033
similarly situated,                *
                                   *
        Plaintiffs,                *
                                   *
    v.                             *
                                   *
UNITED AIRLINES, INC., a           *
corporation; DELTA AIRLINES,       *
INC., a corporation; AMERICAN      *
AIRLINES, INC., a                  *
corporation; AEROVIAS DE           *
MEXICO S.A. DE C.V., a             *
corporation; CONCESIONARIA         *
VUELA COMPANIA DE AVIACION,        *
S.A.P.I. DE C.V.; ABC              *
AEROLINEAS, S.A. DE C.V., a        *
corporation; and U.S.              *
AIRWAYS, INC.,                     *
                                   *
        Defendants.                *

## ORDER

This matter comes before the Court on six Motions to

Dismiss filed by the several Defendant airlines: Delta Air

Lines, Inc. ("Delta") (dkt. no. 88)[1]; ABC Aerolineas, S.A. de

---

[1]  While the docket lists "Delta Airlines, Inc." as a Defendant in this
case, the briefing before the Court reveals that this entity is
actually named "Delta Air Lines, Inc." See Dkt. No. 88.  The Clerk of

C.V. ("Interjet") (dkt. no. 89); United Airlines, Inc. ("United") (dkt. no. 93); Concesionaria Vuela Compania de Aviacion, S.A.P.I. de C.V. ("Volaris") (dkt. no. 97); American Airlines, Inc. ("American") and U.S. Airways, Inc. ("U.S. Airways") (dkt. no. 102); and Aerovias de Mexico, S.A. de C.V. ("Aeromexico") (dkt. no. 103).  The Court held a hearing on Defendants' Motions on January 12, 2016, and thereafter allowed the parties a period of ten days to supplement their briefing on the issues raised therein.  Dkt. No. 154.  On January 22, 2016, Plaintiffs filed a supplemental brief and Motion for Leave to Amend their Complaint.  Dkt. No. 155.  For the following reasons, Defendants' Motions to Dismiss (dkt. nos. 88-89, 93, 97, 102-03) are **GRANTED**, and Plaintiffs' Motion for Leave to Amend (dkt. no. 155) is **DENIED**.

## BACKGROUND

Plaintiffs purport to represent a class of Mexican nationals, children under the age of two, and foreigners with resident status in Mexico, who have purchased tickets from Defendants for air travel from the United States to Mexico and paid an unreimbursed "Mexican Tourism Tax" (the "Tax") in connection therewith.  Dkt. No. 1 ("Compl."), ¶ 1.  Defendants are international air-transportation companies; Delta, United,

---

Court is thus **DIRECTED** to correct the name of this Defendant upon the docket of this case.

American, and U.S. Airways are incorporated in the United States, while Aeromexico, Volaris, and Interjet are Mexican corporations doing business in and having registered agents for service of process in the United States. Id. at ¶¶ 4, 29-35. Defendants are all members of Camera Nacional de Aerotransportes ("CANAERO")—a Mexican legal entity comprised of airlines that, like Defendants, "transport passengers to and from Mexico and the United States, among other countries." Id. at ¶ 4. Defendants regularly meet with each other and Mexican authorities for the purposes of CANAERO. Id.

**I.   The Tax and CANAERO Contract**

The Mexican government has legislatively mandated that travelers arriving on flights to Mexico from other countries must pay a tourism Tax—or mandatory fee—to the government. Id. at ¶ 5. The taxing legislation, however, exempts certain groups of individuals from the Tax, including Mexican nationals and children under two years' of age. Id.

On or around June 30, 1999, the Mexican government entered into a contract with CANAERO, on behalf of Defendants and its other member airlines ("CANAERO Contract" or the "Contract"). Id.[2] The CANAERO Contract sets forth a procedure through which Defendants and the other airlines collect the Tax from

---

[2]   According to the Complaint, each of the Defendants became a signatory to the CANAERO Contract on this date, or upon beginning to operate flights to and from Mexico at a later date. Compl., ¶ 5.

AO 72A
(Rev. 8/82)

passengers and remit the same to the Mexican government.  See generally id. at Ex. 1 ("CANAERO Contract"); id. at Ex. 2 ("CANAERO Procedures").[3]  The Contract specifies that "[t]he collection of the [Tax] shall be included in the airline ticket."  CANAERO Contract, p. 8; see also CANAERO Procedures, p. 2 ("The airlines, travel agencies or any person that is authorized to issue an international ticket with a destination from or to Mexico shall collect the [Tax] at the time of issuing it, in accordance with the regulations and amount in effect.").  The charge must appear on the ticket, with the code "UK." CANAERO Procedures, p. 2.

Importantly, the CANAERO Contract provides that Defendants and the other airlines must not tax certain individuals, including Mexican citizens, children under the age of two, and foreigners residing in Mexico (collectively, "Exempt Passengers").  Id. at p. 1.  The Contract requires that the airlines "determine the cases in which the [Tax] is not applicable," including where Mexican nationals purchase air-transportation tickets from outside of Mexico, and "make the appropriate reimbursements" where necessary.  CANAERO Contract, p. 6.  In particular, the CANAERO Procedures include the following:

---

[3]  Defendants have stipulated for the purpose of the instant Motions that the CANAERO Contract and CANAERO Procedures attached to Plaintiffs' Complaint accurately reflect the agreement between the Mexican government and CANAERO.  See, e.g., Dkt. No. 88, p. 7.

If the [Tax] is mistakenly collected from an Exempt Pas[senger], upon issuing that ticket, and this is asserted by the passenger, he may be reimbursed through the sales conduit or channel, provided that the following is complied with:

A) The passenger proves, by the presentation of the ticket, that he was charged the [Tax], and it is noted on such, with the applicable code and amount.

B) The passenger proves that he is exempt from payment by a suitable official document issued by Mexican authorities.

CANAERO Procedures, p. 2.  The airlines must then remit to the Mexican government the amounts collected from nonexempt passengers, along with passenger manifests and a form showing the number of passengers per flight who were subject to the Tax. Compl., ¶ 7; see also CANAERO Contract, p. 6; CANAERO Procedures, p. 3.

## II.  Defendants' Performance of the CANAERO Contract

In carrying out their contractual obligations, Defendants have allegedly assessed the Tax in their respective airline-ticket sales to both Exempt Passengers and nonexempt passengers alike.  Compl., ¶ 10.  According to Plaintiffs, Defendants have collected the Tax from Exempt Passengers in the following instances:

- On April 18, 2011, Plaintiff Julian Almanza ("Almanza"), a Mexican citizen living in Chicago, Illinois, took Delta flights 418 and 365 to travel from San Juan, Puerto Rico, through Atlanta, Georgia, to Mexico City, Mexico.  Id. at ¶

5

24.   Delta had issued Almanza ticket number 00621874983730
and imposed a $21.79 fee for the Tax.   <u>Id.</u>

- On July 29, 2011, Plaintiff Miguel Orozco ("Orozco"), a
  Mexican citizen residing in Atlanta, Georgia, flew from
  Atlanta, Georgia, to Guadalajara, Mexico, on Delta flight
  537.   <u>Id.</u> at ¶ 23.   Delta had issued Orozco ticket number
  00623547806232 and, in doing so, charged him the Tax in the
  amount of $22.19.   <u>Id.</u>

- On March 30, 2012, Orozco flew from Atlanta, Georgia, to
  Cancun, Mexico, on Delta flight 691.   <u>Id.</u>   Orozco held
  ticket number 00623681482152, the purchase of which had
  included $21.80 for the Tax.   <u>Id.</u>

- On July 12, 2013, Plaintiff Nicolas Arroyo ("Arroyo") took
  Interjet flight 961 from San Antonio, Texas, to Monterrey,
  Mexico.   <u>Id.</u> at ¶ 28.   Plaintiffs state that Arroyo's
  ticket had reservation code Z7ZHGP and a charge for the Tax
  in an undisclosed amount.   <u>Id.</u>

- On December 14, 2013, Plaintiff Alejandro Davison
  ("Davison")—another Mexican citizen living in Chicago,
  Illinois—traveled from Chicago, Illinois, through Atlanta,
  Georgia, to Mexico City, Mexico, on Delta flights 2030 and
  363.   <u>Id.</u> at ¶ 25.   Davison held ticket number
  00623464108735 and had been charged $27.02 for the Tax.
  <u>Id.</u>

- On December 20, 2013, Almanza flew from Chicago, Illinois, to Mexico City, Mexico, on American Airlines flight 658, with ticket number 0012374181011 and having paid $22.52 as the Tax. Id. at ¶ 24.

- On December 24, 2013, Davison took United flight 343 from Atlanta, Georgia, to Guadalajara, Mexico. Id. at ¶ 25. United had sold a ticket to Davison with the confirmation code JPSK8Q and assessed a fee in an amount equal to $22.05 for the Tax. Id.

- On May 9, 2014, Plaintiff Aide Pineda ("Pineda"), a citizen of Mexico residing in Chicago, Illinois, traveled on Aeromexico flight 689 from Chicago, Illinois, to Mexico City, Mexico. Id. at ¶ 27. Pineda's ticket was registered under number 1397394069199 and included the Tax in the amount of $23.16. Id.

- On June 28, 2014, Plaintiff Ana Escobar ("Escobar"), a Mexican citizen living in Chicago, Illinois, flew from Chicago, Illinois, to Mexico City, Mexico, on Aeromexico flight 689. Id. at ¶ 26. Escobar carried ticket number 1392184167363, which she had purchased from Aeromexico for a price that included $21.80 for the Tax. Id.

- On July 6, 2014, Almanza took another flight from Chicago, Illinois, to Mexico City, Mexico—this time on Volaris

AO 72A
(Rev. 8/82)

flight 935.  Id. at ¶ 24.  Volaris had issued Almanza a
ticket with reservation code PHHYOL and charged him the Tax
in the amount of $45.08.  Id.

- On October 22, 2014, Almanza again traveled from Chicago,
Illinois, to Mexico City, Mexico.  Id.  On this occasion,
however, Almanza flew on Aeromexico flight 689, having
purchased ticket number 1392186720167 and paid $23.16 for
the Tax.  Id.

- On January 13, 2015, Almanza once again journeyed from
Chicago, Illinois, to Mexico City, Mexico.  Id.  Almanza
took U.S. Airways flight 1597, having reserved a seat under
the confirmation code AWB4T2 and paid $22.97 in fees owing
to the Tax.  Id.

- On January 18, 2015, Arroyo went from Houston, Texas, to
Monterrey, Mexico, on United flight 4652.  Id. at ¶ 28.
Arroyo's ticket purchase included a fee for the Tax—the
amount of which Plaintiffs do not now disclose—and a
confirmation code of LE4D4Q.  Id.

Notably, Defendants "[n]ever disclosed the terms of the
CANAERO Contract publicly, or otherwise expressly notified
Exempt [Passengers] of their right not to have the . . . Tax
collected from them, or to be refunded the amount . . . if
collected in error."  Id. at ¶ 20.  "Nowhere on their websites,
or on passenger tickets or invoices, [did] . . . Defendants

AO 72A
(Rev. 8/82)

disclose" these matters.  Id. at ¶ 21.  Rather, in each of these and other transactions with Exempt Passengers, the Defendant airline simply included the Tax as a line-item charge—usually in an amount between twenty and twenty-five dollars—not on the face of the ticket but "buried in the details of the costs and fees of each ticket purchased."  Id. at ¶ 1.

Each Defendant allegedly did so despite having "collect[ed], register[ed], know[n], and/or ha[d] constructive knowledge of their passengers' passport numbers and nationalities (information collected online or by sales agents when the passengers would buy their tickets to Mexico and, significantly, information that instantly identifies passengers who are exempt from the [T]ax)."  Id. at ¶ 10.  Even so, it does not appear that any Plaintiff or other member of the proposed class actually presented proof of his or her Mexican citizenship at the time of purchasing an airline ticket from any Defendant.

After collecting the Tax in these instances, Defendants allegedly chose neither to pay the funds to Mexico nor to refund them to the passengers but, instead, to "retain[] and reinvest[] those . . . taxes into their respective operations."  Id. However, there is no suggestion that any Plaintiff or other class member ever identified him or herself as a Mexican citizen when checking in for a flight, or otherwise requested a refund

AO 72A
(Rev. 8/82)

of the Tax with proof of citizenship but was denied reimbursement by a Defendant.

## III. Previous Lawsuits

Various Exempt Passengers have previously brought lawsuits against some of the Defendants in this case, based on their collection of the Tax.  Id. at ¶ 11.

In Sanchez v. Aerovias de Mexico, S.A. de C.V., the plaintiff and the class that she sought to represent were Mexican citizens who were exempt from the Tax but nevertheless had paid this fee in purchasing tickets for air travel on Aeromexico flights from the United States to Mexico.  590 F.3d 1027, 1028 (9th Cir. 2010).[4]  The plaintiff filed suit against Aeromexico alleging breach of contract and other violations of California state law.  Id.  Specifically, the plaintiff argued that the airline had become contractually bound by the representations on its Web site, and that it had violated those contractual obligations by collecting the Tax from Exempt Passengers and failing to disclose their exemption and entitlement to a refund.  Id.

Aeromexico filed a declaration of its Vice President Comptroller, Cesar Laguna ("Laguna"), made under penalty of perjury.  Compl., ¶ 16; see also Declaration of Cesar Laguna in

---

[4]  The plaintiff, in particular, had bought a roundtrip ticket from Aeromexico for travel between Los Angeles, California, and Guadalajara, Mexico—the purchase price of which included $22.00 attributable to the Tax.  Sanchez, 590 F.3d at 1028.

Support of Motion to Dismiss or, in the Alternative, Motion for

Summary Judgment of Aerovias de Mexico, S.A. de C.V., Sanchez v.

Aerovias de Mexico, S.A. de C.V., No. 07—cv-07280-R-RC (C.D.

Cal. Feb. 8, 2008), ECF No. 35 [hereinafter Laguna Decl.].

Discussing the Tax, Laguna represented that CANAERO, on behalf

of its member airlines, had "agreed with the government of

Mexico on procedures whereby Aeromexico and the other airlines

it represents would collect the [Tax] from passengers traveling

on routes from abroad into Mexico, then remit the [Tax] to the

government of Mexico." Laguna Decl., ¶ 4.  Laguna continued:

> 5.  Where it applies, the [Tax] is included in the
> price of the ticket, and it is collected from the
> passenger at the time the ticket is sold.
>
> 6.  The collection of the [Tax] is a service which the
> airlines provide to both the government of Mexico and
> passengers as the collection of the fee at the time of
> ticketing facilitates the flow of passengers through
> the airports of Mexico.
>
>     . . . .
>
> 8.  Aeromexico's competitors who fly between Mexico
> and other countries, including the United States, also
> provide this service.  I am informed and believe that
> Mexicana, Alaska Airlines, United . . . ,
> American . . . , and other airlines which fly routes
> into Mexico all provide this service to their
> passengers.
>
> 9.  With respect to the collection of the [Tax], it is
> not feasible for Aeromexico to implement procedures
> that are different from those of its competitors, and
> that could inhibit the flow of its passengers through
> the airports.  Any change in procedures that would
> inhibit the flow of Aeromexico's passengers routed to
> Mexico through the destination airports or cause its

passengers to experience longer delays than passengers of other airlines would put Aeromexico at a competitive disadvantage with the other airlines operating on routes to Mexico.

Id. at ¶¶ 5-6, 8-9.

The Court of Appeals for the Ninth Circuit upheld the district court's grant of summary judgment in favor of Aeromexico on the basis that the Airline Deregulation Act of 1978 (the "ADA"), 49 U.S.C. § 41713(b)(1), preempted the state-law claims. Sanchez, 590 F.3d at 1028. The court explained that the ADA preempts "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier," but "does not 'shelter airlines from suits . . . seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings.'" Id. at 1029-30 (first quoting 49 U.S.C. § 41713(b)(1); then quoting Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 228 (1995)). The court reasoned that the state-law claims related to Aeromexico's "price[s], route[s], or service[s]" and were not excepted from the ADA because the airline, through its Web site, had not self-imposed any contractual duty to collect the Tax only from nonexempt passengers or to advise Exempt Passengers of their rights not to pay the Tax or to obtain a refund after doing so. Id. at 1028, 1030-31 (quoting 49 U.S.C. § 41713(b)(1)).

AO 72A
(Rev. 8/82)

McMullen v. Delta Air Lines, Inc. similarly involved a plaintiff who, both individually and on behalf of a proposed class, sued the defendant airline for breach of contract under California law based on its collection of the Tax from Exempt Passengers. 361 F. App'x 757, 758 (9th Cir. 2010). Unlike the plaintiff in Sanchez, however, the plaintiff in McMullen relied on two provisions in Delta's contract of carriage to support his breach of contract theory. Id. at 758 & n.1. Even so, the Ninth Circuit affirmed the dismissal of the plaintiff's breach of contract claim. Id. at 758. The court found that even assuming that the claim could survive ADA preemption—either because it did not relate to an air carrier's price, route, or service, or because it fell within the exception for self-imposed obligations—the claim failed "because it [did] not refer to any contractual language that obligate[d] Delta not to collect the . . . [T]ax from all passengers to Mexico, regardless of whether they are exempt from the tax." Id. (citing 49 U.S.C. § 41717(b)(1) and Wolens, 513 U.S. at 219).

## IV.  Plaintiffs' Causes of Action

On March 10, 2015, Plaintiffs, both individually and on behalf of similarly situated Exempt Passengers, filed a Complaint against the Defendant airlines. See generally Compl. Plaintiffs allege that this Court has jurisdiction over the domestic and foreign Defendants alike, because each Defendant

AO 72A
(Rev. 8/82)

has "continuously and systematically conducted business or 'transact[ed] affairs' in this District, and/or has minimum contacts with the United States." Id. at ¶ 36 (alteration in original) (quoting 18 U.S.C. § 1965(a)-(b), (d)). Plaintiffs also state that venue is proper in this Court because all Defendants are subject to personal jurisdiction in this District, and because a substantial part of the events giving rise to this litigation occurred here. Id. at ¶ 37 (first citing 28 U.S.C. § 1391(b)(2)-(3); then citing 18 U.S.C. § 1965).

The crux of Plaintiffs' Complaint is that Defendants have violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), by developing and implementing a scheme to knowingly and wrongfully charge the Tax to Exempt Passengers. Id. at ¶ 1. According to Plaintiffs, Defendants have acted as an "association-in-fact" RICO enterprise, based on both their participation in CANAERO—including their membership in the organization, "regular[] participat[ion] in meetings with each other and various Mexican authorities under the aegis of CANAERO," and agreement to the terms of the CANAERO Contract—and their subsequent "agree[ment] among themselves, either expressly or tacitly, to scheme to collect monies from Plaintiffs under the aegis of the . . . Tax that was never actually owed." Id. at ¶¶ 4, 51; see also id. at ¶ 18 ("[R]ather than comply with

the terms of the CANAERO Contract, all of the Defendants have agreed to self-impose the collection of the . . . Tax from Exempt [Passengers].”); id. at ¶ 67 (“The [Laguna] [D]eclaration indicates there was a tacit, if not explicit, agreement or understanding among the Defendants not to disrupt this practice [of collecting the Tax from Exempt Passengers].”).

In furtherance of this scheme, Plaintiffs contend that Defendants engaged in a pattern of racketeering activity by using mail and wire communications to make fraudulent representations or omissions regarding their ability to collect the Tax from Plaintiffs, Plaintiffs’ exemption from the Tax, and the availability of refund procedures. See id. at ¶¶ 62-64. Plaintiffs state that “Defendants have transmitted, caused to be transmitted or invited others to transmit to class members advertising, tickets, itinerary confirmations, receipts, invoices, and other material relevant to airfare tickets for travel from the United States to Mexico, by mail or private or commercial carriers (such as UPS).” Id. at ¶ 64.[5] Additionally, Plaintiffs maintain that “Defendants have used the Internet to disseminate, publish, and/or direct to the public in general and class members in particular the same types of material and

---

[5]  Plaintiffs allege that each invoice or statement that included the Tax and was sent by mail to a class member constitutes a separate predicate act of mail fraud. Compl., ¶ 65. As examples of such invoices or statements, Plaintiffs cite the tickets, reservations, and confirmations issued to Davison, Escobar, Pineda, and Arroyo in this case. Id. (citing Compl., ¶¶ 25-29).

15

information"—whether through "writings, signs, signals, pictures, or sounds" or in the form of "webpages, e[-]mails, text messages, receipts, itineraries, [or] flight confirmations." Id. at ¶ 66.

Based on these allegations, Plaintiffs set forth three RICO claims: In count one, Plaintiffs assert that Defendants have violated 18 U.S.C. § 1962(c) ("Section 1962(c)") by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Id. at ¶ 78 (quoting 18 U.S.C. § 1962(c)). Plaintiffs' count two claims that Defendants have violated 18 U.S.C. § 1962(a) ("Section 1962(a)") by receiving income through the pattern of racketeering activity and "using portions of those ill-gotten gains to fund CANAERO, and/or to increase and/or sustain Defendants' individual and collective market access and profits in the United States-to-Mexico air travel market." Id. at ¶¶ 80-81. The third and final count seeks recovery pursuant to 18 U.S.C. § 1962(d) ("Section 1962(d)") for Defendants' alleged participation in a conspiracy to engage in the violations of Section 1962(c) set forth in count one. Id. at ¶¶ 83-84.

As relief, Plaintiffs seek treble damages, temporary and permanent injunctive relief, disgorgement of unlawfully obtained proceeds, costs, expenses, and attorneys' fees. Id. at ¶¶ a-f.

Plaintiffs attach to their Complaint copies of the CANAERO Contract and CANAERO Procedures in their original Spanish versions, as well as their English translations.  See CANAERO Contract; CANAERO Procedures.

## DISCUSSION

Defendants now separately move the Court to dismiss Plaintiffs' Complaint on various grounds.  All Defendants seek dismissal of the Complaint for failure to state a RICO claim.  See Dkt. Nos. 88–89, 93, 97, 102–03.  Additionally, the following Defendants raise these arguments: Delta, Interjet, American, and U.S. Airways argue for a dismissal for failure to join a party, dkt. nos. 88–89, 102; Interjet, Volaris, and Aeromexico do so based on a lack of personal jurisdiction and insufficient service of process, dkt. nos. 89, 97, 103; Interjet urges dismissal due to improper venue, dkt. no. 89; and Volaris and Aeromexico make arguments relating to the extraterritorial application of RICO, dkt. nos. 97, 103.  While having responded in opposition to these Motions, see dkt. nos. 117–22, 155, Plaintiffs nevertheless move the Court for leave to amend their Complaint in the event that it is otherwise subject to dismissal on the asserted grounds, dkt. no. 155.  The Court addresses the parties' Motions in turn.

**I.   Defendants' Motions to Dismiss for Failure to State a RICO Claim (Dkt. Nos. 88–89, 93, 97, 102–03)**

Defendants maintain that Plaintiffs' Complaint is subject to dismissal, because it fails to plead sufficient facts to satisfy the generally applicable plausibility pleading standard, and thus falls far short of exhibiting the heightened specificity required in the RICO context.  See, e.g., Dkt. No. 88, p. 10.  Specifically, Defendants contend that all three counts of the Complaint are deficient because Plaintiffs do not make a foundational showing that Defendants have formed a RICO enterprise, see, e.g., id. at pp. 11-20, and that they have engaged in a pattern of racketeering through mail or wire fraud, see, e.g., dkt. no. 93, pp. 18-27.[6]  Defendants further argue that each count fails because it lacks another element of the particular RICO claim asserted therein: count one does not establish that each airline has conducted the affairs of the alleged enterprise, rather than merely its own affairs; count two lacks any cognizable investment injury; and count three fails to demonstrate that Defendants conspired or took actions that would violate RICO.  See, e.g., Dkt. No. 88, pp. 20-26.  In response, Plaintiffs rely only on the plausibility pleading

---

[6]  While the Court cites only to Delta's Motion (dkt. no. 88) for the purposes of the enterprise discussion, and United's Motion (dkt. no. 93) as to the racketeering allegations, the other Defendants largely echo these parties' arguments in their briefs.  See Dkt. Nos. 88-89, 93, 97, 102-03.  Indeed, Defendants elected to have counsel for Delta and United present these matters on their behalf at the January 12, 2016, motions hearing, see dkt. no. 153, 6:6-10, 34:3-7, implicitly recognizing that Delta's and United's positions on these issues are representative of all Defendants.

standard—without mentioning a need for enhanced specificity—and assert that the Complaint plausibly alleges facts to support at least an inference of liability on each count.  Dkt. No. 121, pp. 3-5.

## A.    Legal Standards

A defendant's motion made pursuant Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") challenges the legal sufficiency of the plaintiff's complaint in setting forth a claim to relief.  See Fed. R. Civ. P. 12(b)(6) (defense of "failure to state a claim upon which relief can be granted" may be raised by motion).

Ordinarily, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint need not contain detailed factual allegations, it nevertheless "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (interpreting Fed. R. Civ. P. 8(a)(2)).  Facial plausibility requires that the complaint set forth enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Thus, a plaintiff must plead more than mere labels and conclusions, and a formulaic

AO 72A
(Rev. 8/82)

recitation of the elements of a particular cause of action does not suffice.  Twombly, 550 U.S. at 555.  Rather, at a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

However, a complaint alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b) ("Rule 9(b)").  "[P]ursuant to Rule 9(b), a plaintiff must allege: '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiff[]; and (4) what the defendant[] gained by the alleged fraud.'"  Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1380-81 (11th Cir.1997)).  In cases involving multiple defendants, a plaintiff must set forth facts regarding each defendant's participation in the alleged fraud.  Id. (citing Brooks, 116 F.3d at 1381).

Relevant here is that where plaintiffs bring RICO claims "based on an alleged pattern of racketeering consisting entirely

20

of the predicate acts of mail and wire fraud, their substantive RICO allegations must comply not only with the plausibility criteria articulated in Twombly and Iqbal but also with [Rule] 9(b)'s heightened pleading standard." Id. (citing Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007) (noting that civil RICO claims are "essentially a certain breed of fraud claims" and thus "must be pled with an increased level of specificity" under Rule 9(b)); see also Club Car, Inc. v. Club Car (Quebec) Import, Inc., 276 F. Supp. 2d 1276, 1283 (S.D. Ga. 2003) ("Because of the specificity of the RICO statute and the stigma associated with charges of racketeering, courts have held RICO claims to enhanced specificity of pleading requirements."), aff'd, 362 F.3d 775 (11th Cir. 2004).

In evaluating a defendant's Rule 12(b)(6) motion, a court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). A court's review on a motion to dismiss is typically limited to the factual allegations appearing on the face of the complaint. See Iqbal, 556 U.S. at 678. As such, if a court is presented with matters outside of the pleadings on a motion to dismiss, the motion to dismiss is converted into a summary judgment motion. Fed. R. Civ. P. 12(d).

AO 72A
(Rev. 8/82)

Even so, there are certain instances in which a court may consider matters outside of the pleadings without transforming the motion to dismiss into one for summary judgment. See Davis v. Self, 547 F. App'x 927, 929 (11th Cir. 2013). For example, the court may take into account facts that are subject to judicial notice and documents that are incorporated into the complaint by reference. See Fed. R. Evid. 201(a)-(d); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see also Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) (court may treat documents from prior litigation in other courts as public records subject to judicial notice).

**B.   Failure to Plead a RICO Enterprise**

Section 1962(c)—on which Plaintiffs base count one of the Complaint—makes it unlawful "for any person employed by or associated with an enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added). Section 1962(a), cited in Plaintiffs' count two, prohibits a person who has received income from a pattern of racketeering activity from "us[ing] or

invest[ing], directly or indirectly, any part of such income, or the proceeds of such income," to acquire an interest in or establish or operate "any enterprise which is engaged in . . . interstate or foreign commerce." Id. § 1962(a) (emphasis added). Finally, Section 1962(d), which Plaintiffs assert in count three, forbids any person from conspiring to commit either of the foregoing RICO violations. Id. § 1962(d). Each of these provisions thus requires, whether explicitly or implicitly, that a RICO defendant be involved in an enterprise. See United States v. Starrett, 55 F.3d 1525, 1552 (11th Cir. 1995); Club Car, Inc., 276 F. Supp. 2d at 1283.

RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). While recognizing the breadth of the statutory definition, the United States Supreme Court has determined that an association-in-fact RICO enterprise requires that a group of persons be "associated together for a common purpose" and "function as a continuing unit." Boyle v. United States, 556 U.S. 938, 944-45 (2009) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). As the existence of an enterprise "is a central element of a RICO claim," it "must be pled with specificity" under Rule 9(b). Functional Prods. Trading, S.A. v. JITC, LLC, No. 1:12-CV-0355-

WSD, 2014 WL 3749213, at *3 n.8 (N.D. Ga. July 29, 2014) (citing Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161–62 (2001), and Ambrosia Coal & Constr. Co., 482 F.3d at 1316); see also Am. Dental Ass'n, 605 F.3d at 1291 (substantive RICO allegations must be pled with specificity).

Plaintiffs fail to plead specific facts demonstrating that Defendants have acted as an association-in-fact enterprise. Plaintiffs rely on essentially two types of allegations in this regard: The first is Defendants' involvement in CANAERO, including their membership in the organization, "regular[] participat[ion] in meetings with each other and various Mexican authorities under the aegis of CANAERO," and agreement to the terms of the CANAERO Contract. Compl., ¶¶ 4, 51. Plaintiffs' second line of allegations relates to Defendants' purported "agree[ment] among themselves, either expressly or tacitly, to scheme to collect monies from Plaintiffs under the aegis of the . . . Tax that was never actually owed." Id. at ¶ 51; see also id. at ¶ 18 ("[R]ather than comply with the terms of the CANAERO Contract, all of the Defendants have agreed to self-impose the collection of the . . . Tax from Exempt [Passengers]."); id. at ¶ 67 ("The [Laguna] [D]eclaration indicates there was a tacit, if not explicit, agreement or understanding among the Defendants not to disrupt this practice [of collecting the Tax from Exempt Passengers].").

Initially, the Court must disregard Plaintiffs' conclusory allegations that Defendants have reached some explicit or tacit agreement, as Plaintiffs fail to provide any facts to support these assertions. See Twombly, 550 U.S. at 555 (instructing courts to ignore allegations in a complaint that are merely legal conclusions or formulaic recitations of the elements of a claim); Am. Dental Ass'n, 605 F.3d at 1294 (quoting Twombly, 550 U.S. at 557) ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). Plaintiffs maintain that Defendants "agreed among themselves, either expressly or tacitly, to scheme to collect monies," compl., ¶ 51, but fail to offer any specifics as to where or when this agreement may have occurred, or the terms thereof. While Plaintiffs cite the Laguna declaration in support, it, too, is silent as to these details. See Laguna Decl. The Court thus must eliminate these assertions from its consideration.

After stripping away Plaintiffs' conclusory allegations of agreement, the Complaint is left with only a showing of conscious parallel conduct, which is insufficient to sustain their RICO claims. "RICO does not penalize parallel, uncoordinated fraud." United Food & Commercial Workers Unions & Empl'rs Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 855-56 (7th Cir. 2013) (citing Boyle, 556 U.S. at 947 n.4).

AO 72A
(Rev. 8/82)

Accordingly, an allegation that a group of defendants has engaged in collective or parallel conduct, by itself, does not plausibly demonstrate that those defendants ever reached an understanding that they would undertake such concerted action. See Am. Dental Ass'n, 605 F.3d at 1294-95 (quoting Twombly, 550 U.S. at 557). This is so because this occurrence is consistent with lawful, independent conduct: "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Twombly, 550 U.S. at 554. Thus, "[w]ithout [a] further circumstance pointing to a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory" and is insufficient to state a RICO claim. Am. Dental Ass'n, 605 F.3d at 1294-95 (quoting Twombly, 550 U.S. at 557).

The gist of Plaintiffs' allegations here is that Defendants are competitors, are members of the same professional association, and have engaged in the same practice in making their individual ticket sales. See Compl. As Delta's counsel noted at the hearing, there is nothing in the Complaint as to "who, what, when, where or any other flesh on those bones," dkt. no. 153, 9:25-10:1, to suggest that Defendants ever coordinated

their activities.  Nor is there any allegation that Defendants otherwise shared any management, decision making, or revenues.

Contrary to Plaintiffs' suggestion, see dkt. no. 121, p. 8, Defendants' membership in CANAERO does not distinguish this case from other cases involving allegations of mere parallel conduct. See Am. Dental Ass'n, 605 F.3d at 1295 (citing Twombly, 550 U.S. at 567 n.12) (participation in a trade association or other professional group does not suggest an agreement in violation of RICO).  Moreover, while Plaintiffs allege that Defendants have regularly attended CANAERO meetings, compl., ¶¶ 4, 51, nothing in the Complaint indicates that these meetings have served as a conduit for the allegedly illegal scheme.  See Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1264 (11th Cir. 2004) ("A RICO enterprise exists 'where a group of persons associates, formally or informally, with the purpose of conducting illegal activity." (quoting United States v. Hewes, 729 F.2d 1302, 1311 (11th Cir. 1984)).  To the contrary, the Complaint represents that a major function of CANAERO and a product of these meetings is the CANAERO Contract, which expressly prohibits Defendants from engaging in the exact conduct giving rise to Plaintiffs' RICO claims (i.e., the alleged collection of the Tax from Exempt Passengers).  See CANAERO Procedures, p. 1. [7]

---

[7]  Delta provides a useful illustration of this point:

AO 72A
(Rev. 8/82)

Nor does the fact that Defendants may have had the opportunity to meet one another through this professional association provide any indication that they thereafter decided to function as a cohesive unit in collecting the Tax. The Complaint alleges only that each Defendant has gone against the terms of the CANAERO Contract and charged the Tax to Exempt Passengers in their respective ticket sales, see compl., ¶¶ 18, 51; there is no allegation that Defendants met or otherwise communicated with one another on any occasion other than at the CANAERO meetings. While it is, indeed, possible that Defendants came together and plotted to uniformly assess the Tax against Exempt Passengers, it is equally possible that each Defendant independently determined that its own business interests supported charging the Tax indiscriminately at the time of sale and relying on a refund procedure to parse out Exempt Passengers. That each Defendant chose not to notify these passengers of the exemption or refund procedure on its Web site,

---

Consider the hypothetical example of several Georgia lawyers who have each mailed a series of fraudulent bills to their respective clients. They are associated in fact only as members of the State Bar of Georgia, membership in which is required for them to charge legal fees and carries with it an agreed obligation not to charge excessive or unearned fees. Yet their common membership in the Georgia Bar would not constitute an association-in-fact RICO enterprise. To be sure, the Georgia Bar is a "union or group of individuals associated in fact" (18 U.S.C. § 1961(4)), but not one that could sustain a RICO claim based on that hypothetical.

Dkt. No. 88, p. 13 n.5.

and to retain any taxed amounts not refunded, see dkt. no. 155, pp. 7-10, does not change this result.

Equally unavailing is Plaintiffs' argument that Laguna's declaration pushes this case from the realm of mere parallel conduct into that of calculated, coordinated activity, see dkt. no. 121, pp. 8-9. Significantly, Laguna's declaration is silent as to the taxation of Exempt Passengers and makes no mention of Defendants having worked together in establishing or carrying out their individual procedures for collecting the Tax. See Laguna Decl. At most, Laguna's declaration indicates that Aeromexico and its competitors have charged the Tax to passengers at the time of sale; that each airline has known that the other airlines also engaged in this practice; and that it would not have been feasible for any airline to implement a different procedure that could have inhibited the flow of passengers through the airport. Id. at ¶¶ 5-6, 8-9.[8] However, that Defendants engaged in the same practice—even if consciously so—does not, by itself, create an inference that they

---

[8]  Plaintiffs argue that Defendants' collection of the Tax from Exempt Passengers cannot be coincidental and can only be the product of an agreement, as it requires that each Defendant forego the opportunity to sell tickets to Exempt Passengers at a lower price and thereby gain a competitive advantage on the other airlines. See Dkt. No. 155, pp. 10-11. However, Plaintiffs overlook the airlines' countervailing interests in implementing a procedure that allows all passengers to move through the airport and board their flights in an efficient manner. See Laguna Decl., ¶ 9. In any case, Plaintiffs' Complaint fails to suggest that Defendants weighed these interests as a group, rather than on an individual basis, in deciding the manner in which each airline would collect the Tax.

AO 72A
(Rev. 8/82)

affirmatively agreed or acted together to do so at any time. Rather, as alluded to in Laguna's declaration, competition in the market for airline travel to Mexico could have very well caused each Defendant to independently adopt this practice.  See Laguna Decl., ¶ 9.[9]

Thus, Plaintiffs' Complaint, at most, alleges that Defendants engaged in parallel activity and exhibited competitive interdependence in their respective ticket sales for airline travel to Mexico.  These facts, without more, do not create a plausible inference that Defendants ever functioned as a unit or reached a common understanding to this end.  As such, Plaintiffs fail to sufficiently plead the essential "enterprise" element of the RICO claims asserted in all three counts of the Complaint.  The Complaint is, therefore, subject to dismissal on this basis.


**C.   Failure to Plead a Pattern of Racketeering Activity**

In addition to the existence of an enterprise, Section 1962(a), (c), and (d) require that a plaintiff demonstrate that a defendant engaged in "a pattern of racketeering activity."

---

[9]  At the hearing, Delta's counsel offered a persuasive example involving "two gas stations on opposite corners of the same intersection."  Dkt. No. 153, 13:19-20.  Counsel noted that "the price is always going to be the same"—"[t]hey know what each other is doing"—but that there is "[n]o inference of an agreement there."  Id. at 13:20-22.  In other words, the gas stations' conscious parallel conduct alone does not lend itself to an inference of joint, collusive activity.

See 18 U.S.C. § 1962(a), (c)-(d); see also Am. Dental Ass'n, 605 F.3d at 1290.  To do so, "a plaintiff must show at least two racketeering predicates that are related."  Am. Dental Ass'n, 605 F.3d at 1290-91.  Racketeering predicates include, in part, acts such as mail and wire fraud.  Id. at 1290 (citing 18 U.S.C. § 1961(1)).  "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme."  Id. (quoting Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991)).  A "scheme to defraud" involves proof of "a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."  United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009) (citing United States v. Svete, 556 F.3d 1157, 1161, 1169 (11th Cir. 2009), and United States v. Hasson, 333 F.3d 1264, 1270-71 (11th Cir. 2003)).  As a RICO claim based on predicate acts of mail and wire fraud must comply with Rule 9(b)'s heightened pleading standard, these circumstances must be plead with specificity.  See id. at 1291 (citing Ambrosia Coal & Constr. Co., 482 F.3d at 1316).

Plaintiffs fail to plausibly plead any predicate acts of racketeering, as their allegations lack the level of specificity required to show mail or wire fraud.  Plaintiffs maintain that Defendants used mail and wire communications to make fraudulent

representations or omissions regarding (1) their ability to collect the Tax from Plaintiffs, (2) Plaintiffs' exemption from the Tax, and (3) the availability of refund procedures. See Compl., ¶¶ 62-64. In support, Plaintiffs allege, "Defendants have transmitted . . . to class members advertising, tickets, itinerary confirmations, receipts, invoices, and other material relevant to airfare tickets for travel from the United States to Mexico, by mail or private or commercial carriers (such as UPS)." Id. at ¶ 64. Examples of such invoices or statements, according to Plaintiffs, include the tickets, reservations, and confirmations that Defendants issued to the passenger Plaintiffs in this case. Id. at ¶ 65 (citing Compl., ¶¶ 25-29). Plaintiffs further assert that "Defendants have used the Internet to disseminate, publish, and/or direct to the public in general and class members in particular the same types of material and information"—whether through "writings, signs, signals, pictures, or sounds" or in the form of "webpages, emails, text messages, receipts, itineraries, [or] flight confirmations." Id. at ¶ 66.

Accordingly, Plaintiffs' only examples of Defendants' allegedly fraudulent transmissions are the tickets and confirmations that Plaintiffs describe elsewhere in the Complaint as having received from Defendants. Id. at ¶ 65 (citing Compl., ¶¶ 25-29). These descriptions set forth the

32

following information as to each Plaintiff: his or her date of travel, the Defendant airline, the flight number, the point of origin and destination, the ticket number or confirmation code, and the amount of the Tax appearing thereon.  See id. at ¶¶ 23-28.  Elsewhere in the Complaint, Plaintiffs explain that Defendants included the Tax as a line-item fee, ranging between twenty to twenty-five dollars and "buried in the details of the costs and fees of each ticket purchased by Plaintiffs."  Id. at ¶ 1.

Notably, Plaintiffs do not submit copies of any of these tickets or confirmations—or any other transmissions—sent by Defendants.  Nor does the Complaint quote or otherwise set forth the precise statements allegedly made by Defendants in any of these documents.  See Am. Dental Ass'n, 605 F.3d at 1291 (Rule 9(b) requires that plaintiffs allege, in part, "the precise statements, documents, or misrepresentations made" (quoting Brooks, 116 F.3d at 1380-81)).  The Complaint also does not specify the time at which Defendants allegedly made these statements (i.e., the dates on which Defendants sold these tickets or issued these confirmations, as opposed to the dates of the flights).  See id. (under Rule 9(b), a plaintiff must allege "the time, place, and person responsible for the statement" (quoting Brooks, 116 F.3d at 1380-81)).

AO 72A
(Rev. 8/82)

More importantly, even if Plaintiffs had included these details in the Complaint, it does not appear that Defendants made any affirmative misrepresentation in these documents. Defendants' inclusion of the line-item charge on a ticket or confirmation would have amounted only to a representation that Defendants assessed this fee as part of the purchase price—a representation that was, in fact, true.  This charge does not constitute a false statement that Defendants were permitted to tax Plaintiffs and other Exempt Passengers under the CANAERO Contract, or that these passengers were obligated to pay the same under Mexican law.  See Braswell Wood Co. v. Waste Away Grp., Inc., No. 2:09-CV-891-WKW, 2010 WL 3168125, at *4 (M.D. Ala. Aug. 10, 2010) ("[T]o hold that a wrongfully charged fee constitutes, in itself, a misrepresentation, would be to broaden the word's meaning, and the reach of RICO, past the point of meaning."); see also Gifford v. Don Davis Auto, Inc., 274 S.W.3d 890, 894 (Tex. App. 2008) (inclusion of a tax as an itemized charge was not a misrepresentation).

Plaintiffs also do not show any actionable omission that would support predicate acts of mail or wire fraud. "[N]ondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose either by statute or otherwise." Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1065 (11th Cir.

AO 72A
(Rev. 8/82)

2007) (quoting <u>McCulloch v. PNC Bank Inc.</u>, 298 F.3d 1217, 1225
(11th Cir. 2002)).  "Otherwise" may include, for example, where
there is a relationship of trust and confidence, such as a
fiduciary relationship, between the plaintiff and defendant.
<u>See</u> <u>Ironworkers Local Union 68 v. AstraZeneca Pharm., LP</u>, 634
F.3d 1352, 1368 (11th Cir. 2011) (citing <u>United States v. Brown</u>,
79 F.3d 1550, 1557 (11th Cir. 1996), <u>overruled on other grounds
by</u> <u>United States v. Svete</u>, 556 F.3d 1157 (11th Cir. 2009)).
Plaintiffs do not allege—nor does the CANAERO Contract suggest—
that Defendants had any legal or contractual duty to disclose at
the time of sale that they had agreed not to assess the Tax
against Exempt Passengers, that these passengers were exempt, or
that a reimbursement procedure was available.  The Complaint
also does not reflect that Defendants and Plaintiffs or other
proposed class members shared a relationship that was anything
more than arm's length and commercial in nature.

Thus, Plaintiffs do not set forth any specific instances in
which Defendants have made affirmative misrepresentations or
omissions to sustain claims of mail or wire fraud.  As
Plaintiffs fail to sufficiently plead any predicate acts of
racketeering, Plaintiffs' Complaint is subject to dismissal on
all three counts for this additional reason.  Accordingly,
Defendants' Motions to Dismiss are **GRANTED**, and the Court need

not reach Defendants' remaining arguments with regard to the individual counts under Rule 12(b)(6).[10]

## II.  Plaintiffs' Motion for Leave to Amend (Dkt. No. 155)

Plaintiffs now request that the Court grant them leave to amend their Complaint to avoid dismissal. Dkt. No. 155. Plaintiffs maintain that "they have taken steps to obtain additional, direct evidence that contradicts the Defendants' argument[s] of a parallel course of conduct" under the "enterprise" element of their RICO claims. Id. at p. 11. According to Plaintiffs, leave to amend is warranted "because the facts surrounding the construction and operation of this alleged RICO enterprise"—such as the CANAERO Contract and Defendants' accounting records—"are not readily accessible to the Plaintiffs or the public." Id. at p. 12.  Plaintiffs assert that they have recently acquired "additional information from the Mexican Tourist and Immigration authority ("INM")" and "information concerning the actions of the former CANAERO

---

[10]   In addition to their arguments under Rule 12(b)(6), Delta, Interjet, American, and U.S. Airways move to dismiss Plaintiffs' Complaint for failure to join a party, dkt. nos. 88-89, 102; Interjet, Volaris, and Aeromexico seek dismissal based on a lack of personal jurisdiction and insufficient service of process, dkt. nos. 89, 97, 103; and Interjet argues for dismissal based on improper venue, dkt. no. 89.  Upon due consideration, the Court finds that each of these arguments lacks merit and thus does not provide further grounds for dismissal.  As to the extraterritoriality issue raised by Volaris and Aeromexico, dkt. nos. 97, 103, the Court need not reach this matter, based on its finding that Plaintiffs fail to sufficiently plead the elements of a RICO claim in any event.

managing director who negotiated the CANAERO [C]ontract on behalf of the Defendants." Id. at p. 13.

Plaintiffs submit a proposed Amended Complaint seeking to add, in relevant part, the following allegations with respect to Defendants' joint activity:

> 5. . . . . CANAERO performs a variety of legitimate functions for the Defendant airlines but for purposes of this scheme served as an unwitting host and agent to the Defendants' obtaining a valuable concession from the Mexican government: the right to tack on to every airline fare sold to a non-Exempt [Passenger] flying from or through the United States and landing in Mexico the $20-$25 . . . Tax. That right arose through an agreement, described in detail below, that was negotiated by a group of the Defendants through an administrator at CANAERO with the Mexican government's office of immigration.

> . . . .

> 14. At all relevant times, CANAERO members have organized themselves into various committees and sub-committees [sic] that include committees for technical issues, legal issues, administrative issues, and others . . . . Each airline has appointed at least one and often more individuals, typically Mexican nationals of various legal or professional capacity, to act as that airline's designated representative under the CANAERO organization.

> 15. . . . CANAERO also maintains a so-called "House Staff" of professionals who are not themselves employees or agents of the member airlines.

> 16. At all relevant times, between 1992 and July, 2012, one such "House Staff" member was the Managing Director of CANAERO, Gabriel Ortega Alcocer ("Mr. Alcocer"). Mr. Alcocer's duties included representing CANAERO's members before the Mexican government, agencies, and private companies on such subjects as the airline members desired. Mr. Alcocer

thus became an intermediary and agent, as needed, for the member airlines on these issues.

17.   One subject of great interest to the CANAERO member airlines . . . was the . . . [T]ax, described above.

18.   Mr. Alcocer chaired a number of meetings with the appointed representatives of the airlines identified above to discuss the subject of the . . . [T]ax and its collection by the airlines.  For convenience, the meetings were often held at the offices of the [INM], the Mexican agency that is charged by the [g]overnment of Mexico to actually collect the . . . [T]ax charged to non-Exempt [Passengers].

. . . .

20.   During the meetings in [1998], the INM was not represented, as it was the party from which the airlines would be seeking a concession.  The purpose of the meetings was for the participating airlines' representatives to exchange views and positions on the subject.  Mr. Alcocer attended the meetings, as it was decided that he would become the negotiator for the participant airlines toward the eventual negotiation and execution of a formal agreement with the [g]overnment of Mexico . . . .

. . . .

22.   . . . . [E]ach member airline . . . agreed that the . . . [T]ax procedure would apply equally to each airline and none of the airlines would have an advantage or disadvantage against each other with respect to the collection of the [T]ax, and authorized Mr. Alcocer to negotiate such agreement with the [g]overnment of Mexico.

. . . .

34.   In the months leading to execution of the [CANAERO Contract] and afterward, Mr. Alcocer and the individual members representing the Defendant airlines repeatedly discussed the airlines' actual understanding that the [CANAERO Contract] does not

2a1238043c2dad77

permit them to charge Exempt [Passengers] the . . .
[T]ax . . . .

     35.   These discussions were held during regularly
scheduled monthly meetings and plenary sessions of the
airline representatives at CANAERO, and attended by
representatives of each airline which transported US
passengers to Mexico, including each of the Defendants
in this action.  In addition, Mr. Alcocer had
individual, private conversations with each of the
representative members about these subjects, as he
grew concerned that in spite of the terms of the
[CANAERO Contract], he began to suspect that each
airline had not implemented the procedures it had
agreed to implement, including that each airline was
not discriminating between Exempt [Passengers] and
non-Exempt [Passengers].

     36.   During the discussions that Mr. Alcocer had
with each Defendant airline following 1999, which were
numerous, each airline learned what each other was
doing . . . .

     37.   Mr. Alcocer documented these understandings
by making or causing to be made minutes of each
meeting.  These minutes were distributed to each
representative of the airlines on the committee, so
that each airline, through its committee
representative, had a written record of these
subjects. . . . . There is therefore a written record
. . . of the common understanding by each airline that
each was violating the terms of the [CANAERO
Contract], collecting [the Tax] from each passenger,
and not returning [it] to those passengers who were
improperly charged.

     38.   The member airlines . . . insisted that the
subject of the . . . [T]ax collection be treated
confidentially among them and not be shared with the
public. . . . .

          . . . .

     57.   On many occasions, which occurred at least
as early as 2009, Mr. Alcocer also had meetings with
representatives of the INM, including Elizabeth
Hernandez Saldivar ("Ms. Hernandez"), and the

airlines, in regards to the improper collection and
retention of . . . taxes from Exempt
[Passengers]. . . . .

58. During these meetings, . . . when the
Defendant airlines' representative members were
directly confronted by Ms. Hernandez with . . . the
allegation that each was collecting the . . . [T]ax
from Exempt [Passengers], and . . . asked to provide
the INM an explanation . . . , each Defendant airline
refused to provide an explanation.

. . . .

61. A number of times between 2007 and 2010,
when she was Commissioner of the INM, Ms. [Maria
Guadalupe Cecilia Romero Castillo ("Ms. Romero")]
convened and attended a number of private, . . .
closed[-]door meetings with CANAERO and the Defendant
airlines' representatives at CANAERO.  The meetings
were specifically held to confront the Defendant
airlines regarding their illegal collection of
the . . . [T]ax . . . .

. . . .

63.  . . . [T]he Defendant airline
representatives, jointly, acknowledged to Ms. Romero
the collection of the . . . [T]ax from Mexican
nationals, and represented that each airline would
comply with the CANAERO [Contract] and would stop
collecting the . . . [T]ax from Exempt [Passengers].
Notwithstanding those representations, the Defendant
airlines simply continued to collect the [T]ax from
all Exempt [Passengers] after Ms. Romero left her
position, and did not change their practice.

64. In 2010[,] the INM proposed to CANAERO and
representatives of the airlines to discontinue the
procedure that allowed the Defendants to collect any
tourism [T]ax, and to implement a new procedure that
would prevent the unlawful collection of the . . .
[T]ax from Exempt [Passengers].  The Defendant
airlines directed their CANAERO representatives to
oppose this proposal that would have put an end to the
unlawful assessment of the . . . [T]ax on Exempt
[Passengers] by the Defendant airlines.

Id. at Ex. A ("Am. Compl."), ¶¶ 5, 14-18, 20, 22, 34-38, 57-58, 60-61, 63-64).

As to Defendants' allegedly fraudulent representations or omissions in the airline tickets and confirmations, Plaintiffs set forth only the additional allegation that "[e]ach passenger's ticket lists, in addition to the price charged by each airline for the particular flight, all of the landing fees, airport taxes, and other taxes and fees added to the fare in addition to the . . . [T]ax." Id. at ¶ 52. While not mentioned as the factual basis for their allegations of mail and wire fraud, see id. at ¶¶ 118-22, Plaintiffs nevertheless include several new averments relating to Defendants' representations in the flight manifests and payment reports submitted to the Mexican government:

> 41.  The document used to verify proper collection of the [Tax] by the Defendant airlines, and payment of the properly collected . . . [T]ax by the airlines to the Mexican government, is the manifest of each of the airlines' flights into Mexico.  The flight manifest is also used by the Mexican Civil Aeronautics Board to document the flight, and indeed flight manifests are commonly used by the [Federal Aviation Administration] and other national and international aeronautics agencies, as well as law enforcement agencies for various purposes. . . . .

> 42.  Under both the INM authority and as part of the CANAERO [Contract], the airlines were required to submit to the INM confirmation of the remittance of payments by the airlines to the Public Treasury of Mexico for the . . . [T]ax collected from each non-Exempt [Passenger].  One of the requirements for such

AO 72A
(Rev. 8/82)

reporting was that each manifest submitted to the INM
by each airline operating under the [CANAERO Contract]
must include the flight number, the total number of
passengers on the flight, and the total number of
passengers subject to the . . . [T]ax on each flight.

. . . .

43.   Each manifest submitted to the INM by the
Defendant airlines contains a misrepresentation, in
that it lists the total number of passengers on the
flight (for example one manifest attached as Exhibit 3
lists 148 passengers) and a different number of
passengers subject to the . . . [T]ax (on this
manifest listing 88 passengers subject to the . . .
[T]ax).  In fact, for the flight reflected on Exhibit
3, the airline collected the . . . [T]ax from all 148
passengers.  This occurred for all other flights
listed in this Complaint as well (i.e., the . . .
[T]ax was collected from all passengers, including
Exempt [Passengers]).

. . . .

48.   . . . .  The CANAERO [Contract] required its
members to inform the Mexican Federal Treasury of what
was collected for the [Tax] through any financial
institution authorized by the Tax Administration
Service, an agency from the Department of
Treasury. . . . .

49.   The Defendant airlines reported the payments
on a periodic (monthly and quarterly) basis . . . .

. . . .

51.   What the INM has been provided for each year
in question, that is beginning in 1999 and continuing
at least until late 2014, has only been gross,
undifferentiated lump-sum payments reported by each
airline. . . . .

52.   . . . .  The reason why each Defendant
airline only reports a gross, undifferentiated sum to
the INM for each reporting period is that all of the
Defendant airlines, collectively, decided to
deliberately conceal the fact that they are collecting

AO 72A
(Rev. 8/82)

> the . . . [T]ax from every passenger, including
> passengers the airline[s] know[] are exempt, and
> simply keeping the money.

Id. at ¶¶ 41-43, 48-49, 51-52.

Pursuant to Federal Rule of Civil Procedure 15(a) ("Rule 15(a)"), a party "may amend its pleading once as a matter of course" within twenty-one days after serving it or twenty-one days after service of a required responsive pleading or motion. Fed. R. Civ. P. 15(a)(1). After this time, a party "may amend its pleading only with the opposing party's written consent or the court's leave," which the court "should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "The thrust of Rule 15(a) is to allow parties to have their claims heard on the merits, and accordingly, district courts should liberally grant leave to amend when 'the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief.'" In re Engle Cases, 767 F.3d 1082, 1108 (11th Cir. 2014) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

A court, however, need not allow leave to amend "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." Id. at 1108-09 (quoting Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001)). A proposed amendment would be

43

futile "when the complaint as amended would still be properly dismissed." Coventry First, LLC v. McCarty, 605 F.3d 865, 870 (11th Cir. 2010) (quoting Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007)).

Even assuming—without deciding—that the new allegations concerning Defendants' joint conduct at the CANAERO-related meetings sufficiently support the enterprise element, Plaintiffs' proposed amendment nevertheless fails on futility grounds.  In particular, Plaintiffs' additional allegations of racketeering activity fall short of plausibly suggesting that any predicate acts of mail or wire fraud ever occurred. Plaintiffs add to their mail and wire fraud allegations only the assertion that the tickets and confirmations transmitted by Defendants listed, in addition to the Tax, the total price for the flight, "landing fees, airport taxes, and other taxes and fees."  Am. Compl., ¶ 52.  Because this allegation offers nothing new in the way of Defendants' representations regarding the Tax on the tickets and confirmations, Plaintiffs' amended claims based on these transmissions would be subject to dismissal for the reasons discussed with regard to the original Complaint.

To the extent that Plaintiffs now seek to rely, instead, on Defendants' flight manifests and payment reports to the Mexican government, allegations concerning these transmissions would

AO 72A
(Rev. 8/82)

likewise fail to state any misrepresentation or omission actionable by Plaintiffs.   Plaintiffs unequivocally assert that Defendants have transmitted or caused to be transmitted flight manifests and payment reports to the Mexican government, and that these manifests and reports are viewed or used by various agencies of the Mexican and United States governments for different purposes.   See id. at ¶¶ 41-42, 48-49.   Even accepting as true Plaintiffs' allegations regarding the falsity of Defendants' statements in the manifests and reports, Plaintiffs do not—and cannot—allege specific facts demonstrating that these statements have served to mislead Plaintiffs or other proposed class members in any way.   See Am. Dental Ass'n, 605 F.3d at 1291 ("[P]ursuant to Rule 9(b), a plaintiff must allege . . . the content and manner in which these statements misled the [p]laintiff[]."(quoting Brooks, 116 F.3d at 1380-81)). According to Plaintiffs' own averments, Defendants made these statements to various government officials, not to Plaintiffs or any other Exempt Passengers, and nothing suggests that these passengers accessed the flight manifests or payment reports prior to purchasing their tickets or foregoing refund procedures.   As a result, Plaintiffs' additional allegations based on these documents fail to set forth any viable mail or wire fraud claim.

AO 72A
(Rev. 8/82)

Because Plaintiffs' proposed amendments fail to include even a single predicate act of mail or wire fraud to support a pattern of racketeering activity, Plaintiffs' Amended Complaint would be due to be dismissed for failing to state a claim to relief.  In these circumstances, Plaintiffs' Motion for Leave to Amend must be **DENIED**.

## CONCLUSION

Based on the foregoing, Defendants' Motions to Dismiss (dkt. nos. 88-89, 93, 97, 102-03) are **GRANTED** to the extent that they seek dismissal of Plaintiffs' Complaint based on its failure to set forth a cognizable claim for relief.  Because amendment of the Complaint would be futile, Plaintiffs' Motion for Leave to Amend (dkt. no. 155) is **DENIED** and the Complaint (dkt. no. 1) is hereby **DISMISSED**.  The Clerk of Court is **DIRECTED** to enter the appropriate judgment of dismissal and to close this case.

**SO ORDERED**, this 19TH day of February, 2016.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)